UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                              :
FARBERWARE LICENSING COMPANY, LLC,                            :   No. 09 CV 2570 (HB) (MHD)
                                                              :
                              Plaintiff,                      :
    - *against* -                                             :
                                                              :
MEYER MARKETING CO., LTD., MEYER                              :
INTELLECTUAL PROPERTIES, LTD., and                            :
MEYER CORPORATION, U.S.,                                      :
                                                              :
                              Defendants.                     :
------------------------------------------------------------- x:

## DECLARATION OF DEAN A. DICKIE

I, Dean A. Dickie, hereby declare to the best of my knowledge, understanding and belief, as follows:

1.    I am a member of Dykema Gossett PLLC and am counsel for Meyer Intellectual Properties Limited ("MIP") and Meyer Corporation, U.S. ("MUS"), defendants in the above-captioned proceeding.

2.    This declaration is being submitted in support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction.

3.    Since July 2008, MUS has been corresponding through me with counsel for Farberware Licensing Company, LLC ("FLC"), Christopher J. Sovak, of Bushell, Sovak, Ozer & Gulmi, LLP ("Mr. Sovak"), regarding various issues concerning the 1996 "License Agreement" ("Agreement") between Farberware, Inc. ("Farberware") and Meyer Marketing Co. Ltd., a British Virgin Islands corporation that is no longer an existing entity. Exhibit 1 is a true and accurate copy of the Agreement.[1]

---

[1] The Exhibits cited herein are attached to the Declaration of Heather Kramer, filed concurrently herewith.

4. On behalf of MUS, full and material responses were made to Mr. Sovak's letters in the ordinary course of business. At no time did MUS refuse to participate in any dispute resolution process concerning FLC's unfounded assertions that MUS's use of the Farberware mark in conjunction with the Prestige mark somehow constitutes trademark infringement. The responses were timely and made after due consideration of the serious issues raised, even though some were nonsensical. Nothing in the Agreement required MUS to respond to FLC's counsel within the timeframe demanded. Nothing in Article XV of the Agreement regarding dispute resolution established a time deadline by which Meyer was obligated to provide any materials requested, especially since FLC had previously approved the materials and considered the request merely harassment to pressure MUS into renegotiating the Agreement.

5. As of July of 2008, FLC had embarked upon a process of seeking to mediate the dispute between the parties pursuant to the dispute resolution process in the Agreement, as well as requesting a list of all products and packaging and/or promotional materials for approval, the right which they claimed existed pursuant to Article IV, Section 4.6 of the Agreement.

6. On July 21, 2008, a letter from Mr. Sovak was received requesting certain packaging and promotional materials.

7. On July 28, 2008, a response was sent to Mr. Sovak's letter requesting whether it was FLC's position that MUS had materially breached the Agreement. The letter specifically requested the factual basis upon which the alleged material breach was based, and whether and when the required notice of the material breach was given to MUS.

8. On July 30, 2008, Mr. Sovak stated in yet another letter that it was FLC's position that MUS was in breach of the Agreement due to its sale of kettles, which FLC claimed was outside of the scope of the Agreement. Mr. Sovak further asserted that MUS was in material breach of the Agreement because it failed to comply with the approval process set forth in Article IV of the

Agreement. The approval process referred to in Article IV specifically provides that the timing of approval is at the sole discretion of MUS, and the parties had proceeded as such for several years before and after FLC's acquisition of Farberware's rights under the Agreement.

9.  On August 7, 2008, I requested additional information which was necessary to MUS's ability to proceed with informed mediation. On August 7, 2008, FLC was asked by me to identify the specific basis of its contention that MUS was in material breach of the Agreement. The purpose of the request was based upon the fact that a condition precedent to any material breach claim under the Agreement is the sending of a written notice by FLC stating with particularity the basis for the alleged breach. Until such a notice is served, the 180-day cure period does not begin to run. (*See* Article XIII, Section 13.2.) The significance of seeking a detailed description of the alleged material breach derives from the fact that the Agreement can only be terminated if (a) the specific breach remains uncured for 180 days, and (b) it is determined in an Arbitration proceeding conducted in accordance with Section 15.3 of Article XV that such breach cannot be redressed by the payment of money damages alone and is so egregious as to warrant forfeiture of the rights and license granted to MUS under the Agreement. Accordingly, providing written notice of the specific alleged material breach is a fundamental condition to commencing any proceeding in which FLC seeks to terminate the Agreement by reason of a material breach.

10. On August 14, 2008, Mr. Sovak laid out what he believed to be MUS's material breaches of the Agreement, including its sale of tea kettles.

11. On August 29, 2008, after reviewing the underlying facts, MUS responded by challenging the positions asserted by FLC. Mr. Sovak was advised that based on the investigation made to that date, MUS had every right to sell the tea kettles it was selling. FLC was then asked to provide proof that established that there were any tea kettles in the market which were made entirely of enamel. No such proof has ever been provided. MUS's position is and has always been

that the Agreement permits MUS to make tea kettles of stainless steel, regardless of nature of the material in the exterior coating. Nothing has been provided that controverts this position.

12.    On September 4, 2008, Mr. Sovak responded to MUS's August 29, 2008 letter again claiming that MUS's exclusive rights to sell tea kettles made of stainless steel did not permit MUS to make stainless steel tea kettles with exterior coatings. Mr. Sovak also requested that the parties discuss the selection of mediators and a timeframe for mediation.

13.    On September 17, 2008, MUS contested FLC's position with respect to MUS's sale of kettles and persisted in its contention that MUS was not in material breach of the Agreement.

14.    On September 26, 2008, Mr. Sovak again contested MUS's position, but offered no new evidence or factual support for the claim asserted.

15.    On October 14, 2008 and November 5, 2008, Mr. Sovak informed MUS that FLC objected to MUS's Triple Bonus Set and Double Bonus Event sell sheets and claimed that such promotions violated the Agreement and created confusion. FLC's objections were evaluated and analyzed. Based on that analysis and evaluation, the objections were determined to be invalid and that the Triple Bonus Set and Double Bonus Event sell sheets did not violate the Agreement or create confusion in the product purchasing consumer.

16.    On November 6, 2008, Mr. Sovak was informed that MUS disagreed with FLC's objections for a variety of reasons, including *inter alia*, that there was nothing confusing about the sell sheets, the promotions, or the combination of Farberware and Prestige products. Mr. Sovak was informed at that time that MUS had legitimate grounds to challenge FLC's contentions and had the right to continue to distribute and sell the Farberware cookware sets with Prestige products and intended to do so. Exhibit 9 is a true and accurate copy of the November 6, 2008 Letter.

17.    In that same response, Mr. Sovak was further advised that there were several additional reasons why FLC's objections were invalid and unpersuasive, including but not limited

to these: (a) MUS was not using the Farberware brand to promote Prestige cutlery or kitchen tools; (b) MUS was authorized to distribute and sell Farberware cookware and bakeware products exclusively throughout the world; (c) FLC actually approved the combination of Farberware cookware sets and Prestige products in the past and therefore was estopped from complaining about that combination now; and (d) the packaging and promotional materials fully satisfied the standards of Article IV of the Agreement.

18. The November 6, 2008 letter further emphasized to Mr. Sovak that pursuant to the Agreement, FLC has the affirmative obligation to identify the specific issue or issues to be mediated, that it had not done so, and that FLC had otherwise not moved the arbitration process forward. Additionally, the letter stated that FLC has no right to restrain or otherwise interfere MUS's lawful trade by arbitrarily dictating how MUS could or could not promote its own products.

19. On December 11, 2008, I responded to Mr. Sovak's letters dated November 21, 2008 and December 4, 2008 in a single, succinct letter. The letter again explained why the combination of Prestige and Farberware products was not improper and asked Mr. Sovak for an explanation of the specific impropriety alleged and sought clarification as to why FLC was persisting in asking questions which had already been answered. Exhibit 10 is a true and accurate copy of the December 11, 2008 Letter.

20. The December 11, 2008 letter verified that the sell sheets of which FLC complained involved a practice which FLC had previously approved. The letter also brought to FLC's attention the fact that it continued to ignore the standards set forth in Section 4.6 of the Agreement. That section permits FLC to decline only those MUS promotional materials whose quality and appearance fail to comply with the lesser of either the (1) promotional materials used by old Farberware, or (2) promotional materials used by MUS itself. The letter further emphasized that any

attempted declination by FLC for reasons other than (1) or (2) had no contractual support or legal significance.

21.  To date, FLC has failed to provide the clarification or explanation requested in the December 11, 2008 letter.

22.  Thereafter, both MUS and FLC proceeded on a course that the dispute relating to the combined packaging and promotion of Farberware cookware sets with Prestige products would be resolved pursuant to the formal dispute resolution process set forth in Article XV of the Agreement.

23.  In December, FLC appointed a mediator and MUS appointed a mediator.

24.  The third mediator had yet to be selected by the two appointed mediators when FLC unilaterally abandoned the dispute resolution process by filing this lawsuit. Significantly, the Agreement contains no timeframe by which the two mediators are to select a third mediator.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 27, 2009

_____
Dean A. Dickie