**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FARBERWARE LICENSING COMPANY, LLC,  :  No. 09 CV 2570 (HB) (MHD)

                            Plaintiff,  :

      *- against -*  :

MEYER MARKETING CO., LTD., MEYER  :
INTELLECTUAL PROPERTIES, LTD., and  :
MEYER CORPORATION, U.S.,  :

                      Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Dean A. Dickie
Harry N. Arger
Heather L. Kramer
Renee L. Zipprich
DYKEMA GOSSETT PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606
Phone: (312) 876-1700
Fax:   (312) 627-2302
Email: DDickie@Dykema.com
Email: HArger@Dykema.com
Email: HKramer@Dykema.com
Email: RZipprich@Dykema.com

Alan D. Reitzfeld
Christelette A. Hoey
HOLLAND & KNIGHT LLP
195 Broadway, 24th Floor
New York, NY 10007
Phone: (212) 513-3200
Fax:   (212) 385-9010
Email: alan.reitzfeld@hklaw.com
Email: christelette.hoey@hklaw.com

*Counsel for Defendants Meyer Corporation,*
*U.S. and Meyer Intellectual Properties Limited*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION.................................................................................................1

BACKGROUND...................................................................................................1

    Farberware Cookware Sets.............................................................................2

    FLC's Approval of Farberware Cookware Sets ..............................................4

    Relationship with Retailers ............................................................................5

    Dispute with FLC ...........................................................................................5

ARGUMENT .......................................................................................................7

I.     THERE IS NO BASIS TO ISSUE A PRELIMINARY INJUNCTION. ...............7

    A.    FLC Is Not Likely To Succeed On The Merits Of Its Infringement Claim Because Defendants Have Not Violated Sections 32(1) And 43(A) Of The Lanham Act. ...................................................................................................7

        1.    FLC Consented To Defendants' Use of the Farberware Trademark with Other Non-Farberware Products. ...........................................7

        2.    There is No Likelihood of Confusion. .............................................9

            a.    The Strength of the Farberware Trademark is the Product of MUS. ...............................................................................10

            b.    The Farberware and Prestige Marks Are Not Identical or Similar. .............................................................................10

            c.    The Parties' Products Are Not Proximate. ..........................11

            d.    Bridging the Gap. ..............................................................13

            e.    There Is No Evidence of Actual Confusion. .......................13

            f.    At All Times, MUS Acted in Good Faith. ...........................14

            g.    The Quality of Prestige Products Does Not Affect the Farberware Trademark. .....................................................15

            h.    Cookware Sets Are Not Impulse Purchases.......................16

    B.    FLC Is Not Likely to Succeed on its Claim for Trademark Dilution.........................17

C.      Reference to Farberware Cookware Division is a Red Herring. ................................. 18

D.      Retailer Advertisements and Websites Should Not Be Considered. .......................... 19

E.      There Is No Irreparable Harm. ...................................................................................... 20

F.      Defendants Would Face Substantial Hardship if a Preliminary Injunction
        Were Granted. ................................................................................................................ 21

G.      FLC's Claims Are Barred by the Doctrines of Waiver and Estoppel. ....................... 23

        1.      FLC's Objections to MUS' Promotion of Farberware Cookware Sets
                with Prestige Products Have Been Waived. .................................................... 23

        2.      Based on FLC's Approval at the 2008 Show, FLC is Estopped from
                Objecting to MUS' Combination of Farberware and Prestige
                Products. .......................................................................................................... 24

H.      FLC's Prayer For Relief is Improper and Should be Denied. ................................... 24

CONCLUSION ................................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen Organ Co. v. CBS, Inc.,*
No. 84 Civ. 3856 (SWK), 1986 WL 4901 (S.D.N.Y. Apr. 21, 1986)......................................21

*Am. Express Travel Related Servics. Co., Inc. v. MasterCard Int'l Inc.,*
776 F. Supp. 787 (S.D.N.Y. 1991)...................................................................................14, 20

*Anheuser-Busch, Inc. v. L. & L. Wings, Inc.,*
962 F.2d 316 (4th Cir. 1992)....................................................................................................10

*Arrow Fastener Co., Inc. v. Stanley Works,*
59 F.3d 384 (2d Cir. 1995.)..............................................................................11, 12, 15, 16

*Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.,*
576 F. Supp. 1055 (E.D.N.Y. 1983).........................................................................................9

*BigStar Entm't, Inc. v. Next Big Star, Inc.,*
105 F. Supp. 2d 185 (S.D.N.Y. 2000)....................................................................................21

*Cache, Inc. v. M.Z. Berger & Co.,*
No. 99 CIV 12320 (JGK), 2001 WL 38283 (S.D.N.Y. Jan. 15, 2001) ...................................15

*Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,*
824 F.2d 665 (8th Cir. 1987)...................................................................................................25

*Cheng v. Dispeker,*
No. 94 Civ. 8716 (LLS), 1995 WL 86353 (S.D.N.Y. Mar. 2, 1995) .....................................21

*Christian v. Alloy,*
No. 03 Civ. 10258(HB), 2004 WL 1375274 (S.D.N.Y. June 17, 2004) ...........................20, 21

*Citibank, N.A. v. Citytrust,*
756 F.2d 273 (2d Cir. 1985)....................................................................................................20

*Conopco, Inc. v. Cosmair, Inc.,*
49 F. Supp. 2d 242 (S.D.N.Y. 1999)..................................................................................17, 18

*Consumers Union of United States, Inc. v. General Signal Corp.,*
724 F.2d 1044 (2d Cir. 1983)..................................................................................................13

*Fed. Express Corp. v. Fed. Espresso, Inc.,*
201 F.3d 168 (2d Cir. 2000)....................................................................................................21

*Gen. Elec. Capital Corp. v. Armadora, S.A.,*
37 F.3d 41 (2d Cir. 1994)........................................................................................................24

*General Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*,
   85 N.Y.2d 232, 647 N.E.2d 1329 (1995) ................................................................ 23

*Greenpoint Fin. Corp. v. Sperry & Hutchinson Co., Inc.*,
   116 F. Supp. 2d 405 (S.D.N.Y. 2000) ..................................................................... 21

*Invicta Plastics (USA) Ltd. v. Mego Corp.*,
   523 F. Supp. 619 (S.D.N.Y. 1981) ........................................................................... 15

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
   456 U.S. 844 (1982) ...................................................................................................... 19

*Jahr USA Pub. v. Meredith Corp.*,
   991 F.2d 1072 (2d Cir. 1993) .................................................................................... 10

*L. Gem Lab Ltd. v. Gem Quality Inst.*,
   90 F. Supp. 2d 277 (S.D.N.Y. 2000) ....................................................................... 11

*Lang v. Retirement Living Publishing Co.*,
   949 F.2d 576 (2d Cir. 1991) ...................................................................................... 14

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
   799 F.2d 867 (2d Cir. 1986) ...................................................................................... 16

*Mathematica Policy Research, Inc. v. Addison-Wesley Pub. Co.*,
   No. 89 Civ. 3431 (JFK), 1989 WL 63075 (S.D.N.Y. June 5, 1989) ..................... 21

*McGregor-Doniger Inc. v. Drizzle Inc.*,
   599 F.2d 1126 (2d Cir. 1979) .............................................................................. 16, 17

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*,
   425 F. Supp. 2d 402 (S.D.N.Y. 2006) ............................................................ 7, 17, 18

*Moseley v. V. Secret Catalogue, Inc.*,
   537 U.S. 418 (2003) ...................................................................................................... 18

*Nabisco, Inc. v. Warner-Lambert Co.*,
   220 F.3d 43 (2d Cir. 2000) ................................................................................... 10, 11

*New York ex rel. Spitzer v. St. Francis Hosp.*,
   94 F. Supp. 2d 423 (S.D.N.Y. 2000) ....................................................................... 11

*O'Keefe v. Ogilvy v. Mather Worldwide, Inc.*,
   590 F. Supp. 2d 500 (S.D.N.Y. 2008) ..................................................................... 15

*Origins Natural Res., Inc. v. Kotler*,
   No. 01 CIV. 1881(HB), 2001 WL 492429 (S.D.N.Y. May 8, 2001) ................ 10, 20

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
   317 F.3d 209 (2d Cir. 2003) ...................................................................................... 16

*Playtex Prods., Inc. v. Georgia-Pacific Corp.*,
  390 F.3d 158 (2d Cir. 2004) ........................................................................... 9, 11

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) ..................................................... 9, 10, 11, 12, 14, 15

*Savin Corp. v. The Savin Group*,
  391 F.3d 439 (2d Cir. 2004) ........................................................................... 18, 19

*Segal v. Geisha NYC LLC*,
  517 F.3d 501 (7th Cir. 2008) ................................................................................. 7

*Star Indus., Inc. v. Bacardi & Co. Ltd.*,
  412 F.3d 373 (2d Cir. 2005) ........................................................................... 16, 17

*Sterling Drug, Inc. v. Bayer AG*,
  14 F.3d 733 (2d Cir. 1994) ................................................................................. 25

*The Estate of John Lennon v. Screen Creations, Ltd.*,
  939 F. Supp. 287 (S.D.N.Y. 1996) (Baer, J.) .................................................. 7, 23

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  576 F. Supp. 2d 463 (S.D.N.Y. 2008) ........................................................... 17, 19

*Tucker Anthony Realty Corp. v. Schlesinger*,
  888 F.2d 969 (2d Cir. 1989) ................................................................................. 20

*Vitarroz Corp. v. Borden, Inc.*,
  644 F.2d 960 (2d Cir. 1981) ................................................................................. 12

*W.W.W. Pharm. Co. v. Gillette Co.*,
  984 F.2d 567 (2d Cir. 1993) ................................................................................. 12

## REGULATORY CASES

*General Elec. Co. v. A-All Appliance Parts Co.*,
  224 U.S.P.Q. 1054 (E.D. Mich. 1984) ................................................................. 15

## RULES

Fed. R. Civ. P. 52(a) ............................................................................................ 16

Fed. R. Civ. P. 65(c) ............................................................................................ 22

Fed. R. Evid. 701 ................................................................................................. 11

**STATUTES**

15 U.S.C. § 1114(1)(a) ........................................................................................... 7

15 U.S.C. § 1115(b)(9) .......................................................................................... 23

§ 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) ................................................. 17

Sections 32(1) And 43(A) of The Lanham Act ..................................................... 7

## INTRODUCTION

There is no trademark infringement; there is no trademark dilution; and there is no irreparable harm. Without these, Plaintiff, Farberware Licensing Company, LLC ("FLC"), cannot succeed on its motion for preliminary injunction against Defendants, Meyer Intellectual Properties Limited ("MIP") and Meyer Corporation, U.S. ("MUS") (collectively "Defendants").[1]

*First*, there is no likelihood that FLC will succeed on its Lanham Act claims. Pursuant to an agreement, Defendants were authorized to use and exploit the Farberware mark. MUS' combination of Farberware and Prestige products cannot violate that agreement and is an acceptable business practice. Moreover, because MUS has at all times taken steps to expressly label the Farberware products as "Farberware" and the Prestige products as "Prestige" on its packaging and promotional materials, no likelihood of confusion exists. Finally, given the dissimilarity of marks, among other things, the Farberware mark has not been diluted.

*Second*, no irreparable harm will befall FLC if a preliminary injunction is not entered. FLC delayed in bringing this action, even though it knew that MUS was distributing Farberware products with Prestige products as early as March 2008. For these same reasons, FLC's request for a preliminary injunction is barred by the equitable doctrines of waiver and estoppel.

*Third*, the entry of such an overly-broad injunction would be catastrophic to MUS. Such an order would cause MUS to lose substantial revenue and irreparably damage the Farberware brand.

## BACKGROUND

On June 27, 1996, Meyer and Farberware, Inc., FLC's predecessor, entered into a 200-year term "License Agreement" ("Agreement") whereby Farberware, Inc. sold MMC the exclusive right and license to use and exploit the Farberware brand name and trademarks in connection with the sourcing, manufacturing, distribution and sale of Farberware-branded "Cookware and Bakeware Products," as

---

[1] The other named Defendant, Meyer Marketing Co. Ltd. ("MMC"), no longer exists, a fact known to FLC when it named MMC a Defendant.

defined in the Agreement. (Declaration of Heather Kramer ("Kramer Dec."), Ex. 1.) At that time, MMC paid Farberware, Inc. about $25 million. Article XI of the Agreement also provided that Farberware, Inc. would receive royalties totaling $1.00 per year only. (Declaration of Dean Krause ("Krause Dec.") ¶ 2.) The first 100 years of the royalties have already been paid. (*Id*.)

Since 1996, MIP has become and remains the current holder of the exclusive and worldwide rights and licenses purchased by MMC. (*Id*. ¶¶ 5, 10.) Farberware sales by MUS and its affiliates are more than $100 million per year. (*Id*. ¶ 10.) Thus, although the Agreement is styled as a "License Agreement," it is not a typical license agreement, but rather, a purchase agreement involving certain specifically defined intellectual property rights for cookware and bakeware, subject to terms and conditions. FLC derives no ongoing revenue from the Farberware brand on any cookware or bakeware manufactured and sold by MUS or its affiliates under the Agreement. (*Id.*)

For almost 13 years, MUS, not FLC, has invested substantial resources to develop the Farberware brand and enhance the market for Farberware cookware and bakeware products. (*Id.* ¶ 11.) Development, research, and promotion of Farberware cookware are controlled entirely by MUS and its affiliates. (*Id.*) In contrast, FLC has not invested any money to develop or improve the reputation or enhance the market for the Farberware products. MUS, as opposed to FLC, handles all the upkeep expenses on the trademarks. (*Id.* ¶ 12.) Farberware, Inc., and thereby FLC, contracted away its right to control the direction of the products offered by MUS or the promotional materials used by MUS. Significantly, FLC has absolutely no right to object to any Farberware products or promotional materials, as long as they are comparable in quality to those utilized and/or approved by Farberware, Inc. prior to 1996 or the equivalent to other MUS-branded products. (Kramer Dec., Ex. 1, ¶ 4.6.)

## Farberware Cookware Sets

Farberware cookware sets, which include different combinations of pots, pans and lids in numerous varieties (*e.g.*, stainless steel, nonstick) and colors, were initially sold by MUS in 1997. (Declaration of David Tavacol ("Tavacol Dec.") ¶ 4).) In 2007, as an additional market incentive and to

gain a competitive advantage, MUS began to include Prestige kitchen tools, knives and baking sheets with the Farberware cookware sets. (*Id.* ¶ 5.) Prestige is a widely-known housewares brand which is owned outright by MIP. (Krause Dec. ¶ 21.) Such marketing was fairly common in the housewares industry by manufacturers, distributors and retailers believed as a way to distinguish their products from competitors. (Tavacol Dec. ¶ 6.) Today, MUS distributes approximately 26 (of which 23 are active) Farberware cookware sets that include Prestige products. (Declaration of Jay Zilinskas ("Zilinskas Dec.") ¶ 5.) The price of such products ranges from about $80 to $150. (FLC Exs. G, J, K, N, O; Krause Dec. ¶ 28.)

Prior to distributing these cookware sets and to ensure that the packaging was not confusing and complied with the law, MUS prepared the packaging for the cookware sets that included both Farberware and Prestige products. (Tavacol Dec. ¶ 7.) MUS, under the supervision of its in-house counsel, took steps to expressly and clearly label the packaging for the cookware sets as "Farberware" and the additional accessories as "Prestige." (*Id.*; Krause Dec. ¶ 22.) The final packaging design takes great care to avoid any confusion between the products. To do so, MUS placed a separate photo of the Prestige kitchen accessories next to a photo of the Farberware cookware set. Inside the Prestige box, it states "Includes Prestige Kitchen Tools." (Tavacol Dec. ¶ 8; Krause Dec. ¶ 23; Kramer Dec., Exs. 2 and 3.)

MUS also distributed and sold a "Triple Bonus Set" that included a total of 19 items: a 10-piece Farberware cookware set and nine Prestige bonus items (7" Santoku knife, a 6-piece kitchen tool set, and two cookie sheets). This packaging carefully distinguishes between the Farberware and Prestige products. (Tavacol Dec. ¶¶ 9-10; Krause Dec. ¶ 24.) The primary photo of the packaging is a 10-piece cookware set, above which is the bold title "Farberware 10 Piece Set." Above this photo of the pots and pans and the word "Farberware" are three separate photos of the nine Prestige bonus items. At or near the top of these individual boxes, it states "Includes Prestige Kitchen Utensils." (Kramer Dec., Ex. 4.)

To further distinguish the origin of the two marks, all packaging for Farberware cookware sets that include Prestige products has a trademark legend identifying that the Farberware mark is licensed from FLC and the Prestige mark is registered to MIP. (Tavacol Dec. ¶ 12.) The legend also refers to a Farberware Cookware Division, an internal division of MUS. It is not a separate legal entity. (Krause Dec. ¶ 13.)

**FLC's Approval of Farberware Cookware Sets**

Pursuant to Article IV of the Agreement, MUS is to provide FLC with samples or notices of new products and packaging and promotional materials either before or after release of the items at MUS' discretion. Article IV sets forth limited quality standards against which MUS' products and promotional materials are measured. (Kramer Dec., Ex. 1.) After executing the Agreement and without any objection from any party, MUS and Farberware, Inc. and, thereafter, FLC followed this process very informally, if at all. (Krause Dec. ¶ 16.) On or before 2005, MUS and FLC met once a year at the annual International Home and Housewares Show ("Show") in Chicago, Illinois. There, MUS displayed the Farberware-branded products and promotional materials. (Tavacol Dec. ¶ 36.) In advance of the Show, MUS and FLC established a time to meet at MUS' booth to review and approve all of the Farberware products and ask any questions about the Farberware products and materials. (Tavacol Dec. ¶ 36.) Until mid-2008, neither Farberware, Inc. nor FLC objected to this practice or demanded that samples, products, or packaging and promotional materials be provided to it. (Krause Dec. ¶ 18; Tavacol Dec. ¶ 40.)

Consistent with this practice, David Tavacol, the Director of Creative Services & Retail Marketing at MUS, met with Jan Ratushny, President of FLC, at the 2008 Show, which took place on March 16-18, 2008. (Tavacol Dec. ¶ 17.) When Mr. Tavacol and Mr. Ratushny met, they reviewed the Farberware products, including Farberware cookware sets that were paired with non-challenged Prestige kitchen accessories. (*Id.* ¶ 18.) Farberware sell sheets were available for Mr. Ratushny and others to review and discuss. These sells sheets identified the Farberware cookware sets containing bonus Prestige products. (Tavacol Dec. ¶ 37.) At that time, FLC objected to only one item – the tea kettles –

and FLC approved the very products and promotional materials which are under attack in this action. (Tavacol Dec. ¶ 39.)

## Relationship with Retailers

MUS is a wholesaler and does not operate any physical retail stores. MUS sells the Farberware products to retailers, such as Kohl's and Target, who in turn market the products to the consuming public. (Tavacol Dec. ¶ 14.) Like most wholesalers, MUS has little involvement with and no control over the content of retailer's print and website advertising. (*Id.* ¶ 16.) With regard to both internet and print advertisements, retailers shoot their own ads, create their own layouts and write their own copy. (*Id.* ¶ 17.) No retailer gives MUS any approval rights over the retailer's print and website advertisements. (*Id.* ¶ 18.)

MUS did not provide Target or Kohl's with photos or copy for the Target website advertisement marked as FLC's Exhibit O or the Kohl's advertising circulars marked as FLC's Exhibits G and N. MUS neither approved these advertisements nor had an opportunity to comment on or object to them prior to their publication. (Tavacol Dec. ¶¶ 20, 25, 32.) All information provided to Target and Kohl's by MUS properly and distinctly labeled the cookware sets as Farberware and the kitchen accessories as Prestige. (Tavacol Dec. ¶¶ 21-22, 26-28, 33; Kramer Dec., Exs. 3, 4, 5, 6, 8.) Consequently, MUS never knew nor had any reason to know that Target or Kohl's was allegedly mischaracterizing (which MUS strongly disputes) the Farberware and Prestige products in the advertisements. (Tavacol Dec. ¶¶ 23, 29, 34.)

## Dispute with FLC

After years of reviewing and approving Farberware products and promotional materials at the Show, FLC suddenly began in mid-2008 to request a list of all products and packaging and/or promotional materials pursuant to Article IV of the Agreement. (Krause Dec. ¶ 30.) MUS responded to FLC's request, and on October 2, 2008, MUS forwarded to FLC several sell sheets that were to be upcoming promotions in 2009. (Krause Dec. ¶ 31; FLC Ex. E.) The products identified in the sell sheets

were current products MUS distributed. In fact, several of the promotions being offered, such as the Triple Bonus Set and the Double Bonus Event, had been previously offered. (Tavacol Dec. ¶ 11.)

In response to the October letter and despite previously approving the practice, FLC notified MUS of objections it had to the Triple Bonus Set and Double Bonus Event sell sheets and claimed that such promotions violated the Agreement and created confusion. (Krause Dec. ¶ 35.) In a November 6, 2008 letter, MUS disagreed stating, *inter alia*, that there was nothing confusing about the sell sheets, the promotions, or the combination of Farberware and Prestige products. (Declaration of Dean A. Dickie ("Dickie Dec.") ¶ 16; Kramer Dec., Ex. 9.) Both the Triple Bonus Set sell sheet and the Double Bonus Event sell sheet expressly identify the cookware sets as Farberware and the bonus items as Prestige. The Prestige bonus items were not labeled "Farberware." (Krause Dec. ¶¶ 33-34, Kramer Dec., Exs. 5 and 7.)

MUS had additional reasons for challenging FLC: (1) MUS was not using the Farberware brand to promote Prestige cutlery or kitchen tools; (2) MUS was authorized to distribute, sell, and promote Farberware cookware and bakeware products; (3) nothing in the Agreement prohibits what MUS was selling; (4) FLC previously approved the Farberware/Prestige combination; (5) the packaging and promotional materials satisfied the limited standards of Article IV of the Agreement. (Dickie Dec. ¶ 17; Kramer Dec., Ex. 10.) Thus, MUS had a good faith basis to challenge FLC's contentions and continue to distribute and sell Farberware cookware sets that included Prestige products. (Krause Dec. ¶ 37.)

Despite FLC's contentions to the contrary, MUS responded appropriately to FLC's letters. (Dickie Dec. ¶ 4.) In addition to the November 6 letter, MUS again responded to FLC's letters on December 11, 2008, and asked for further clarification as to the basis of FLC's claim. (*Id.* ¶¶ 19-20; Kramer Dec., Ex. 10.) FLC never provided that clarification. (Dickie Dec. ¶ 21.) Thereafter, both MUS and FLC proceeded on a course that the dispute relating to the packaging and promotion of Farberware cookware sets with Prestige products would be resolved pursuant to the formal dispute resolution process set forth in Article XV of the Agreement. FLC appointed a mediator and MUS appointed a

mediator. (*Id.* ¶ 22.) Although the two mediators discussed possible candidates, the third mediator had not been selected before FLC unilaterally abandoned the dispute resolution process by filing this lawsuit. (*Id.* ¶ 24.)

**ARGUMENT**

**I.    THERE IS NO BASIS TO ISSUE A PRELIMINARY INJUNCTION.**

A preliminary injunction is "an extraordinary and drastic remedy which should not be routinely granted." *The Estate of John Lennon v. Screen Creations, Ltd.,* 939 F. Supp. 287, 293 (S.D.N.Y. 1996) (Baer, J.). To obtain one, the movant must show: (1) that it will suffer irreparable harm without an injunction; and (2) either, (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Id.*

**A.    FLC Is Not Likely To Succeed On The Merits Of Its Infringement Claim Because Defendants Have Not Violated Sections 32(1) And 43(A) Of The Lanham Act.**

To prevail under § 32(1) or § 43(a) of the Lanham Act, a plaintiff must show that it owns a valid mark "that the defendant used in commerce, ***without the plaintiff's consent*** and in connection with the sale or advertising of goods or services." *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 410-11 (S.D.N.Y. 2006) (emphasis added). "The plaintiffs must then show that the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Id.* at 411. "Likelihood of confusion requires that 'an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" *Id.*

**1.    FLC Consented To Defendants' Use of the Farberware Trademark with Other Non-Farberware Products.**

The absence of consent by FLC to the Defendants' use of the mark is essential to Plaintiff's Lanham Act claim. 15 U.S.C. § 1114(1)(a); *Merck*, 425 F. Supp. 2d at 410-11. In other words, there can be no violation of the Lanham Act so long as Defendants acted within the scope of the Agreement

giving them rights to use the Farberware mark. *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008) ("where the trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized").

FLC cannot overcome this initial hurdle. The Agreement granted Defendants the exclusive right to use and exploit the Farberware name and related trademarks in connection with the distribution of cookware and bakeware products. (Kramer Dec., Ex. 1 at ¶2.1.) By providing these rights to Defendants, Farberware, Inc. expressly consented to Defendants' exclusive right to market, advertise and promote the brand. In utilizing these rights, MUS determined that to gain a competitive advantage, MUS would market and promote the Farberware cookware sets by adding Prestige bonus items. (Tavacol Dec. ¶ 5.) FLC simply cannot ignore the nature and extent of the rights MUS acquired by virtue of the Agreement. As successor, FLC's rights are no greater than those of Farberware, Inc., and FLC's attempt to avoid the exclusive authority is prohibited by the Agreement.[2] Accordingly, so long as Defendants' advertising and packaging materials are either comparable in quality to those materials utilized and/or approved by Farberware prior to 1996 or equivalent to the packaging and promotional materials of other MUS-branded products, MUS has complete control over its quality, style, and appearance. (Kramer Dec., Ex. 1, ¶ 4.6.)

MUS began to market Farberware cookware sets with Prestige products in 2007. Prestige is a registered trademark of MIP and known to be a quality brand. (Krause Dec. ¶¶ 20-21.) FLC was aware of this marketing initiative when it approved the combination. (Tavacol Dec. ¶¶ 37-39.) Having

---

[2] FLC's frustration is directly attributable to the fact that it inherited an agreement that is more like a purchase agreement than a license agreement. The Agreement contains an extensive dispute resolution process, a 180-day cure period, and the ability to terminate the contract only if the breach is so egregious that money damages cannot suffice. (Kramer Dec., Ex. 1, ¶¶ 13.2, 15.1, 15.2, 15.3.) Although the combination of these provisions is almost unheard of in license agreements, they are common in purchase agreements, where one party (MMC/MUS) pays a large monetary amount in exchange for the other party's (Farberware, Inc.'s/FLC's) agreement to only sue it under extreme circumstances. FLC has not honored these provisions by disregarding the dispute resolution process and the 180-day cure period.

consented to the practice of combining Farberware and Prestige products pursuant to Article IV of the

Agreement, FLC's Lanham Act claims must fail.

Likewise, the claim that MUS used the Farberware mark to describe "cutlery and utensils" in

violation of the Agreement is simply wrong. (FLC Memo at 4.) A simple review of the materials

demonstrates that the Farberware brand was not used to promote Prestige products:

- In the packaging for the Farberware/Prestige cookware sets, the Farberware name is used to describe the cookware sets and the Prestige name is used to describe the bonus items. (Kramer Dec., Exs. 2, 3, 4.)

- In the sell sheets, the cookware is labeled as Farberware, whereas the cutlery and bonus items are labeled as Prestige. (Kramer Dec., Exs. 5-7.)

- On the potsandpan.com and farberwarecookware.com websites, MUS expressly described the kitchen tools as Prestige and the cookware as Farberware. MUS also placed a photo of the Prestige knife set in a separate box apart from the Farberware cookware set. (FLC Exs. J, K.)

- The packaging for the cutlery is labeled Prestige in bold and large font. (FLC Ex. I.)

Accordingly, FLC's reliance on *Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.*,

576 F. Supp. 1055, 1060 (E.D.N.Y. 1983) is misplaced. The defendants in *Baskin-Robbins* used ice

cream from an entirely different source in violation of the franchise agreement without notifying

customers of the change. *Id.* Here, there is no contractual provision on combining Farberware products

with non-Farberware products; moreover, MUS always advised the consumer that the cookware was

Farberware and kitchen utensils were Prestige. (Tavacol Dec. ¶¶ 8, 10.)

### 2.    There is No Likelihood of Confusion.

Because FLC cannot establish a likelihood of confusion, its claims for trademark infringement

must fail. A mere possibility of confusion is not enough; there must be a probability of confusion.

*Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004). To analyze likelihood

of confusion, the Second Circuit balances eight specific factors that were set forth in *Polaroid Corp. v.*

*Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). It is not a "mechanical process where the party

with the greatest number of factors weighing in its favor wins," and one factor alone, such as similarity,

may be a dispositive factor. *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000). A balancing of the *Polaroid* factors tips heavily in favor of Defendants.[3]

### a.    The Strength of the Farberware Trademark is the Product of MUS.

The first *Polaroid* factor examines the strength of the mark. *Polaroid,* 287 F.2d at 495. The strength of the Farberware mark is a result of MUS' substantial investment and hard work, not FLC's. FLC's suggestion that it contributed to the commercial strength of the Farberware mark is patently false. (FLC Memo at 13.) Its only "business" is to license the Farberware trademark; it has no role in the development of any Farberware cookware and bakeware products or the market acceptance of the brand since 1996; and its commercial success is the result of MUS' and other licensees' investment in the Farberware brand. (Krause Dec. ¶¶ 10-12.) Given that MUS has been the ***sole*** developer of the Farberware mark's strength in connection with cookware and bakeware, this *Polaroid* factor cannot weigh in FLC's favor.

### b.    The Farberware and Prestige Marks Are Not Identical or Similar.

Despite noting that there are two trademarks at issue, FLC persists in claiming that these trademarks are "identical." (FLC Memo at 13-14.) FLC concedes that a court must first compare the marks in question to determine whether they are similar on their face. (FLC Memo at 13.) Here, there is no such similarity. The "Farberware" mark and the "Prestige" mark do not sound or look alike. *See Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993); *Origins Natural Res., Inc. v. Kotler*, No. 01 CIV. 1881(HB), 2001 WL 492429, at *3 (S.D.N.Y. May 8, 2001).

MUS' use of the marks also establishes a lack of similarity. *See Nabisco*, 220 F.3d at 47. In both the packaging and sell sheets of which FLC complains, the cookware sets are distinctly labeled as

---

[3] Like many issues in this case, the probability of confusion issue is inherently a jury decision for two reasons: (1) the jury, which represents a cross-section of consumers, is well-suited to evaluate whether an "ordinary consumer" would likely be confused; and (2) the likelihood of consumer confusion is an "inherently factual" issue that depends on the unique facts and circumstances of each case. *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.,* 962 F.2d 316, 318 (4th Cir. 1992).

"Farberware" and the cutlery and kitchen tools are distinctly labeled as "Prestige." (Kramer Dec., Exs. 2-7.) The prominent use of the respective brand names "significantly reduces, if not altogether eliminates," the likelihood of any confusion as to the source or the affiliation of the parties' products. *Nabisco*, 220 F.3d at 46; *Playtex*, 390 F.3d at 164-65. Similarly, MUS took steps to distinguish between the Farberware and Prestige products on its websites. (FLC Exs. J, K.) There, the lack of affiliation between the bonus set of Prestige knives and the Farberware cookware is made clear by placing the knives in its own separate highlighted box marked "Bonus $30 Value." There is no indication that the knives are Farberware products, and MUS describes the kitchen tools included in the cookware set are Prestige products. (*Id*.) By emphasizing the distinct brand names of the products, and separating the Farberware and Prestige products from one another, this factor weighs heavily in Defendants' favor.

FLC's assertion that consumers will mistake the Prestige mark for a sub-brand of Farberware is mere speculation and without merit. (FLC Memo at 14.) To support its claim, FLC relies upon FLC's President, Mr. Ratushny. (Ratushny Dec. ¶ 45.) Ratushny provides no foundation or expertise for such a legal conclusion. *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 423, 428 (S.D.N.Y. 2000); Fed. R. Evid. 701. The case law upon which FLC relies is readily distinguishable. In *E.G.L. Gem Lab Ltd. v. Gem Quality Inst.,* 90 F. Supp. 2d 277 (S.D.N.Y. 2000), confusion was created because the defendant used multiple marks to describe one product. In contrast, MUS used the Farberware mark only for cookware sets and the Prestige mark for kitchen tools.

### c.     The Parties' Products Are Not Proximate.

In assessing this *Polaroid* factor, the courts look to the "competitive distance between the products." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995.) In other words, the issue is whether the two products compete with each other. "To the extent goods or (trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir. 1993). Here, the two groups that would be "competing" against each other are Prestige's

accessory kitchen products (kitchen tools, knives, and baking sheets) and Farberware's cookware sets. Cookware (i.e., pots and pans) is used to cook food on a stove, whereas bakeware (e.g., cookie sheets) is used only in the oven, and kitchen tools (e.g., spoons, ladles) are use to prepare food.  They are distinct categories, non-interchangeable categories. One would never buy a Prestige kitchen tool in place of a Farberware cookware set. *See, e.g.*, *Vitarroz Corp. v. Borden, Inc*., 644 F.2d 960, 967 (2d Cir. 1981) (no error in District Court's finding of no proximity between chips and crackers). In addition, the cost of the cookware sets, which are as high as $150, far exceeds the cost of the kitchen accessories, which are $5.00 or less. (Krause Dec. ¶¶  28, 29.) *See Arrow,* 59 F.3d at 397 (price differential can also indicate proximity).

In analyzing proximity, the question is also "whether a purchaser could easily assume that, while the [cookware sets and kitchen accessories] themselves are different, they belong to the same genre of products and might well have the same source." *Arrow*, 59 F.3d at 396 (citation omitted). The Second Circuit, however, cautions that a court should also consider the first two *Polaroid* factors (strength of mark and similarity) when examining this inquiry and the existence of competitive proximity. *Id.* Such consideration is particularly applicable here as the marks are not at all similar, and the packaging separately identifies the two classes of products. *See id.* (reversing district court's proximity finding, because the products were non-competitive in function and price, and their marks were not confusingly similar.)

Moreover, there is nothing confusing or misleading about the trademark legend on the Triple Bonus Set packaging.  Instead, it clarifies the relationship between the marks by stating:

**For more information, visit us at:**

# Farberwarecookware.com

**Farberware is a registered trademark of Farberware Licensing Company LLC**
**Manufactured and sold pursuant to a license from Farberware Licensing Company LLC**
**Manufactured for Farberware Cookware Division, Vallejo, CA 94590**
**Prestige is a Registered trademark of Meyer Intellectual Properties Limited**

(FLC Ex. 4.) Given the clarity of the legend, it is more likely to reduce consumer confusion than create any. *See, e.g., Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1053 (2d Cir. 1983).

### d.    Bridging the Gap.

At the heart of this factor is whether FLC, the senior user, will enter MUS', the junior user's, market in the future. This factor is simply not applicable in this context as FLC is not a "senior user." FLC has never used the Farberware mark for cookware and bakeware or kitchen tools and cutlery. Rather, it "purchased" the mark long after it had been licensed to various entities, such as MUS and Lifetime Brands. Given FLC's complete lack of use of the Farberware mark in connection with any of the products at issue, FLC should not reap the benefit of this factor.

### e.    There Is No Evidence of Actual Confusion.

FLC's evidence of actual confusion between MUS' Farberware products and its non-Farberware products rests entirely on an expert report prepared by Thomas Maronick, who conducted four surveys from website "zoomerang.com." FLC admits, though, that such surveys are not direct evidence of actual confusion, but mere circumstantial support that confusion *may* exist. (FLC Memo at 17.)  A detailed discussion of the inadequacy of the Maronick analysis is contained in Defendants' separate and contemporaneously filed Motion to Bar Maronick Expert Report, Testimony and Surveys, which is supported by the Declaration of Dr. Bobby Calder, a Professor of Marketing at Northwestern University. In sum, the Maronick surveys are wholly irrelevant to the claims at issue, are biased, leading and unreliable, and do not follow accepted standards for consumer surveys in the Second Circuit. (*See* Defs. Motion to Exclude.)

For example, two of the four Maronick surveys relied on by FLC evaluate statements that were not made by the defendants in this lawsuit. (Tavacol Dec. ¶¶ 14-34.) Specifically, Survey 2 admittedly focuses entirely on statements made by Target, while Survey 4 focuses on statements made by Kohl's. But FLC offers no support for why statements of others, over whom MUS has no control, should tend to

establish that MUS has caused confusion with respect to its products. Survey 3, which addresses various aspects of the exterior packaging of the Triple Bonus Set, is likewise inapplicable to whether MUS caused confusion in the minds of purchasers of its products. Because the Triple Bonus Set is only available for purchase through the internet, the packaging is only seen *after* a sale is completed. (FLC Ex. O.)

In addition, the methodologies that Maronick followed deviate so drastically from accepted standards that the surveys cannot meet the *Daubert/Kumho* standard for admissible expert evidence. Despite the fact that all authorities on the subject of consumer survey evidence note the importance of identifying and surveying the proper universe of respondents, Maronick did neither. Nowhere does the Maronick report explain his choice of respondents, nor do the actual respondents match the proper universe of potential purchasers of MUS' products. Therefore, there is a strong likelihood of prejudice.

FLC offers no other evidence[4] of actual confusion beyond the extremely questionable surveys to support a finding of confusion. Because the surveys fail to meet the necessary standards of relevance, reliability and accuracy to be admissible, FLC has failed to establish the actual confusion *Polaroid* factor.

### f.    At All Times, MUS Acted in Good Faith.

Defendants did not use the Prestige trademark in conjunction with the Farberware trademark to capitalize on the Farberware trademark or to create any confusion. *See Lang v. Retirement Living Publishing Co.*, 949 F.2d 576 (2d Cir. 1991). Indeed, the evidence demonstrating that MUS acted in good faith with respect to its use of the marks is plentiful. First, from the very beginning, MUS believed that by adding Prestige bonus items to Farberware cookware sets, the Farberware products would be given competitive advantage. (Tavacol Dec. ¶ 5.) Second, in designing the packaging and promotional

---

[4] FLC does cite to one other piece of evidence relating to CSN Stores, LLC's ("CSN") purported confusion about the 5-piece Prestige Cutlery Set. This argument is a red herring since the CSN websites no longer offer the "Farberware-Affiniti 5 Piece Prestige 3.5 Paring Knife Set," and consequently, there is no actual confusion or harm arising out of CSN's website to support the issuance of a preliminary injunction. *Am. Express Travel Related Servics. Co., Inc. v. MasterCard Int'l Inc.*, 776 F. Supp. 787, 790 (S.D.N.Y. 1991).

materials, MUS took steps to ensure that the Farberware cookware sets were clearly labeled as Farberware and the Prestige bonus items were clearly labeled as Prestige. (Tavacol Dec. ¶¶ 8, 9, 10. 12; Krause Dec. ¶¶ 22-26.) Third, FLC approved MUS' combination of Farberware cookware sets with Prestige bonus items at the 2008 Show. (Tavacol Dec. ¶¶ 37, 38.) Finally, given this approval and as the exclusive distributor and promoter of Farberware cookware products, MUS was authorized under the Agreement to promote Farberware cookware consistent with Article 4.6, which it did. (Kramer Dec., Ex. 1, ¶¶ 2.1.1, 4.6.) MUS is not a competitor of FLC but rather it is trying to enhance the brand. Accordingly, MUS' use of the Prestige trademark with the Farberware trademark was always truthful and forthright.

FLC claims that MUS' failure to withdraw its packaging and promotional materials after FLC gave notice of its objections constitutes bad faith. (FLC Memo at 20.) As MUS sets forth in this brief, as well as in a detailed letter to FLC on November 6, 2008, there was no basis to withdraw the packaging and promotional materials. (Kramer Dec., Ex. 9.) Simply because FLC asserted that there was trademark infringement does not make it so, and MUS is not automatically required to withdraw the purported infringing materials. *O'Keefe v. Ogilvy v. Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008) (finding no bad faith when defendant failed to discontinue use of the mark in the face of a cease and desist letter).[5]

> g.    **The Quality of Prestige Products Does Not Affect the Farberware Trademark.**

This *Polaroid* factor considers whether Farberware's mark could be jeopardized by the inferior quality of the Prestige cutlery and/or kitchen utensils. *Arrow*, 59 F.3d at 398. FLC does not claim that the Prestige products are of inferior quality or somehow embarrass the Farberware mark. Nor can it - the

---

[5] Moreover, the cases cited by FLC are not on point. Specifically, FLC can find no support from *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F. Supp. 619, 624 (S.D.N.Y. 1981), *General Elec. Co. v. A-All Appliance Parts Co.*, 224 U.S.P.Q. 1054, 1058 (E.D. Mich. 1984) or *Cache, Inc. v. M.Z. Berger & Co.*, No. 99 CIV 12320 (JGK), 2001 WL 38283, at *12 (S.D.N.Y. Jan. 15, 2001). None of those cases dealt with a situation such as this where MUS was operating pursuant to an Agreement and using the Farberware trademark to actually identify Farberware products and the Prestige trademark to identify Prestige products.

Prestige products are quality products. Rather, FLC claims that even the good quality of Defendants' products could lead to confusion and cites *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir. 1986). (FLC Memo at 21.) As explained in *Arrow*, 59 F.3d at 398, *Lois Sportswear* is inapposite. In *Lois Sportswear,* the Court based its decision on the fact that in the post-sale context, consumers could perceive that the jeans sold by Lois Sportswear could be a Levi's product, because the stitching pattern on the jeans pockets was highly similar. *Lois Sportswear*, 799 F.2d at 872-75; *see also Arrow*, 59 F.3d at 398. No such similarity exists between the Farberware cookware set and the Prestige kitchen accessories, which differ in appearance, function and price. Also, the labels identifying the brand of the jeans in *Lois Sportswear* could be discarded after purchase, whereas both the Farberware and Prestige trademarks remain on their respective products. *Lois Sportswear*, 799 F.2d at 873; *Arrow,* 59 F.3d at 398. Accordingly, this factor does not favor FLC.

### h.  Cookware Sets Are Not Impulse Purchases.

The consumer sophistication factor requires the Court to "consider the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 390 (2d Cir. 2005). In determining consumer sophistication, both the nature of the product and its price are revealing. *Id.; McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979), *superseded on other grounds* by Fed. R. Civ. Proc. 52(a).

Here, FLC merely restates its arguments for actual confusion. It engages in no analysis of the actual consumers of Farberware and Prestige except to state that as bonus items, the Prestige products are essentially "free." (FLC Memo at 22.) Such an argument, though, wholly ignores the Farberware cookware sets. As a result, the case relied on by FLC – *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 219 (2d Cir. 2003) – is distinguishable because it only involves consumers of inexpensive pasta sauces, which are often impulse purchases.

Consumers purchasing cookware sets deliberate prior to making such a substantial investment (between $80 to $150) and are careful to select products that are safe and durable. (FLC Exs. G, J, K, N, O; *see also* Krause Dec. ¶ 28.) Such careful consideration also applies to the Prestige bonus items, as consumers will likewise want those products to be safe and durable, especially the knives. Accordingly, given the non-impulsive nature associated with the purchase of Farberware cookware sets and Prestige kitchen tools, consumers of such products will possess the necessary sophistication to understand the difference between Farberware and Prestige products. *McGregor-Doniger*, 599 F.2d at 1129, 1137 (affirming finding that consumers of jackets priced between $25 and $900 were sophisticated); *see also Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d at 390.[6]

### B.    FLC Is Not Likely to Succeed on its Claim for Trademark Dilution.

To prevail on a claim of trademark dilution under § 43(c) of the Lanham Act 15 U.S.C. § 1125(c), a plaintiff must establish (1) ownership of a famous mark and (2) a likelihood of dilution. *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 257 (S.D.N.Y. 1999). Here, FLC asserts dilution existed by blurring, which occurs "where the defendant uses or modifies the plaintiff's trademark ***to identify the defendant's goods*** and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Merck*, 425 F. Supp. 2d at 416 (citation and quotation marks omitted) (emphasis added). As has been shown a number of times, MUS used the Farberware mark to identify the Farberware products and the Prestige mark to identify the Prestige products. On that factor alone, FLC's dilution claim should fail. *See Tiffany,* 576 F. Supp. 2d at 524 (no dilution by blurring where defendant accurately used the mark to identify plaintiff's goods).

---

[6] Given that there is no likelihood of confusion, the defense of nominative fair use applies, which allows MUS to use FLC's mark to describe "FLC's" products. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 496 (S.D.N.Y. 2008). MUS' use of both the Farberware and Prestige products and marks in the same packaging and promotional materials is a common practice and meets the criteria to satisfy the elements of the defense: (1) the cookware sets are only identifiable when used in conjunction with the Farberware mark; (2) MUS limited its use of the Farberware marks to only the cookware sets; and (3) MUS did nothing to suggest the endorsement of the Prestige products by Farberware or FLC. *See id.* at 496. Accordingly, FLC's claims are further barred by the doctrine of nominative fair use.

Six factors are used to evaluate dilution: (1) similarity of the marks, (2) similarity of the products, (3) sophistication of consumers, (4) predatory intent, (5) renown of the senior mark, and (6) renown of the junior mark. *Merck*, 425 F. Supp. 2d at 416. If the balance of these factors does not weigh in FLC's favor, its dilution claim must fail. *Conopco,* 49 F. Supp. 2d at 258.

FLC rests its entire dilution by blurring claim on its faulty assertion that the marks are identical. FLC is incorrect. "Farberware" and "Prestige" are dissimilar in name, appearance and sound. (*See supra* at Section A(2)(b).) At all times, MUS uses the Farberware mark to identify Farberware products and the Prestige mark to identify Prestige products. In such a situation, the *Savin* court stated that "where the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution." *Savin Corp. v. The Savin Group,* 391 F.3d 439, 453 (2d Cir. 2004) (citing *Moseley v. V. Secret Catalogue, Inc.,* 537 U.S. 418, 433 (2003)). Therefore, even if FLC could show, which it cannot, that the combined packaging of Farberware and Prestige products caused an association of the products in the minds of consumers, there would still be no dilution.

Similarly, the remainder of the factors do not support dilution: (i) the products are not similar as they have different functions and purposes; (ii) cookware and kitchen tools and cutlery are not impulse purchases; (iii) there is no evidence of predatory intent, but rather, strong evidence that MUS acted in good faith; and (iv) both marks are strong due to the investment made by MUS since 1996. As a result, there is no trademark dilution.

### C.    Reference to Farberware Cookware Division is a Red Herring.

FLC refers repeatedly to the fact that the packaging for Farberware and Prestige goods were manufactured for the "Farberware Cookware Division." As well it should, since they were. The Farberware Cookware Division is an internal division of MUS, not a separate legal entity. (Krause Dec. 13.) Within MUS, the Farberware Cookware Division is charged with the task of carrying out the Defendants' exclusive right to distribute and promote Farberware products. (*Id.*) In that regard,

the Farberware products and those products that are used to enhance the Farberware brand, such as Prestige tools and knives, are manufactured for the Farberware Cookware Division of MUS. (*Id.*)

The Farberware Cookware Division cannot be associated with FLC, since FLC has no distribution or marketing division for cookware or kitchen tools and cutlery. This is because MUS and Lifetime Brands have the exclusive right to do those tasks. As a result, there is no risk of a consumer believing that the Farberware Cookware Division referenced on the package of Prestige knives is affiliated with FLC. Moreover, the actual language of the full trademark legend states before any reference to Farberware Cookware Division that the Farberware cookware set was "Manufactured and sold pursuant to a license from Farberware Licensing Company LLC" (FLC Ex. P4.) No reasonable consumer would believe that the Farberware Cookware Division was affiliated with FLC except through a license agreement, which is accurate. Accordingly, MUS' use of the "Farberware Cookware Division" cannot be evidence of confusion or dilution.

### D.    Retailer Advertisements and Websites Should Not Be Considered.

FLC relies on retailers' advertisements and websites to support its claims of confusion. However, as is overwhelmingly common in the industry, Defendants have no control over retailer's advertisements or websites.[7] Without such control, Defendants did not know and had no reason to know the retailers were engaging in any alleged trademark infringement. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982); *Tiffany,* 576 F. Supp. 2d at 507.

First, FLC points to the Target website advertising the Triple Bonus Set, which failed to reference Prestige. (FLC Memo at 7; FLC Ex O.) Its reliance on the Target website is misplaced as MUS did not provide Target with the information for the website advertisement, and never reviewed or approved the content of the ad. (Tavacol Dec. ¶ 20.) At most, MUS provided Target with the packaging

---

[7] In this regard, FLC's dispute is with the retailers, not MUS, which has no control over these entities. Defendants reserve the right to object to FLC's failure to join the retailers as necessary and indispensible parties.

for the Triple Bonus Set and a sell sheet, which as described above correctly labels the cookware set as Farberware and the bonus items as Prestige. (Tavacol Dec. ¶ 21.) Accordingly, MUS did not know and had no way of knowing that Target would disregard the packaging for the Triple Bonus Set that distinctly labeled the bonus items as Prestige products.

Second, FLC points to Kohl's advertising circulars as improperly associating Prestige cutlery and utensils with Farberware. (FLC Memo at 5; FLC Exs. G, N.) Again, FLC's argument is misplaced. Both Kohl's advertising circulars place the cutlery away from the Farberware cookware set, and the product description expressly states the knives are Prestige products. (FLC Exs. G, N.) Regardless, MUS did not provide Kohl's with any content or photos for these advertisements, and never had an opportunity to review or approve them. (Tavacol Dec. ¶ 25.)

Finally, FLC refers to CSN posting a product described as "Farberware Affiniti 5-Piece Prestige Cutlery Set" on its website. (FLC Memo at 6; FLC Ex. H.) Such postings should be disregarded, because they are no longer posted on CSN's various websites. (Kramer Dec., ¶¶ 4-6, Ex. 11.) Accordingly, there is no continuing harm from this website and it is, therefore, an inappropriate ground for issuance of a preliminary injunction. *Am. Express Travel*, 776 F. Supp. at 790.

### E.    There Is No Irreparable Harm.

In order for the Court to grant a preliminary injunction in favor of FLC, FLC must show that it will suffer irreparable harm without this remedy. Irreparable injury is arguably the most important prerequisite to the issuance of a preliminary injunction. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985). FLC "must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Christian v. Alloy*, No. 03 Civ. 10258(HB), 2004 WL 1375274, at *3 (S.D.N.Y. June 17, 2004) (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)). FLC's claim of irreparable harm is disingenuous, because there is no imminent harm.

FLC waited almost one year from its discovery of the alleged infringement before filing a motion for preliminary injunction. *See Citibank,* 756 F.2d at 276; *Origins,* 2001 WL 492429, at *2 ("a

significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement or dilution alone will cause irreparable harm…") (internal citations omitted). MUS began marketing and selling Farberware-branded products with Prestige products in 2007. (Tavacol Dec. ¶ 5.) FLC reviewed the Farberware and Prestige products at the Show in Chicago on March 16-18, 2008. (Tavacol Dec. ¶ 37.) At that time, Ratushny, on behalf of FLC, approved the products. (Tavacol Dec. ¶ 38.) One year later, FLC filed this motion for a preliminary injunction. If FLC can wait for one year to seek a preliminary injunction, FLC's harm is not imminent and it can wait for its relief, if any, until after a trial. *See*, *e.g.*, *Allen Organ Co. v. CBS, Inc.*, No. 84 Civ. 3856 (SWK), 1986 WL 4901, at *1 (S.D.N.Y. Apr. 21, 1986) (eight-month delay); *Cheng v. Dispeker*, No. 94 Civ. 8716 (LLS), 1995 WL 86353, at *5 (S.D.N.Y. Mar. 2, 1995) (five-month delay); *Mathematica Policy Research, Inc. v. Addison-Wesley Pub. Co.,* No. 89 Civ. 3431 (JFK), 1989 WL 63075 (S.D.N.Y. June 5, 1989) (three and a half month delay); *Christian,* 2004 WL 1375274, at *3 (S.D.N.Y. June 17, 2004) (two-year delay); *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co., Inc.*, 116 F. Supp. 2d 405, 408-09 (S.D.N.Y. 2000) (four-month delay).

Irreparable harm must be more than a "mere possibility;" it must be "actual." *Christian,* 2004 WL 1375274, at *3. FLC alleges that without a preliminary injunction, its "hard-won name and reputation . . . is at stake." (FLC Memo at 24.) This accusation is specious, as FLC has done nothing to establish the name or reputation of Farberware and what it proposes will actually damage the mark. *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 174 (2d Cir. 2000).

## F.     Defendants Would Face Substantial Hardship if a Preliminary Injunction Were Granted.

Without a likelihood of success on the merits, FLC must prove that there is "a balance of hardships tipping ***decidedly*** in its favor." *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 219 (S.D.N.Y. 2000) (emphasis added). As already shown, FLC will not be irreparably harmed by the denial of a preliminary injunction. Any possible hardship to FLC is purely speculative, and FLC has

shown no evidence of harm to the goodwill or reputation of the Farberware brand due to MUS' marketing of Farberware products with Prestige products.

On the other hand, a grant of this preliminary injunction would be catastrophic to MUS' business and severely damage the mark as well. Based on the current language of the proposed preliminary injunction order, it appears that MUS would be required to recall approximately 26 different types (of which 23 are active) of Farberware cookware sets that include Prestige products, as well as various Prestige products from thousands of retailers across the country. Such a process would cost MUS millions of dollars to find, return, re-design, and repackage all the products. In addition, MUS' revenue would be severely reduced, because MUS would lose valuable shelf space and retail dollars, and could be liable to retailers for their lost profits. If FLC only seeks to stop MUS from selling the Farberware cookware sets with Prestige products in the future, MUS must still redesign and repackage its millions of dollars worth of current inventory. Moreover, even if repackaged, MUS' revenues will be greatly reduced due to lost sales during the repackaging process, and the Farberware cookware sets will no longer have a competitive advantage without the Prestige bonus items. (Zilinskas Dec. ¶¶ 8-12.)

Finally, MUS, the Farberware trademark, and the Prestige trademark will lose valuable goodwill by having to remove products from the shelves of retailers. For nearly 13 years, MUS has invested substantial resources to develop and establish the Farberware brand and goodwill for Farberware cookware and bakeware products. This goodwill will be destroyed if the preliminary injunction is entered. Additionally, MUS' relationships with its retailers will be severely damaged. Based on the tens of millions of dollars and goodwill that MUS stands to lose by being forced to comply with the proposed preliminary injunction, the balance of hardship tips decidedly in favor of MUS. (Zilinskas Dec. ¶¶ 8-14.)[8]

---

[8] Given these substantial hardships, there is a serious question as to FLC's financial ability to post a sufficient bond pursuant to Fed. R. Civ. P. 65(c).

### G.    FLC's Claims Are Barred by the Doctrines of Waiver and Estoppel.

Given that a preliminary injunction is an equitable remedy, FLC's claims should be denied based on the equitable defenses of waiver and estoppel. 15 U.S.C. § 1115(b)(9) (equitable defenses, such as laches and estoppel, can be asserted in trademark infringement action); *The Estate of John Lennon*, 939 F. Supp. at 293 (holding that an injunction is an equitable remedy and can be barred by equitable defenses).

### 1.    FLC's Objections to MUS' Promotion of Farberware Cookware Sets with Prestige Products Have Been Waived.

Upon entering into the Agreement in 1996, Farberware, Inc. knowingly relinquished its right to object to Defendants' promotion and packaging of Farberware cookware and bakeware so long as such materials were equivalent to those that Farberware and Defendants had used or approved in the past. (Kramer Dec., Ex. 1 at ¶ 4.6.) As the successor to Farberware, Inc. FLC's rights are no greater than Farberware, Inc.'s. Nevertheless, FLC is now trying to avoid the effects of Paragraph 4.6 under the guise of a trademark infringement claim. In reality, though, FLC's claim is nothing more than an objection to how MUS packages and promotes the Farberware cookware sets, which is unfounded under Paragraph 4.6 given that MUS' current packaging and promotion of the Farberware cookware sets is consistent with MUS' prior packaging. As early as 2007, MUS began to package and promote Farberware cookware sets with Prestige bonus items, and in March 2008, FLC was aware of this practice and approved it. (Tavacol Dec. ¶¶ 37-38.) Thus, because FLC's objections fit within the parameters of Paragraph 4.6 of the Agreement, FLC waived its objection to MUS' marketing strategy of combining Farberware products with Prestige products. *General Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236, 647 N.E.2d 1329, 1331 (1995) (noting that waiver is the intentional relinquishment of a known right).

Regardless of Paragraph 4.6, FLC also waived its right to object to the marketing and sale of Farberware-branded products with Prestige products when FLC approved and failed to object to the combination of Farberware and Prestige products at the 2008 Show or shortly thereafter. (Tavacol Dec.

¶¶ 37, 38.) Allowing FLC to now claim, one year later, that the packaging infringes its trademark would be inequitable.

**2.    Based on FLC's Approval at the 2008 Show, FLC is Estopped from Objecting to MUS' Combination of Farberware and Prestige Products.**

Similarly, FLC is estopped from objecting to the marketing and sale of Farberware-branded products with Prestige products because FLC represented to MUS that such action was permissible. To establish estoppel, a defendant must show: (1) material misrepresentation; (2) reliance; and (3) damage. *Gen. Elec. Capital Corp. v. Armadora, S.A.*, 37 F.3d 41 (2d Cir. 1994). FLC represented to MUS at the 2008 Show that it approved and had no objection to combining Farberware and Prestige products. (Tavacol Dec. ¶¶ 37, 38.) MUS relied on these representations and continued to market and sell the products in that fashion. If FLC is allowed to change its position and now object to the packaging and promotional sets for Farberware cookware combined with Prestige products, MUS would be damaged by the expense of changing its advertising and packaging, recouping the inventory that is in the possession of retailers, and re-boxing that inventory in the new packaging. (Zilinskas Dec. ¶¶ 8-12.)

**H.    FLC's Prayer For Relief is Improper and Should be Denied.**

In its Prayer for Relief, FLC seeks to preliminarily and permanently enjoin Defendants from, *inter alia*, (1) using Farberware's name, trademark, etc. in connection with the sale, advertisement, etc. of Prestige-branded products; (2) representing that Prestige products are made or sponsored by Farberware; and/or (3) doing any acts likely to cause confusion in the mind of the public vis-à-vis Prestige products and Farberware products, or otherwise "unfairly competing with Farberware…or misappropriating that which rightfully belongs to FLC." (Order to Show Cause, 3/26/09.)

In essence, FLC is asking this Court to permanently and broadly enjoin Defendants from violating the Lanham Act and from fully using its exclusive right to distribute Farberware cookware sets. The requested relief is wholly improper. A prayer for relief cannot simply request that the opposing

party comply with the law, or alternatively, *not* violate the law. *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994) (striking preliminary injunction language that prohibited violating the plaintiff's rights in its trademark and "engaging in unfair competition" on the ground that a court cannot fashion an injunction that is "so broad as to prohibit generally all unlawful activity.") Injunctive relief must provide "fair and precisely drawn notice of what the injunction actually prohibits." *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987) (reversing grant of injunction on the ground that "broad language in an injunction that essentially requires a party to obey the law in the future is not encouraged").

Like the plaintiff in *Sterling Drug*, FLC seeks relief prohibiting Defendants from "otherwise unfairly competing" with Farberware. This is precisely the type of relief that this Court cannot order. Because FLC cannot and has not established that Defendants should be enjoined, and because such a broad request for relief is wholly improper, FLC's request for relief should be stricken in its entirety.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court deny FLC's Motion for Preliminary Injunction.

Dated: April 27, 2009

Respectfully submitted,

**MEYER CORPORATION, U.S. and MEYER INTELLECTUAL PROPERTIES LIMITED**

s/ Heather L. Kramer

| | |
|---|---|
| Alan D. Reitzfeld | Dean A. Dickie |
| Christelette A. Hoey | Harry N. Arger |
| HOLLAND & KNIGHT LLP | Heather L. Kramer |
| 195 Broadway, 24th Floor | Renee L. Zipprich |
| New York, NY 10007 | DYKEMA GOSSETT PLLC |
| Phone: (212) 513-3200 | 10 South Wacker Drive, Suite 2300 |
| Fax:    (212) 385-9010 | Chicago, IL 60606 |
| | Phone: (312) 876-1700 |
| | Fax:    (312) 627-2302 |

## <u>CERTIFICATE OF SERVICE</u>

I, Heather L. Kramer, am an attorney admitted to practice before this Court, and hereby certify that:

On April 27, 2009, I caused a true and correct copy of Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction and Declarations of Dean Krause, David Tavacol, Jay Zilinskas, Dean A. Dickie, and Heather Kramer to be electronically filed in the United States District Court for the Southern District of New York, thereby causing same to be electronically submitted to Plaintiff's counsel.

I certify that the foregoing statements made by me are true. I understand that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


/s/
_____
Heather L. Kramer (IL 6272559)

Dated: April 27, 2009