Christopher J. Sovak (CS 3164)
Cem Ozer (CO 1718)
BUSHELL, SOVAK, OZER & GULMI, LLP
60 E. 42nd Street
Suite 2925
New York, New York 10165
(212) 949-4700
*Attorneys for Plaintiff*
*Farberware Licensing Company LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
|  |  |
|---|---|
| FARBERWARE LICENSING COMPANY LLC, | Case No. 09-CV-2570 (HB and MHD) |
| Plaintiff, |  |
| – against – |  |
|  | ECF CASE |
| MEYER MARKETING CO., LTD., MEYER INTELLECTUAL PROPERTIES, LTD., and MEYER CORPORATION, US, |  |
| Defendants. |  |

------------------------------------------------------------------x

## DECLARATION OF THOMAS J. MARONICK, DBA, JD

I, Thomas J. Maronick, hereby declare as follows:

1.      My qualifications and background are described in my report "An Analysis of Consumers' Perceptions of Claims Made by Meyer When Marketing Farberware Licensing Company Cookware Sets."

2.      Questions have been raised by Meyer that: a) "Survey 3, regarding the packaging containing the Farberware 10 piece triple bonus cookware set is irrelevant …because the Triple Bonus Set is only available from Target's online store…and it not available for in-

1

store purchase" (Memorandum in Support of Defendants' Motion to Bar Maronick Expert Report, Testimony and Surveys at 8); b) that the use of "Based on what is said or suggested..." in the questionnaire is leading as such questions "...improperly cue the respondent to guess, speculate, or otherwise look for a suggestion, not simply what the ad objectively says," (Memorandum in Support of Defendants' Motion to Bar Maronick Expert Report, Testimony and Surveys at 9; c) that the improper universe was surveyed (Memorandum in Support of Defendants' Motion to Bar Maronick Expert Report, Testimony and Surveys at 14); d) the Zoomerang.com panel was the improper sampling frame for the survey (same); and e) that "gibberish" and "illogical" responses were included in the results (Memorandum in Support of Defendants' Motion to Bar Maronick Expert Report, Testimony and Surveys at 13).

3.      Below is my response relative to each assertion.

4.      The Ten-Piece Bonus Set is Available for In-Store Purchase.  Contrary to Meyer's assertion, the Ten-Piece Bonus Set is available for in-store purchase.  In fact, I personally purchased the package and photographed the image shown to respondents in Study 3.  A copy of the receipt for that purchase is included hereto as Exhibit B.  Therefore, an assertion that the Ten-Piece Bonus Set is only available in on-line is without merit.

5.      The Use of "Say or Suggested" in the Questions is Proper.  Contrary to the assertions made by Meyer's expert, Bobby J. Calder, the generally accepted methodology for measuring implied claims is to use "say or suggested."  The issue in this case is not simply what Meyer said in their ads and on their package, but what consumers took from what Meyer said or did not say, i.e., what Meyer implied, namely that the Bonus Items offered in ads or on the package were made by Farberware, when they were, in fact,

made by Meyer. Therefore, to simply ask what the ad "said" (i.e., "what the ad objectively said") would not have measured what message consumers may have taken from the express and/or implied claims Meyer made in the ad or on the package, namely a false belief that the bonus items were made by Farberware. Therefore, the use of the phrase "say or suggested…" is not only not leading, it is the generally accepted way to measure implied claims. Based on my own experience preparing consumer surveys for the Bureau of Consumer Protection at the Federal Trade Commission, it was and is the accepted practice to ask survey respondents their impressions about an ad based on what the ad said or suggested.

6.      Additionally, in all questions related to who made the products shown in the ads or on the package (cookware or bonus items), the questions were open-ended, where the respondent was asked to write in a response to the question. In fact, the name "Farberware" was not mentioned in any question or response except the final question where respondents were asked if they owned any Farberware products and, if so, which ones. Thus, care was taken to assure that respondents were not "cued" in any way as to any particular response. They were simply asked to report through the use of open-ended questions what they took from the express and implied claims made in the ad or package. Furthermore, in all four surveys, each respondents were first asked, "did you notice the [knife set, bonus items, or Prestige]… in the ad or on the package as applicable, with the ad or image of the package visible on the screen in front of them when answering the question. Only after they had had the opportunity to review the ad or package image and respond to the question was he or she asked the follow-up open-ended question, "based

on what is said or suggested in the ad, who do you think makes the [knife set or bonus items] shown in the ad?"

7.      Given all the steps taken to assure that the questions met generally accepted standards for measuring consumers' perceptions of express and implied claims in the ads and package for Farberware cookware sets with bonus items, including applying generally accepted standards for unbiased and non-leading questions, I believe that Dr. Calder's assertions to the contrary are without merit.

8.      The Surveys Are Based on the Relevant Universe.  Respondents in each of the first four studies[1] were screened to assure that they were in the target market for kitchenware products. [Appendix A, at Exhibit A, lists the specific screen-out/skip protocol for each study].  Specifically respondents were screened to determine that they: are the member of their household who purchases kitchenware (e.g., pots and pans, cutlery, kitchen utensils, bakeware) for their home (Q2) [– those saying NO were screened out]; buy cookware frequently, occasionally, or seldom (Q4) [– those saying NEVER were screened out]; and buy cookware such as pots and pans for their home in sets (Q5) [– those who bought ONLY individual items were screened out][2]. Additionally, in the two surveys related to internet promotions (Survey 1, Survey 2), respondents were also asked whether they would consider purchasing cookware over the internet (Q3) [– those saying NO were screened out].

9.      These screening procedures are consistent with generally accepted standards for assuring the proper universe is included in the sample.  The standard is that the survey should include objective screening questions to assure that the respondents fit the selected

---

[1] Survey 5 asked awareness of brand names, hence there was no screening since it would have sensitized respondents to the brands of interest in the study.

[2] These questionnaire numbers are from Survey 1.  Comparable questions are in the other surveys.

4

sampling population but are not biased. Clearly, that standard was applied in these studies.

10.     Thus, the resulting samples are clearly in the target market for kitchenware and they must be considered "potential purchasers" of kitchenware and cookware sets. Moreover, the fact that a number of respondents already own Farberware kitchenware is not unusual because one would expect kitchenware to be in most households and Farberware is, to my knowledge, a long-standing brand name in this product category. However, because these are consumer items, I believe the cookware would likely have to be replaced from time to time. Therefore, an assertion that the relevant universe was not surveyed because it included current owners of Farberware cookware is without merit.

11.     The Zoomerang.com Panel Provides a Proper Sampling Frame. Contrary to the assertions by Meyer and their marketing expert, Dr. Calder, internet panels in general and the Zoomerang.com panel in particular are a widely utilized sampling frame for advertising and marketing studies. In fact, 47% of Harris Interactive poling is undertaken utilizing internet surveys and there is one estimate that 35% of all data collected in 2006 was by way of on-line methodologies.[3] Finally, approximately 70 of Fortune 100 companies use the Zoomerang.com panel for at least some of their research.

12.     Meyer's expert also suggested that the Zoomerang.com panel was inappropriate because they were "compensated" in that respondents on the panel were given an incentive to participate. While it is true that the respondents were compensated with "zoom points" which they will be able to redeem for merchandise, the utilization of compensation with internet panels is no different that paying individuals to participate in a mall-intercept study. Importantly, while compensating respondents increases response

---

[3] Bradley, Johnson "Online Methods Upend Consumer Survey Business" Advertising Age, July 17, 2006.

rates (i.e., willingness to respond), nominal compensation such as "zoom points" has no impact on the quality of the resulting data.

13.     Given the fact that, in general, internet surveys are widely utilized and that the Zoomerang.com panel in particularly utilized by so many marketing and advertising firms, an assertion that the Zoomerang.com panel is not an appropriate sampling frame to use to assess consumers' perceptions about express and claims made by Meyer in their ads and/or on their packages, is without merit.

14.     <u>The "Gibberish" and "Illogical" Responses are Insignificant.</u> Meyer's attorneys argue that "gibberish" and illogical responses were included in the resulting data. Nothing could be farther from the truth.  In fact, all "gibberish" or "illogical" responses were included as "other responses" in every table for each of the four surveys.  In fact, if the respondents who gave a "gibberish" response to a particular question were dropped from the sample, as Meyer suggests, the resulting percentage of respondents who identified Farberware in a particular open-ended response <u>would increase</u> since the number of Farberware responses (the numerator) would be divided by a smaller denominator.  Moreover, Meyer' identified approximately 50 "gibberish" responses (see footnote 5 in the Memorandum in Support of Defendants' Motion to Bar Maronick Expert Report, Testimony and Surveys).  I believe this number is de minimus, particularly when one realized that across the four advertising surveys there are a total of 17 open-ended questions responded to by 200 respondents.  Thus, the total number of open-ended responses is approximately 3,400.  Additionally, there are a total of 1,350 open-ended responses in Survey #5.  Therefore, in total, there approximately 4,750 open-ended responses across the five surveys.  Thus, approximately 50 gibberish or illogical

responses across that many response amounts to slightly more than 1% of the total number of responses.  This small percentage is insignificant and does not change the conclusions drawn from the data.

15.     <u>Conclusion</u>  Given that the research reported followed generally accepted standards as to selecting the proper sample from the relevant target market, design (i.e., the use of non-leading, primarily open-ended questions to measure respondents' perceptions of express and implied claims made by Meyer) and accurately reported the results, I believe any assertion that the results are not valid and reliable is meritless.

Pursuant to 28 U.S.C. ¶ 1746, I declare under penalty of perjury that the foregoing is true and correct.

Submitted:

_Thomas J. Maromick_                           _May 11, 2008_
Thomas J. Maromick, DBA, JD                Date

# EXHIBIT A

## APPENDIX A

## SCREENING/SKIP PROTOCOL FOR EACH STUDY

Study 1  (PotsandPans.com website)

Visits:        389
Partials:      16
Completes:     201
Screen outs:   126

Screen out protocol:

Q2     Screen out if NO to Q2
Q3     Screen out if NO to Q3
Q4     Screen out if NEVER to Q4
Q5     Screen out if INDIVIDUAL ITEMS (only) in Q5
Q11    SKIP to Q13 if NO to Q11
Q13    SKIP to Q15 if NO; NOT SURE to Q13
Q18    SKIP to END if NO; NOT SURE to Q15

Study 2 (Target.com website)

Visits:        333
Partials:      9
Completes:     200
Screen outs:   98

Screen out protocol:

Q2     Screen out if NO to Q2
Q3     Screen out if NO to Q3
Q4     Screen out if NEVER to Q4
Q5     Screen out if INDIVIDUAL ITEMS (only) in Q5
Q12    SKIP to END if NO; NOT SURE to Q12

Study 3x (Triple Bonus Package)

Visits:        351
Partials:      5
Completes:     206
Screen outs:   128

Screen out protocol:

Q2      Screen out if NO to Q2
Q3      Screen out if NEVER to Q3
Q4      Screen out if INDIVIDUAL ITEMS (only) in Q4
Q14     SKIP to END if NO; NOT SURE to Q14

## Study 4 (Kohl's Promotion Flier)

Visits:        316
Partials:      3
Completes:     204
Screen outs:   87

Screen out protocol:

Q2      Screen out if NO to Q2
Q3      Screen out if NEVER to Q3
Q4      Screen out if INDIVIDUAL ITEMS (only) in Q4
Q10     SKIP to Q12 if NO; NOT SURE to Q10
Q15     SKIP to END if NO; NOT SURE to Q15

## Study 5 (Brand Awareness Study)

Visits:        166
Partials:      4
Completes:     150
Screen outs:   0

Skip protocol:

Q15     SKIP to END if NO; NOT SURE to Q15

# EXHIBIT B



KOHL'S

Timonium
Timonium, MD 21093
(410) 252-2581

02-18-09 8:11P    0665/0005/3425/4 1962XXX
ID# 999-9781-9079-8881-9334-9465-7492

COOKWARE          631899718495  *    99.99 T1

                        SUBTOTAL      99.99
SENIOR CITIZEN DISCOUNT   15%      15.00-
   T1=    84.99  @    6.0% TAX       5.10
                          TOTAL      90.09


VISA            XXXXXXXXXXXXX8303    90.09
APPROVED        91815D

Kohl's Kids Who Care Scholarship Program
helps stand-up kids stand out. Kohl's plan
to reward more than 2,000 young volunteers
with over $350,000 in scholarships & prize
help us recognize deserving kids. Nominate
         at kohlskids.com by March 15, 2009.

MAR 0021