UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

FARBERWARE LICENSING COMPANY, LLC,

                           Plaintiff,

     *- against -*

MEYER MARKETING CO., LTD., MEYER
INTELLECTUAL PROPERTIES, LTD., and
MEYER CORPORATION, U.S.,

                           Defendants.

---------------------------------------------------------------- x

No. 09 CV 2570 (HB) (MHD)

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
## TO BAR MARONICK EXPERT REPORT, TESTIMONY AND SURVEYS

Dean A. Dickie
Harry N. Arger
Heather L. Kramer
Renee L. Zipprich
DYKEMA GOSSETT PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606
Phone: (312) 876-1700
Fax:     (312) 627-2302
Email: DDickie@Dykema.com
Email: HArger@Dykema.com
Email: HKramer@Dykema.com
Email: RZipprich@Dykema.com

Alan D. Reitzfeld
Christelette A. Hoey
HOLLAND & KNIGHT LLP
195 Broadway, 24th Floor
New York, NY 10007
Phone: (212) 513-3200
Fax:     (212) 385-9010
Email: alan.reitzfeld@hklaw.com
Email: christelette.hoey@hklaw.com

*Counsel for Defendants Meyer Corporation, U.S.*
*and Meyer Intellectual Properties Limited*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

LEGAL STANDARDS ..........................................................................................................1

    A.    Evidence Must Be Relevant to Be Admissible ........................................................1

    B.    Survey Evidence Must Be Probative of a Matter at Issue ......................................2

    C.    Standards for the Admissibility of Expert Testimony: Daubert, Kumho Tire, and the Federal Rules ....................................................................................2

    D.    Second Circuit Standards for Admissibility of Consumer Survey Evidence .........4

        1.    Surveys Must Use Appropriate Methodology .............................................4

        2.    Survey Evidence Must Fall Into A Recognized Hearsay Exception ..........5

    E.    The Standard for Actual Confusion Under Sections 32(1) and 43(a) of the Lanham Act..........................................................................................................7

ARGUMENT ..........................................................................................................................7

    A.    The Majority of the Maronick Opinion and Three of the Five Maronick Surveys Are Irrelevant ........................................................................................7

    B.    The Maronick Surveys Are Unduly Biased and Based on Prejudicial Leading Questions ..................................................................................................8

    C.    The Maronick Surveys are Little More Than Memory Tests and Are Not Probative As To Likelihood of Confusion..........................................................11

    D.    The Maronick Surveys Are Not Based on the Relevant Universe of Potential Purchasers of Defendants' Products .......................................................13

CONCLUSION.......................................................................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Footwear Corp. v. General Footwear Co. Ltd.,*
  609 F.2d 655 (2d Cir. 1979).............................................................................5, 12

*Amstar Corp. v. Domino's Pizza, Inc.*,
  615 F.2d 252 (5th Cir. 1980) .................................................................................15

*Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City,*
  383 F.3d 110 ...........................................................................................................15

*Daubert v. Merrell Dow Pharm. Inc.,*
  509 U.S. 579 (1993)...........................................................................................2, 3, 4

*Dreyfus Fund Inc. v. Royal Bank of Canada,*
  525 F. Supp. 1108 (S.D.N.Y. 1981).........................................................................5

*Holland v. Walter Kidde Portable Equipment, Inc.,*
  No. 05-cv-0325 ......................................................................................................12

*Hutchinson v. Essence Commc'ns, Inc.,*
  769 F. Supp. 541 (S.D.N.Y. 1991).........................................................................14

*In re Paoli R.R. Yard PCB Litig.,*
  35 F.3d 717 (3d Cir. 1994).......................................................................................3

*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999)..............................................................................................3, 4

*Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007).................................................................2, 4

*Polaroid Corp. v. Polarad Elecs. Corp.,*
  287 F.2d 492 (2d Cir. 1961).....................................................................................7

*Schering Corp. v. Pfizer Inc.,*
  189 F.3d 218 (2d Cir. 1999).....................................................................................6

*Scotts Co. v. United Indus. Corp.,*
  315 F.3d 264 (4th Cir. 2002) ...................................................................................4

*Simon Prop. Group L.P. v. mySimon, Inc.*,
  104 F. Supp. 2d 1033 (S.D. Ind. 2000) ...............................................................2, 3

*Sports Auth., Inc. v. Prime Hospitality Corp.*,
  89 F.3d 955 (2d Cir. 1996)...................................................................................7

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir. 1999)..............................................................................2, 8

*TrafficSchool.com, Inc. v. Edriver, Inc.*,
  No. CV 06-7561 PA(CWx), 2008 WL 4000805 (C.D. Cal. June 4, 2008) ............................12

*Trouble v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001)...................................................................14

*U.S. v. Downing*,
  753 F.2d 1224 (3d Cir. 1985).............................................................................2

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
  746 F.2d 112 (2d Cir. 1984)........................................................................5, 10, 15

*Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*,
  516 F.3d 853 (10th Cir. 2008) ...........................................................................4

## RULES

Fed. R. Evid. 703 ........................................................................................3, 11

Fed. R. Evid. 802, 803, 807 ...............................................................................6

Fed. R. Evid. 803(3).......................................................................................6

Fed. R. Evid. 807 ........................................................................................6, 12

Federal Rule of Evidence 401 .............................................................................1

Federal Rules of Evidence 402 ...........................................................................1

Federal Rule of Evidence 403 .............................................................................2

Federal Rule of Evidence 702.............................................................................2, 3

Federal Rules of Evidence 703 ...........................................................................3

## OTHER AUTHORITIES

2 Anne Gilson LaLonde, Gilson on Trademarks § 5.04 (No. 68 2008) ...........................................7

3 Anne Gilson LaLonde, <u>Gilson on Trademarks</u> §8.11(a) (No. 68 2008) .....................................14

6 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> §32:159 (4th ed. 2009) ...........................................................................................................................14

## INTRODUCTION

Plaintiff Farberware Licensing Company, LLC ("FLC") filed its Memorandum of Law In Support of Its Motion for A Preliminary Injunction with this Court on April 2, 2009. In support of that memorandum, FLC attached the declaration of Thomas J. Maronick, which in turn attaches a purported expert opinion as well as several hundred pages of survey printouts from "zoomerang.com." As shown below, the majority of the Maronick report is wholly irrelevant the issues in this matter. Any remaining portion of the Maronick documents falls far short of the standards for reliability of expert evidence set forth in the Federal Rules and the *Daubert*/*Kumho Tire* line of cases and must be excluded from consideration in this case. Accordingly, Defendants, Meyer Intellectual Properties Limited ("MIP") and Meyer Corporation, U.S. ("MUS") (collectively "Defendants" or "Meyer"), respectfully request that this Court exclude or give no weight to Dr. Maronick's opinion and survey.

## LEGAL STANDARDS

### A.    Evidence Must Be Relevant to Be Admissible

A fundamental principle of the Federal Rules of Evidence is that to be admissible, evidence must be relevant. Federal Rule of Evidence 401 provides that "'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Put simply, Rule 401 requires the question be asked: "Does the item of evidence tend to prove the matter sought to be proved?" Fed. R. of Evid. 401 advisory committee's notes. Rule 402 provides that "[e]vidence which is not relevant is not admissible." The lack of relevance is an absolute bar to admissibility. Fed. Rule of Evid. 402 advisory committee's notes ("that evidence which is not relevant is not admissible [is] a presupposition involved in the very conception of a rational system of evidence") (citations omitted). The Supreme Court affirmed

1

the importance of this concept in connection with the presentation of expert opinions in holding that it is a necessity for the District Court, as a gatekeeper, to determine the reliability of an expert's testimony and assess the relevancy of the opinion as well. *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579, 597 (1993) ("[T]he Rules of Evidence . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."), *id.* at 591 (evidence should be admitted if it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.") (citing *U.S. v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).

### B.      Survey Evidence Must Be Probative of a Matter at Issue

Like all evidence, consumer surveys used in Lanham Act cases must meet Federal Rule of Evidence 403's requirement that the offered evidence not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ." Thus, a survey may have sufficiently significant flaws to cause its exclusion under Rule 403 due to its potential to mislead. *See Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 297 (2d Cir. 1999) (probative value of survey "was easily outweighed, under a Rule 403 analysis, by the danger of confusion of the issues"); *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 596 (S.D.N.Y. 2007) ("both Rule 702 and 403 require the court to look at the cumulative effect of all of the flaws in a survey"); *Simon Prop. Group L.P. v. mySimon, Inc*., 104 F. Supp. 2d 1033, 1039 n.3 (S.D. Ind. 2000).

### C.      Standards for the Admissibility of Expert Testimony: *Daubert, Kumho Tire*, and the Federal Rules

Because consumer survey research must be presented through an expert witness, its admissibility is governed by the standards applicable to expert testimony. *See, e.g., Malletier,* 525 F. Supp. 2d at 581 ("the result of a survey is essentially expert testimony," and Federal Rule

of Evidence 702 is "clearly applicable"); *Simon,* 104 F. Supp. 2d at 1039-1040 (consumer survey results "must be presented through expert witnesses," and therefore tested under Rule 702).

The *Daubert/Kumho Tire* line of cases, along with Federal Rules of Evidence 702/703, set out the minimum standards for expert testimony to be admissible.  The standard is straightforward: an expert's opinions, to be admissible, must be based on sufficient facts and data, be the product of reliable principles and methods, and must be faithfully based on those principles.  Fed. R. Evid. 702.  The facts and data must be of a type reasonably relied upon by experts in the field of testimony.  Fed. R. Evid. 703.  In *Daubert*, the Supreme Court reaffirmed that relevance and reliability are the lynchpin of admissibility of expert opinions.  509 U.S. at 597.  The standard articulated in *Daubert* extends to all expert discovery and is not limited to "scientific" subject matter.  *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 138 (1999).  The *Daubert* inquiry must focus "solely on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595.  "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

*Daubert* requires that the trial judge determine "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The Court provided a list of non-exclusive factors to consider, including: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted within the relevant scientific community. *Id.* at 592-94.

*Kumho Tire* held that judges in cases involving non-scientific testimony both enjoy broad discretion in determining how to assess an expert's reliability and are not limited to the *Daubert* factors in assessing the reliability of the proffered expert testimony. *Kumho Tire*, 526 U.S. at 150-151. *Daubert* emphasized that the four-part test is *not* a "definitive checklist or test." 509 U.S. at 593. *Kumho Tire* reiterated that point, holding that "[t]oo much depends upon the particular circumstances of the particular case at issue" to determine whether all *or any* of the *Daubert* factors should be considered by a court in determining whether expert testimony should be allowed. *Kumho Tire*, 526 U.S. at 150. The *Daubert* test "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. Therefore, "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id*. at 153.

**D.    Second Circuit Standards for Admissibility of Consumer Survey Evidence**

**1.    Surveys Must Use Appropriate Methodology**

The proponent of a survey "must prove by a preponderance of the evidence that it is reliable," including proof that the expert offering the survey "appl[ied] principles and methods in accordance with professional standards." *Malletier,* 525 F. Supp. 2d at 580. Survey evidence can—and should—be excluded when the survey methodology is flawed or the survey exhibits a "failure to focus on the critical question." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (holding that such a failure was error and reversing the District Court's acceptance of such evidence). *See also Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 864 n.8 (10th Cir. 2008) (upholding the exclusion of a plaintiff's survey intended to show actual confusion, where the defendant's expert—a professor of marketing with market research expertise—testified that the "survey suffered from systematic design flaws and utterly failed to

comply with generally accepted survey principles. The survey suffered from question bias, interviewer bias, location bias, participant bias, and timing bias.") (internal citations omitted).

The Second Circuit has held that a consumer survey which utilizes an improper universe cannot be relied upon in establishing consumer confusion in a trademark case. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984). The Court in *Universal* held that "[t]o be probative and meaningful surveys must rely upon responses by *potential* consumers of the products in question." *Id.* (citing *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981) (emphasis added)). Inclusion of individuals who have already purchased accused products rather than those contemplating such a purchase is improper. *Id.* Additionally, a survey which suggests a connection between the accused product and the plaintiff's mark is an obviously leading and improper inquiry. *Id.* Finally, when the survey attempts to " raise an image which [plaintiff] does not own in the minds of the respondents" it is likewise objectionable. *Id.* When a survey commits all of the above errors, it is "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion." *Id.*

Furthermore, to be valid consumer surveys must accurately replicate the actual conditions in which the consumer will encounter the product. *Am. Footwear Corp. v. General Footwear Co. Ltd.,* 609 F.2d 655, 660 n.4 (2d Cir. 1979) (holding that failure to simulate actual marketing conditions was a "critical defect" in the survey).

**2.    Survey Evidence Must Fall Into A Recognized Hearsay Exception**

Statements made by survey respondents are relied upon by the survey proponent for the truth of the matter asserted by respondent—*e.g.,* that the consumer was confused. As such, these statements are hearsay and must fall under one of the exceptions to the hearsay rule to be admissible and relied upon. Fed. R. Evid. 802, 803, 807; *Schering Corp. v. Pfizer Inc.,* 189 F.3d

218, 227 (2d Cir. 1999).  Often in the case of consumer surveys used to prove claims under the Lanham Act, the pertinent exception will be either the "state of mind" exception of Fed. R. Evid. 803(3) or the residual exception of Fed. R. Evid. 807.  *Schering*, 189 F.3d at 227, 230.

"The great majority of surveys admitted in [the Second Circuit] including those used in Lanham Act cases to establish actual confusion or secondary meaning, fall into [the Rule 803(3) category:  they poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions." *Id.* at 227.  However, if statements expressing the survey respondent's state of mind are offered "to establish not only that the states existed, however, but also the facts thereby recalled or believed, the statements are no longer simply expressions of mental state." *Id.* at 231.  Indeed, Rule 803(3) makes clear that "a statement of memory or belief to prove the fact remembered or believed" is not included in the state of mind exception.  *Id.* Thus, survey responses which related memories, rather than present state of mind, are not admissible under the 803(3) exception.

A second common basis for admission of survey evidence is the residual exception of Rule 807, allowing evidence with "equivalent circumstantial guarantees of trustworthiness."  In short, Rule 807 requires five elements "trustworthiness, materiality, probative importance, the interests of justice and notice." *Schering*, 189 F.3d at 231.  Admission of evidence under the residual exception "requires an initial trustworthiness determination before it will allow for the admission of evidence."  *Id.* at 234.  Such determination includes an analysis of the "methodological strengths" and "their proneness to faulty memory and perception." *Id.*

E.    **The Standard for Actual Confusion Under Sections 32(1) and 43(a) of the Lanham Act**

Actual confusion is one of the eight *Polaroid* factors established in the Second Circuit which may be considered to support a finding of likelihood of confusion. *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961). Actual confusion occurs when members of the purchasing public believe the defendant's product was made or sponsored by the plaintiff. 2 Anne Gilson LaLonde, Gilson on Trademarks § 5.04 (No. 68 2008). In the Second Circuit, a showing of actual confusion requires the plaintiff to establish that the accused use by the defendant "could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 963 (2d Cir. 1996).

## ARGUMENT

The Maronick evidence is so badly flawed that it cannot be said to affirmatively establish any relevant fact asserted in FLC's motion.

A.    **The Majority of the Maronick Opinion and Three of the Five Maronick Surveys Are Irrelevant**

As a threshold matter, only two of the Maronick surveys address statements made by MUS or any of its affiliates. Maronick's Surveys 2 and 4 address statements made by retailers—Target and Kohl's, respectively—not MUS or MIP.[1] Thus, regardless of their contents, Defendants did not create or invite or allow any confusion by virtue of advertisements that they do not control. Survey 5 is not relied upon in the Maronick report or elsewhere. The purpose for its inclusion by FLC is unclear.

---

[1] Removing any possible lingering doubt as to the source of the Target and Kohl's ads, Defendants have submitted the Declaration of David Tavacol in conjunction with its Response in Opposition to the Motion for Preliminary Injunction, establishing that it does not have control over ads put out by retailers such as Target and Kohl's. (Tavacol Decl. ¶¶ 14-34.)

Because three of the five Maronick surveys have no logical relevance to statements made by Meyer which may have caused consumer confusion, FLC cannot claim that those surveys are "sufficiently tied to the facts of the case" to aid in resolving the pending motion to enjoin Meyer's conduct. Even if FLC could establish some tenuous relevance, that thin connection would be "easily outweighed, under a Rule 403 analysis, by the danger of confusion of the issues." *Starter*, 170 F.3d at 297.

**B.     The Maronick Surveys Are Unduly Biased and Based on Prejudicial Leading Questions**

There are numerous examples of the use of leading questions to garner the desired results of the Maronick survey. Each of the survey's questions immediately strike a leading tone. For example, several of the questions begin by asking "Based on what is said *or suggested*." (*See, e.g.,* Maronick Decl. at Ex. B, Survey 1, Questions 7, 8, 10; Ex. C, Survey 2, Questions 7, 8; Ex. D, Survey 3, Questions 6, 8, 10; Ex. E, Survey 4, Questions 6-9, 11.) These "suggestive" questions are heavily relied upon by Dr. Maronick in his report. (Maronick Decl. at Ex. 1, pp. 7-8, 10, 12, 14-15.) These questions improperly cue the respondent to guess, speculate or otherwise look for a *suggestion*, not simply what the ad objectively says.

Furthermore, question 7 of Survey 1 asks in full "Based on what is said or suggested in the ad, what brand or brands of kitchenware (pots and pans, cutlery, kitchen utensils) is/are being offered in the ad?" (*See, e.g.,* Maronick Decl. at Ex. B, Survey 1, Questions 7, 8, 10.) This question does not even ask the respondent to list all brands shown. Given that Farberware cookware is the primary item offered, it is unsurprising that most respondents listed only Farberware. Next, after respondents had been primed with the name Farberware on their minds, respondents are asked to name the manufacturer of the bonus items, again "based on what is said *or suggested*." (*See, e.g.,* Maronick Decl. at Ex. B, Survey 1, Question 10.) These responses are

further skewed by that fact that it appears that the respondents are no longer viewing the ad while they are answering the survey questions. Nor does it appear that there is a way for them to go back to review the ad.[2] By priming respondents to think of "Farberware," denying them an opportunity to review the ad, and heavily implying that they should look for a "suggestion" in the ad, Maronick all but assured a strong "Farberware" response. Thus, because Maronick relies heavily on these leading and prejudicial questions, the results of his surveys should be excluded.

In Survey 3, in addition to the leading tactics described above, Maronick also uses leading questions regarding the "Prestige" trademark. Specifically, at question 10, he asks: "Based on what is said or suggested on the package, what company or brand is the name "Prestige" associated with." (*See, e.g.,* Maronick Decl. at Ex. D, Survey 3, Question 10.) By asking the question in this manner, he strongly suggests that respondents should understand an association between "Prestige" and some other name, rather than asking the respondents if they perceive any association at all. These leading questions render the survey incapable of offering any reliable indications of whether confusion exists. *See Universal City*, 746 F.2d at 118 ("A survey question which begs its answer cannot be a true indicator of the likelihood of consumer confusion.").

Survey 4 builds on these tactics by again forcing a suggestion or association, and also goes further by re-presenting the respondent with carefully cropped, zoomed-in portions of the ad—a tactic that further highlights the "memory test" nature of the survey, discussed below. (*See, e.g.,* Maronick Decl. at Ex. E, Survey 4.)

Most importantly, these tactics in Maronick's opinion and surveys do not live up to the methodological standards in his field. In his declaration, Dr. Bobby Calder, a Professor of

---

[2] See further discussion of this issue in Section C, *infra.*

Marketing at Northwestern University, confirmed that the methodologies employed by Maronick were flawed and leading.  (Calder Decl. at ¶ 3).  In particular, consumers are asked to guess as to determinations about products that they would otherwise not normally make, and are further pressured to make associations such as that all the items fall under one brand name. (Calder Decl. at ¶4).  In another instance, the survey employs biased question ordering, such as in Survey 1 where consumers are first prompted at question 12 to associate the Farberware brand with the Affiniti model, then the following question 13 asks for the consumer to look for a name to associate the Prestige mark with.  (Maronick Decl. at Ex. B, Survey 1, Questions 12-13.) (Calder Decl. at ¶ 5).  As Dr. Calder points out, this ordering no doubt creates bias with respect to the latter asked question.  (Calder Decl. at ¶ 5).  The intended bias is even more obvious when one considers that any link between Affiniti and Farberware is not a part of FLC's claims. Therefore the only reason for inclusion of question 12 could be to prime respondents to give the desired response to question 13.

As further noted in the declaration of Dr. Calder, the Maronick surveys make several erroneous presumptions about consumer behavior. (Calder Decl. at ¶ 8)  Maronick then crafts questions calculated to support a selected conclusion. Professor Calder notes that given understandings of consumer behavior, it is far from given—and in fact is unlikely—that consumers upon viewing the stimulus material presented in the Maronick surveys would, upon contemplating purchase, consider or care about whether there is an association between the combined products.  (Calder Decl. at ¶ 10).  Consumers are used to products being combined, and if left to give an unpressured answer, would likely recognize that they cannot make an appropriate inference as to the source of bundled items.  (Calder Decl. at ¶ 12).

Dr. Calder's declaration shows that such a poorly executed and biased survey as Marnoick's is not the type of survey that is reasonably relied upon by experts in the field of consumer behavior. Therefore, the Maronick surveys are unreliable and cannot form the basis of any expert opinion evidence, pursuant to Fed. R. Evid. 703.

### C. The Maronick Surveys are Little More Than Memory Tests and Are Not Probative As To Likelihood of Confusion

Perhaps the most egregious example of how the Maronick surveys were constructed in a biased manner is the way respondents are allowed to view the stimuli. In each case, the website snippet or package picture is withdrawn from the respondents' view before they are allowed to answer questions based on it. Therefore, many responses must be drawn from memory, rather than observation. This has two effects: First, it diminishes further the extent to which the survey simulates market conditions. Second, it takes the evidence generated outside of the recognized hearsay exception for consumer surveys, rendering it inadmissible.

To the extent it can be ascertained from the poor quality copies provided by counsel for FLC, it is clear that the stimulus material for all surveys were in some way cropped or resized. These alterations alone create a "critical defect" in the survey's probative value. *Am. Footwear*, 609 F.2d at 660 n.4. Withdrawing the cropped images from view before many of the questions are asked destroys any remaining connection to a realistic purchasing experience. This is not the first time that Dr. Maronick has failed to simulate market conditions. In *TrafficSchool.com, Inc. v. Edriver, Inc.*, No. CV 06-7561 PA(CWx), 2008 WL 4000805, at *11 (C.D. Cal. June 4, 2008), the court held that parts of Dr. Maronick's opinions should be excluded and specifically found that "The Court agrees that the lack of a control, and the failure to present Defendants' webpage as an actual consumer would see it, including the disclaimer, are significant problems with

Dr. Maronick's survey." *See also Holland v. Walter Kidde Portable Equipment, Inc.,* No. 05-cv-0325, at *3 (N.D. Ala. Nov. 9, 2007) (excluding testimony of Maronick as an expert).

Also, by withdrawing the images, the answers of respondents are therefore necessarily recalled memories, not their current states of mind. Therefore, FLC can only rely on the residual hearsay exception of Rule 807 for admissibility of its surveys – a route which is foreclosed by Maronick's complete failure to follow any acceptable methodology. Thus, the surveys wholly lack any guarantees of trustworthiness. Further diminishing any circumstantial guarantees of trustworthiness are the numerous "gibberish" or otherwise non-sensical answers[3] by respondents. The gibberish answers show that the survey was not designed to solicit adequate consideration, or even apparently any consideration of the question—rather, they show evidence of users seeking to merely complete the survey as quickly and with as little regard as possible.

---

[3] Some examples of illogical/gibberish responses:

Survey 1, Q7 (what brands offered): 154-"jhbkjnk,"
Survey 1, Q8 (who makes 12 pc. set): 154-"ikughkj,"
Survey 1, Q10 (who makes knife): 155-"kjnklnl," 186-"cuts,"
Survey 1, Q12 (seeking Affiniti association): 75-"cars,"
Survey 2, Q7 (what brands offered): 44-"na," 56-"feelk," 101-"none," 113-"T-fel," 166-"cook ware," 171-"Looks like a good deal," 186-"na," 188-"Teflon," 200-"52"
Survey 2, Q8 (who makes bonus items): 6-"all," 2-"someone like me," 3-"no comment," 6-"all," 46-"not," 52-"Pots and Sheet Pans," 56-"home," 66-"good deal," 67-"utensils," 92-"Cheap," 99-"i like it," 133-"My," 145-"yes," 155-"thats interesting," 172-"A utinsol set.", 174-"99.99," 177-"?," 200-"0"
Survey 3, Q6 (what brands offered): 25-"yuykhk," 107-"na," 130-"000000," 156-"g,"
Survey 3, Q8 (who makes bonus items): 25-"yhl.yhi," 32-cutting knife, p;astic accessories, and 2 baking s," 58-"saw 10 times big pot saw something about bonus in," 130-"0000000," 156-"g," 165-"yes," 179-"didn't pay attention to that part," 204-"0"
Survey 3, Q10 (seeking Prestige association): 25-"i0o[i," 123-"upper class," 130-"000000," 152-"pressure cooker,"156-"g,"
Survey 4, Q 6 (what brand offered): 82-"lijuygytr," 98-"right," 130-"adskljdfasjkl,"
Survey 4, Q7 (what brands of kitchenware offered): 98-"left," 130-"asdjkdklsa lasdj f," 163-"sadfsadf," 188-"non"
Survey 4, Q8 (who makes knife): 82-"fdxewr," 98-"right," 110-"free," 111-"no," 114-"yes because it look nice, made you want it more," 130-"ajsd fddl jlasj dfl"
Survey 4, Q9 (seeking Millenium association): 82-"ijudr," 107-"very good value," 130-"sadlkjflk dfjsjdf sjalkf,"
Survey 4, Q11 (seeking Prestige association): 75-"good," 99-"5."

### D.    The Maronick Surveys Are Not Based on the Relevant Universe of Potential Purchasers of Defendants' Products

Maronick's surveys are drawn from the "zoomerang.com" panel of "2.5 million email addresses of individuals." (Maronick Decl. at Ex. 1, p. 5, n.4.) The majority of the respondents to all surveys (as high as 60%) owned Farberware products, though Maronick does not report whether they are Defendants' Farberware products or those of other licensees. In any case, it is clear that Maronick makes no effort whatsoever to narrow the respondents to potential purchasers of the accused products—the bonus items included with the various Farberware cookware sets. This is directly contrary to the relevant universe in a proper confusion inquiry: "In evaluating confusion in a trademark infringement case, it is important to remember that the courts are dealing with confusion as to source, and that the only 'relevant population' is potential purchasers of the junior user's goods or services." *Hutchinson v. Essence Commc'ns, Inc.,* 769 F. Supp. 541, 546 (S.D.N.Y. 1991).

Maronick did not screen out respondents on any basis and makes no mention of how the surveys were tailored to target the relevant universe. Indeed, Maronick does not even state what he considers the relevant universe to be. Notably, Maronick asks no screening or other questions as to whether respondents would consider purchasing or be more likely to purchase a cookware set including bonus items—the critical issue in this litigation. In short, Maronick has failed at what most consider to be the first step in assembling a proper consumer survey to measure likelihood of confusion. *See, e.g.,* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed. 2009) ("The first step in designing a survey is to determine the 'universe' to be studied."), 3 Anne Gilson LaLonde, Gilson on Trademarks § 8.11(a) (No. 68 2008). Like other surveys which rely on an irrelevant universe, the Maronick survey evidence must be excluded. *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) (to be

meaningful, a survey "must rely upon responses from all potential consumers of the product in question"); *Universal City,* 746 F.2d at 118 (survey which utilized an improper universe was excluded); *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City,* 383 F.3d 110, 119 (excluding a survey commenting that "A survey of the wrong 'universe' will be of little probative value in litigation); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (excluding survey evidence, and commenting that "the persons interviewed must adequately represent the opinions which are relevant to the litigation").

## CONCLUSION

The surveys presented by FLC and Maronick fall far short of the standards for admissibility in the Second Circuit. Rather, it is clear that the surveys presented were not carefully tailored to answer any critical question presented by FLC's complaint. Instead, any careful tailoring was solely directed toward crafting leading and biased questions of an irrelevant survey of an inappropriate survey participant pool. Indeed, under Second Circuit precedent, the Maronick surveys meet all the criteria requiring them to be deemed "so badly flawed that [they] cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion." *Universal City*, 746 F.2d at 118. As such, the surveys bear no probative value and should be excluded from consideration at this or any other stage in this litigation. As in other cases where Maronick has offered testimony, his opinion offers no value and should be excluded or given no weight.

Dated:  July 24, 2009

Respectfully submitted,

s/ Timothy K. Sendek

Dean A. Dickie
Harry N. Arger
Heather L. Kramer
Renee L. Zipprich
Katharine K. Dunn
Timothy K. Sendek
DYKEMA GOSSETT PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL  60606
Phone: (312) 876-1700
Fax:     (312) 627-2302
Email:  DDickie@Dykema.com
Email:  HArger@Dykema.com
Email:  HKramer@Dykema.com
Email:  RZipprich@Dykema.com

Alan D. Reitzfeld
Christelette A. Hoey
HOLLAND & KNIGHT LLP
195 Broadway, 24th Floor
New York, NY  10007
Phone: (212) 513-3200
Fax:     (212) 385-9010
Email:  alan.reitzfeld@hklaw.com
Email:  christelette.hoey@hklaw.com

*Counsel for Defendants Meyer Corporation, U.S.
and Meyer Intellectual Properties Limited*

15

<u>**CERTIFICATE OF SERVICE**</u>

I, Timothy K. Sendek, am an attorney admitted to practice before this Court, and hereby certify that:

On July 24, 2009, I caused a true and correct copy of Notice of Motion, Memorandum in Support of Defendants' Motion to Bar Maronick Expert Report, Testimony and Surveys, Declaration of David Tavacol, and Declaration of Bobby J. Calder, PhD., to be electronically filed in the United States District Court for the Southern District of New York, thereby causing same to be electronically submitted to Plaintiff's counsel.

I certify that the foregoing statements made by me are true. I understand that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

/s/Timothy Sendek

Timothy K. Sendek (IL 6293755)
