# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

FARBERWARE LICENSING COMPANY,  )

LLC,                           )

    Plaintiff,              )

  vs.                          )

MEYER MARKETING CO., LTD.,     )No. 09 CV 2570

MEYER INTELLECTUAL            )  (HB and MHD)

PROPERTIES, LTD., and MEYER   )

CORPORATION, U.S.             )

    Defendants.             )

    The deposition of HAL L. PORET, called for

examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before GINA M. LUORDO, a notary public within and

for the County of Cook and State of Illinois, at

195 Broadway, New York, New York, on the 20th day

of July, 2009, at the hour of 8:59 a.m.

Reported by:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

```
 1     APPEARANCES:

 2         BUSHELL, SOVAK, OZER & GULMI, LLP,

 3         BY:  MR. CHRISTOPHER J. SOVAK

 4         60 East 42nd Street, Suite 2925

 5         New York, New York  10165

 6         (312) 949-4700

 7            Representing the Plaintiff;

 8

 9         DYKEMA GOSSETT PLLC

10         BY:  MR. TIMOTHY K. SENDEK

11         10 South Wacker Drive, Suite 2300

12         Chicago, Illinois  60606

13         (312) 876-1700

14            Representing the Defendants.

15

16

17

18

19

20

21

22

23

24     Also Present:  Mr. Gary T. Ford
```

1   the population of the United States?

2       A.  You mean is the relevant universe?

3       Q.  Universe.

4       A.  No.

5       Q.  So the relevant universe in this case is

6   not the population as a whole of the United States?

7       A.  Correct.

8       Q.  Is it correct that the relevant universe

9   in this case is potential purchasers of the goods

10  shown in the advertising stimulus used in the

11  survey?

12      A.  Yeah, if by goods you mean the unit, the

13  package.

14      Q.  Right, potential purchasers of the item or

15  bundle of items shown in the Farberwarecookware.com

16  product page.

17      A.  Yes.

18      Q.  Potential purchasers of that are the

19  relevant universe?

20      A.  Yes.

21      Q.  If you flip to Appendix B to your report,

22  respondent composition data --

23      A.  Yes.

24      Q.  -- and look at the lower table, the table

1    the answer to both of those questions.  The other,

2    there are -- for likelihood of confusion, it's

3    accepted to be typically a forward-looking inquiry.

4    You know, in other words, when somebody is talking

5    about an injunction, you're usually looking at

6    future likelihood of confusion, and courts have,

7    therefore, said it's future purchasers that are

8    important, you know, as opposed to past purchasers.

9    But on the other hand, market researchers often say

10   past behavior is a good predictor of future

11   behavior, so some market researchers, even if what

12   they want to know is are these future purchasers,

13   they would prefer to ask past as a predictor of

14   future.  So it's kind of common to ask both.

15       The other issue is if you have a case

16   where -- well, whether damages are potentially

17   involved, damage is, obviously, based on things

18   that have occurred in the past, so sometimes you

19   also ask about the past if damages are relevant.

20       Q.  You said researchers often say that past

21   behavior is a good predictor of future behavior.

22   Isn't it true that researchers, in fact, say that

23   past behavior can be a better indicator of future

24   behavior than self-reported future behavior?

151

1  that people do buy repeatedly, but it's not so -- I
2  don't have knowledge to tell me exactly what the
3  cycle -- how often pots and pans are replaced
4  versus other items.  So I don't feel I necessarily
5  have the ability to say such specific knowledge
6  about cookware patterns that I could say one or the
7  other is better.  It's part of the reason why I
8  asked both was to be safe.
9     Q.  Do you have any particular expertise in
10 cookware buying patterns?
11    A.  No.
12    Q.  Do you have any particular expertise in
13 cookware marketing?
14    A.  No.
15    Q.  Or marketing in general?
16    A.  Well, just my survey research expertise.
17    Q.  So apart from expertise in survey
18 research, you don't have any marketing expertise?
19    A.  No.
20    Q.  Part of screening for whether respondents
21 had in the past 12 months or would likely in the
22 next 12 months purchase kitchenware, you also asked
23 whether they would consider purchasing anything
24 over the internet; is that correct?

152

1    A.  Yeah.

2    Q.  And that -- on that basis, you eliminated

3  people who said they would not?

4    A.  Yes.

5    Q.  And people who said they would consider

6  purchasing kitchenware over the internet were

7  screened for the survey or were used for the

8  survey?

9    A.  Yes.

10   Q.  Did you ever ask people if they had

11 purchased anything over the internet?

12   A.  No.

13   Q.  Do you have any way of knowing with

14 respect to all of the respondents of your survey if

15 any of them had ever purchased anything over the

16 internet?

17   A.  Yes.

18   Q.  What's that?

19   A.  I have the fact that I asked the -- that

20 the people who participated in the study were

21 people who said they would consider purchasing over

22 the internet, and, obviously, out of 400 plus

23 people who said they would consider purchasing

24 something over the internet, obviously, many people

1    of those people would be people who have purchased

2    something over the internet before.

3        Q.  So your basis for saying that some of

4    those people had purchased something over the

5    internet is based on your assumption that because

6    they all answered yes to this question, some of

7    them must have?

8        A.  Well, it's not even a requirement that

9    they purchase something over the internet before,

10   but if you wanted to know -- if you really wanted

11   to analyze whether these people had purchased

12   anything before, it would be ridiculous to say

13   that, you know, 440 people in America now who say I

14   would consider purchasing kitchenware over the

15   internet have never bought an item over the

16   internet before.

17       Q.  You can't say that for a fact, though, can

18   you?

19       A.  I can say it for as much of a fact as

20   anything is a fact.

21       Q.  Is there any one person who you can point

22   to, any one respondent that you can identify as

23   having ever purchased anything over the internet?

24       A.  No, not on an individual respondent

154

1   because that question wasn't in there.

2   Q.  Is there any one respondent that you can

3   identify had ever purchased kitchenware over the

4   internet?

5   A.  No.

6   Q.  Can you say for a fact that any of the

7   respondents have ever purchased kitchenware over

8   the internet?

9   A.  Again, I would think -- I would say it's

10  close to a fact as possible that when you ask all

11  these people this question of would you consider it

12  and that question was highly effective in weeding

13  out people who said no, I wouldn't consider it, it

14  seems inconceivable to me that all of these people

15  were people who had never done it before.

16  Q.  So as close to a fact as possible meaning

17  that you think it's a strong likelihood?

18  A.  Meaning that the scientific method is

19  based on doing science and drawing -- basing things

20  on things that are considered fact by science or

21  just things that are very high probability.

22  Q.  But as close as a fact as possible, you

23  mean not actually a fact.  You can't say it is a

24  fact?

160

1  replace their utensils or had replaced their

2  utensils, they would say yes to both questions or

3  yes to either question?

4      A.  Yes, and they would be relevant.

5      Q.  But they would not be a potential

6  purchaser of pots and pans?

7      A.  I guess according to your definition, not

8  in the next 12 months, but it's not as if the next

9  12 months is some magical limit that makes somebody

10  irrelevant or relevant.

11     Q.  Based on your screening questions, you

12  can't tell if they're a potential purchaser of pots

13  and pans in the next 12 months or in the

14  foreseeable future?

15     A.  I'm not -- you mean -- you're talking

16  about just pots and pans?

17     Q.  Sure.

18     A.  I guess the right answer is you can't --

19  you don't know if pots and pans specifically is

20  something they bought, they're going to buy in the

21  next 12 months, but you can tell that they are a

22  purchaser of the types of items that make them

23  relevant to show this product to.

24     MR. SENDEK:  Let's take a break.

1  the internet, and it struck me -- I certainly saw

2  some high-end things that were a lot more

3  expensive, and I saw a few things that seemed a bit

4  cheaper, so it struck me to be somewhat a middle

5  range.

6     Q.  Middle range in terms of price?

7     A.  That was my impression, but you're just

8  asking me my impression.  I'm not saying any of

9  this has any connection to the survey.

10     Q.  And that impression that it's a

11  middle-range price cookware line is based on the

12  internet searching you did to prepare for this

13  survey?

14     A.  It's based on coming across things in

15  places like Williams Sonoma.  I think I saw things

16  like All Clad that seemed a good deal more

17  expensive, and I've certainly seen things that

18  seemed to be much more cheaper product.  That's

19  just my impression.

20     Q.  So it's not based on any sort of

21  analytical determination of prices and where this

22  falls in between of what prices are out there?

23     A.  No.  I would only do that if I thought it

24  was a product that was in a price range that was so

1   specialized that consumers really needed to be

2   screened for a price.

3       Q.  How did you screen for consumers that

4   might be shopping for cookware in a price range

5   other than where Farberware falls?

6       A.  I'm not sure what you mean.

7       Q.  Did you do anything to screen potential

8   purchasers of cookware who might be potential

9   purchasers of cookware, but in a price range

10  outside of where Farberware is?

11      A.  No, because somebody should not be

12  excluded from a survey on the basis that they might

13  be shopping for something more expensive.

14      Q.  So if someone is a potential purchaser

15  of -- let's say one of the -- let's say there's a

16  potential purchaser who only buys high-end

17  cookware, would they have been screened out from

18  responding to your study?

19      A.  No.

20      Q.  And if there is a potential purchaser who

21  only buys very cheap cookware, would they be

22  screened out from your study?

23      A.  No, nobody would be screened out based on

24  what you're talking about in terms of price.

179

1          (Whereupon, PORET Deposition

2          Exhibit No. 7 was marked for

3          identification.)

4    BY MR. SENDEK:

5       Q.   Looking at what I'll call the home page of

6    Appendix F, which is the Farberwarecookware.com web

7    page, is it correct that if you click on the link

8    products next to the main name Farberware, it will

9    take you to this page of Exhibit 7?

10      A.   Yes.  You've refreshed my recollection.

11   Now seeing this page, I do recall there are two

12   pages in between the ones that I show this one

13   that's for Farberware products, and then clicking

14   on sets would bring you to another page that shows

15   Farberware sets.  And I made the decision not to

16   show all of these pages so as to not just be

17   bombarding people with the name Farberware.  That

18   was the reason.

19      Q.   I'll also hand you what I'll mark as Poret

20   Exhibit 8, which is another page from the website.

21         (Whereupon, PORET Deposition

22          Exhibit No. 8 was marked for

23          identification.)

24

1    that's the subject of your survey?

2       A.   Well, I can say that if somebody came to

3    the home page, they would have to go through these

4    two intermediate pages, but if somebody landed

5    directly on the page of sets or the page with the

6    end product, then they wouldn't.  And given that

7    things could happen a couple of ways, I did it the

8    way that was the most favorable to Meyer.

9       Q.   You agree, though, that no one would ever

10   see it as the way it was presented in the survey,

11   which was the home page immediately followed by the

12   product page?

13      A.   Yes, I agree with that.

14      Q.   If you look at the exhibit that was marked

15   as Exhibit No. 8, which is a partial view of all

16   the sets you would see or might see, do you see

17   that some of the sets have utensils and some of

18   them don't?

19      A.   Yes.

20      Q.   And do you also see that with respect to

21   the ones that have utensils, some of the utensils

22   are called out in a separate box, and sometimes the

23   utensils are not called out in a separate box?

24      A.   Yes.

183

1    Q.  So respondents to your survey did not have

2    an opportunity to see that?

3    A.  Well, they had an opportunity to see the

4    utensils only called out in a separate box.

5    Q.  So they didn't have an opportunity to see

6    sets without utensils, correct?

7    A.  They did not see this Exhibit 8.  It's as

8    clear as that.

9    Q.  Did they see any cookware sets without

10   utensils?

11   A.  No.

12   Q.  Did they see any cookware sets with

13   utensils where the utensils weren't called out in a

14   separate box?

15   A.  No.

16   Q.  Do you know how people typically behave

17   when they go to a site like Farberwarecookware.com

18   and shop for cookware?

19   A.  That's too vague to answer, but my best

20   answer is I don't have specific knowledge about how

21   people behave on that specific site.

22   Q.  For example, do you know whether or not

23   they're likely to look around at different products

24   before settling on one to buy or if they just go

1    straight to one product and buy it?

2        A.  I do not know.  I would assume that people

3    look at multiple products, but all I could do as a

4    survey expert is do what I think is the most

5    defensible.  There, obviously, are a variety of

6    things that consumers could do in the real world,

7    and I did the situation that is the least

8    potentially confusing.

9        Q.  So like you said, you would assume that

10   the typical visitor would look at multiple

11   products.  If they were shopping for cookware sets,

12   would they look at multiple cookware sets?

13       A.  My prediction is most people would look at

14   multiple sets and that that would increase their

15   tendency to be confused.  And by me skipping that

16   step, I was, again, bending over backwards to give

17   them the chance to not be confused.

18       Q.  And when they looked at multiple sets,

19   they would have the opportunity to notice, again,

20   that some of the sets have utensils and some of

21   them don't, correct?

22       A.  Yes.

23       Q.  And they would have the opportunity to

24   notice that some of these sets with utensils have

1      Q.   What highly technical sophisticated

2    distinction do you think I'm suggesting?

3      A.   You're suggesting that somebody could

4    deduce by the way utensils aren't circled in one

5    case and are circled in another case that the

6    utensils come from different sources when somebody

7    who looks at this page is just being bombarded with

8    Farberware set, Farberware set, Farberware set over

9    and over and over again.  I believe it's

10   inconceivable that what you're suggesting could

11   arise beyond that bombardment of the Farberware

12   mark.

13     Q.   If I were suggesting this, which is if

14   people saw the cookware sets where the utensils are

15   not in a box and then saw the cookware sets where

16   the utensils were in a box, might they arrive at

17   the conclusion that when they're not in the box,

18   they're from the same source as the cookware and

19   when they are in the box, they're from different

20   sources?

21     A.   That's what I'm calling a technical and

22   sophisticated deduction or assumption, and what I'm

23   saying is I think it's extremely unlikely that a

24   respondent would have gone through a thought

1    attention.

2    BY MR. SENDEK:

3        Q.   So when I say the disposition of the

4    validation results by market and interviewer, would

5    you understand what I'm asking for?

6        A.   I understand you to be asking for the

7    validation sheet, which shows -- which would show

8    the respondent's name and address and telephone

9    number, and then there would be a recording of

10   whether they were reached or whether they were not

11   reached.  And if they weren't reached, how many

12   attempts were made to call them and what happened

13   during those attempts.

14          To do the analysis you would like to do,

15   though, you would need to match up that validation

16   sheet to the certification pages and the

17   certification page to the questionnaire.  So in

18   other words, you would have to look on the

19   validation sheet and see Tom Jones was reached and

20   find the certification page for Tom Jones and see

21   what interviewer and market Tom Jones was from.

22   And with all of that, you could do this analysis.

23          In theory, I have no objection to allowing

24   you to do that other than the turning over of the

209

1  respondent personal information, which is a thorny

2  issue.  And if that were going to happen, we would

3  have to work out some way that's really legitimate

4  to do that.

5      Q.  So in terms of the physical documents, we

6  would be talking about what you termed the

7  validation sheet and the certification pages; is

8  that correct?

9      A.  Yes, that's what would be needed.

10     Q.  Is the validation sheet really just one

11 sheet, or is it a collection of documents?

12     A.  There would be multiple pages because

13 there's over 400 respondents.

14     Q.  But you would consider it one document?

15     A.  Yeah, it's one document.

16     MR. SENDEK:  Joe, is that specific enough?

17     MR. GULMI:  The validation sheet?

18     MR. SENDEK:  And the certification.

19     MR. GULMI:  And the certification pages, that's

20 what you want me to produce.

21 BY MR. SENDEK:

22     Q.  Would you agree that -- understanding you

23 have some concerns about privacy for the individual

24 respondents turning over the certification pages,