**OZER DECLARATION
(MOTION *IN LIMINE* – PORET)**

# EXHIBIT A

# STUDY TO DETERMINE WHETHER CONSUMERS ARE CONFUSED AS TO THE SOURCE OR SPONSORSHIP OF PRESTIGE KITCHEN ITEMS INCLUDED IN SETS OF FARBERWARE PRODUCTS

REPORT PREPARED FOR:

Bushell, Sovak, Ozer & Gulmi LLP
60 E. 42nd Street
Suite 2925
New York, NY 10165

PREPARED BY:

Guideline
625 Avenue of the Americas
New York, NY  10011

July, 2009

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE ------------------------------------------------- 1
STUDY AUTHORSHIP/QUALIFICATIONS---------------------------------- 2
STUDY DESIGN------------------------------------------------------------------------- 3
SUMMARY OF FINDINGS AND OPINIONS----------------------------------- 8

METHOD
      OVERVIEW------------------------------------------------------------------ 9
      THE RELEVANT UNIVERSE OF INTEREST ------------------------- 10
      SAMPLING PLAN----------------------------------------------------------- 10
      DOUBLE-BLIND INTERVIEWING ------------------------------------ 14
      INTERVIEWING PROCEDURES------------------------------------------ 14
      RESPONDENT VERIFICATION------------------------------------------- 15
      CHECK-IN PROCEDURES------------------------------------------------- 16
      INTERVIEWING PERIOD------------------------------------------------- 16

DETAILED FINDINGS ------------------------------------------------------------------ 17

CONCLUSIONS---------------------------------------------------------------------------- 23

APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR/RULE 26 MATERIAL
APPENDIX B:   QUESTIONNAIRES
APPENDIX C:   FIELD INSTRUCTIONS
APPENDIX D:   RESPONDENT COMPOSITION DATA
APPENDIX E:   VALIDATION RESULTS
APPENDIX F:   STIMULI
APPENDIX G:   CLASSIFICATION OF RESPONDENTS

## BACKGROUND AND PURPOSE

Farberware Licensing Company LLC ("FLC") is the owner of the mark Farberware. FLC has licensed Meyer Marketing Co. Ltd and its affiliates (collectively "Meyer") to use the Farberware mark in connection with certain cookware, such as pots and pans. Meyer is not licensed to use the Farberware mark in connection with certain other kitchenware, such as cutlery and kitchen tools.  Meyer uses the mark Prestige in connection with such items.

Meyer is marketing sets of kitchenware that bundle together products for which Meyer is licensed to use the Farberware mark (such as pots and pans) with products for which Meyer is not (such as kitchen tools or cutlery).  Meyer is marketing such kitchenware sets through, among other ways, a website at the URL www.farberwarecookware.com. The home page of the website says "Welcome to Farberware" and displays the Farberware mark and Farberware products in multiple places.  The Farberware mark also appears in multiple places on the web pages advertising the specific kitchenware sets.

FLC is concerned that consumers will be confused into believing that non-licensed Meyer products (such as kitchen tools and cutlery) that are included with Farberware-licensed pots and pans in the kitchenware sets sold on the Farberware Cookware website are Farberware products or are sponsored by Farberware.
Bushell, Sovak, Ozer, and Gulmi, attorneys for FLC, retained me to conduct a study to determine whether there is an appreciable likelihood of such consumer confusion.

In the course of preparing this study, I reviewed the following materials:  (1) the Complaint; (2) Declaration of Thomas J. Maronick; (3) Declaration of Bobby J. Calder; (4) Defendants' Notice of Motion to Bar Maronick Expert Report, Testimony and Surveys; (5) Memorandum in Support of Defendants' Motion to Bar Maronick; (6) Farberware Cookware web pages; and (7) other web pages involving cookware.

## STUDY AUTHORSHIP AND QUALIFICATIONS

This study was designed, supervised, and implemented by Guideline under the supervision of Hal L. Poret, Vice President.

As a Vice President of Guideline, I have personally designed, supervised, and implemented over 250 consumer surveys.  More than 120 of these have been trademark surveys and many others have concerned related issues regarding whether consumers are confused or deceived by advertising or marketing.   I have been personally involved in numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts and the Trademark Trial and Appeal Board.

I have frequently spoken at major intellectual property law conferences on the topic of how to design and conduct trademark surveys, including those sponsored by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Promotions Marketing Association, and American Conference Institute.  Most recently, in May 2009, I spoke at the INTA Annual Conference as an expert on the topic of Trademark Surveys in US Litigations.

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.

Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

The fee charged for the study and preparation of this report is $45,000.   Additional time in connection with this matter, if any, will be billed at my ordinary rate of $400/hr.

Hal Poret                                          7-1-09

## STUDY DESIGN

441 qualified respondents participated in this study, which was conducted in 12 mall research facilities around the country.

Each respondent was randomly assigned to one of two Cells.  227 respondents were assigned to a Test Cell and 214 to a Control Cell.

Once screened and determined to be qualified, all respondents were seated in front of a computer and instructed as follows:

> In a moment, I'm going to show you two pages from a website.  The first page will be the home page and the second page will be another page from the same website.  I'd like you to look at the web pages I show you as you ordinarily would if you came across the website while shopping on the internet.  You may take as much time as you like to review each of the web pages.  After you are finished, I will ask you some questions. If, for any question I ask, you don't know the answer or you have no opinion, please just say so.  Please do not guess.

Test Cell

Respondents in the Test Cell were then shown the home page of the www.farberwarecookware.com website on the computer monitor.[1]  After respondents had a chance to see the home page, they were next shown a web page from the same website advertising a 15-piece kitchenware set from the Farberware Classic Series.[2]

_____

[1] The web pages shown on the screen were not live pages. They were saved pages that had been loaded onto a CD. The reason for not using live web pages was to ensure that each respondent saw the same pages in the same easily viewable and readable size and format.  The saved web pages appeared on the computer screen exactly as they would to a consumer seeing them live on the internet.  Copies of the CDs used in the study are available for viewing.

[2] The URL for the actual page advertising this set is:
http://www.farberwarecookware.com/cs/Satellite/Product+-
+Farberware+Classic+Series+15+Piece+Set/mProduct/1192055216775/farberware/1198793766
170/mProduct/CookwareDetailEcomm.htm.  See Appendix F for images of the two web pages shown.  The images in Appendix F are modified to fit on a printed page.  The CDs from the

This set consists of Farberware-licensed pots, pans, and lids, and three Prestige brand kitchen tools – a spatula, serving spoon, and slotted spoon.  The kitchen tools are pictured below the pots and pans in an inset that contains the text "Includes Prestige® Kitchen Tools."

The web page for this particular 15-piece kitchen set was selected for use in the study because, of all the web pages I reviewed on the Farberware Cookware website, the advertisement for this set made the most prominent use of the Prestige mark in connection with the items that are not licensed by Farberware.

When the page showing the kitchenware set was on the screen, respondents were instructed:

> I'm now showing you another page from the same website.  This page is offering a 15-piece set of kitchenware.  Please look at this page as if you were shopping for kitchenware and were considering purchasing the advertised set.  Please let me know when you are finished and then I will ask you some questions.

After respondents were finished reviewing the web page, they were instructed that they were now going to be asked some questions about the "kitchen tools" included in the advertised set – namely, "the spatula, serving spoon, and slotted spoon that are shown beneath the pots and pans."

In criticizing the survey conducted by Dr. Maronick, Meyer complained that respondents were not allowed to see the advertisements during the questioning.  Meyer criticized this procedure as a "memory test" that did not simulate actual market conditions, and asserted that respondents should have been allowed to see the advertisements during the interview so that they could see the Prestige mark.  In order to address Meyer's concern regarding this issue, the web page advertising the set was

_____

study can be used to see the web pages in the size that they actually appeared on the computer screen during the interview.

left on the screen for the entire interview.  Therefore, respondents had every opportunity to consult the web page and see the Prestige mark during the questioning.

After respondents indicated being finished looking at the page advertising the set, respondents were then asked a series of questions about the kitchen tools.  With the second web page still viewable on the screen, respondents were first asked:

> Who do you think makes or puts out these kitchen tools, or don't you have an opinion?

For each company or brand respondents named, if any, respondents were asked;

> What makes you think *(company/brand)* makes or puts out these kitchen tools?

All respondents were next asked:

> Do you think the company that makes these kitchen tools has a business affiliation with any other company or brand, or don't you think so, or do you have no opinion?

Respondents who answered "yes" were asked:

> What other company or brand, if you know?

If respondent named a company or brand, they were asked the follow-up:

> What makes you think the company that makes these kitchen tools has a business affiliation with *(company/brand)*?

Finally, all respondents were asked:

> Do you think these kitchen tools are made or put out with the permission or approval of any company or brand, or don't you think so, or do you have no opinion?

Respondents who answered "yes" were next asked:

> What company or brand, if you know?

If respondent named a company or brand, they were asked the follow-up:

> What makes you think these kitchen tools are made or put out with the
> permission or approval of *(company/brand)*?

See Appendix B for the complete text of the main questionnaire.[3]

These are standard questions used to measure whether there is a likelihood of several
forms of confusion recognized by the Lanham Act – confusion as to source,
sponsorship, or affiliation.

Control Cell

Surveys often incorporate "controls" in order to ensure that the results represent
genuine trademark-related confusion as opposed to guessing or other forms of "noise."
The test group incorporated a control procedure in the form of questions asking
respondents to give reasons for their answers. Such questions enable us to determine
whether respondents who mention Farberware are doing so because of the use of the
Farberware mark in connection with the advertised set or are merely guessing or
naming "Farberware" for other reasons. To be conservative in the measurement of
confusion, however, the survey also incorporated a separate Control Cell to measure
the level of survey noise – i.e., the tendency of respondents to name Farberware for
reasons unrelated to Meyer's use of the Farberware trademark.

The procedure, instructions, and questioning in the Control Cell were identical to the
Test Cell. The only difference was the web pages shown to Control Cell respondents.
For the Control Cell, the true Farberware Cookware web pages were altered to remove
any indicia of Farberware. Both the home page and the web page advertising the
specific set were digitally altered to change every instance of the "Farberware" mark to

---

[3] The "blue" questionnaire shown in Appendix B was used to administer Test Cell interviews
using web pages loaded on a CD labeled with a blue dot. The "pink" questionnaire shown was
used to administer Control Cell interviews using a CD labeled with a pink dot.

a control name, "Kitchenware." In addition, photos of Farberware pots and pans were removed and, in some places, photos of other brands of pots and pans were added.

Accordingly, the web pages created for the Control Cell were identical to the true Farberware Cookware pages except for there being no use of the Farberware mark and no images of pots and pans recognizable as Farberware. Therefore, the Control Cell allows us to determine the extent to which respondents tend to name Farberware in response to the questions asked even in the absence of use of the Farberware mark. Because the only difference between the pages shown to the Test and Control Cells is the absence of the Farberware mark, any difference between the Test and Control results must be attributed to Meyer's use of the Farberware mark.[4]

---

[4] See Appendix F for images of the two control web pages shown, modified to fit on a printed page. The CDs from the study can be used to see the control web pages in the size that they actually appeared on the computer screen during the interview.

## *SUMMARY OF FINDINGS AND OPINIONS*

1) There is an extremely high likelihood of confusion created by Meyer's use of the Farberware mark in the context of the Farberware Cookware website. 77.1% of Test Cell respondents (175 out of 227) answered that Farberware makes or puts out the Meyer kitchen tools that are included with the advertised set. An additional 11 respondents (4.8%) answered that the kitchen tools are put out with the permission or approval of Farberware, for a total confusion rate of 81.9% (186 out of 227 respondents.)

2) In the Control Cell, 17 of 214 respondents (7.9%) answered that Farberware makes or puts out the Meyer kitchen tools that are included with the advertised set. An additional 5 respondents (2.3%) answered that the kitchen tools are put out with the permission or approval of Farberware or by a company that is affiliated with Farberware, for a total noise level of 10.3%.

3) Subtracting the 10.3% noise level from the 81.9 Test Cell result yields confusion net of noise of 71.6%.

4) Confusion net of noise of 71.6% is extremely high. Accordingly, it is my opinion to a high degree of professional certainty that there is a very large likelihood of consumer confusion.

## *METHOD*

### OVERVIEW

In designing and conducting studies intended to measure consumer perceptions and beliefs, we follow the guidelines and standards generally employed in the field of survey research, as well as the criteria set forth in the <u>Reference Guide on Survey Research</u> published by the Federal Judicial Center (2000).

These standards and criteria require that:

1. Those responsible for the design, conduct and analysis of the survey be experts in the field of survey research.

2. The survey design properly address its objectives.

3. The relevant universe be defined appropriately.

4. A representative sample be drawn from the relevant universe.

5. The measures collected include data for control groups and/or control questions when appropriate.

6. The survey questions be framed clearly, precisely, and so as to avoid bias; and, as far as possible, so as to avoid order or context effects.

7. The interviewers be well-trained and be without knowledge of the purposes for which the data will be used.

8. The interviews be conducted in a correct and unbiased manner and in accordance with generally accepted standards of procedure in the field.

9. Once gathered, the data be accurately analyzed and reported.

These criteria are discussed in greater detail on the following pages.

## THE RELEVANT UNIVERSE OF INTEREST

The relevant universe of interest for this study was defined as consumers or prospective consumers of kitchenware sets sold over the internet.  To be eligible for participation in the study, respondents were required to answer screening questions indicating that they: (1) have personally purchased kitchenware in the past 12 months or are likely to do so in the next 12 months; (2) mainly or sometimes buy sets of kitchenware items, as opposed to mainly buying individual items and; (3) consider purchasing kitchenware over the internet.

The survey excluded persons employed in fields that would give them special knowledge or insight about this subject, namely those working in advertising or market research, or for a company or store that makes or sells kitchenware.  Similarly, persons who had an immediate household member so employed were excluded from participation.  Screening out people with special knowledge is a generally accepted procedure.

Additionally, as part of standard procedure, those who had participated in a survey in a mall research facility within the past three months were excluded.

The actual wording of the screening questions used is shown in Appendix B.

## SAMPLING PLAN

The sampling procedure employed, which utilized shopping malls as a means of identifying relevant consumers, has been widely used and relied upon by market researchers, and many business decisions of consequence are made based on studies that employ such plans.  Properly designed and executed studies of this type have been accepted in numerous court decisions.

A multi-stage sampling plan was executed in interviewing facilities located in shopping malls in each of the four principal U.S. Census regions.  The four stages of the sampling plan for this study were:

SAMPLING UNIT

1.      Census Regions

2.      Metropolitan Areas within regions

3.      Shopping malls within Metropolitan Areas

4.      Respondents within shopping malls

1.      <u>Census Region Selection</u>

In accordance with generally accepted standards, the study was conducted in three markets in each U.S. census region -- Northeast, South, Midwest and West -- thus obtaining a cross section of residents from all parts of the country.

2.      <u>Metropolitan Area Selection</u>

The selection of markets for this study was carried out using a sample design developed by Professor Martin R. Frankel[5].  Professor Frankel developed a computer program for Metropolitan Area selection specifically for use by Guideline Research Corporation.

The population frame for the first stage of sample selection consists of the 112 Metropolitan Areas[6] in the United States that have one or more permanent mall interviewing facilities.

---

[5] Martin R. Frankel, Ph.D. is Professor of Statistics and Computer Information Systems at the Bernard M. Baruch College, City University of New York.  Professor Frankel is the Chairman of the Research Quality Council of the Advertising Research Foundation.  He has served as the Chairman of the Survey Research Section of the American Statistical Association and as Standards Chair of the American Association for Public Opinion Research.  Dr. Frankel is the author of several publications on the methods and theory of survey sampling.

[6] The term "Metropolitan Areas" is used in accordance with the definitions of the U.S. Bureau of the Census.  In New England, Metropolitan Areas follow the definitions of NECMAS (New England County Metropolitan Areas) as defined by the U.S. Bureau of the Census.

Prior to sample selection, the sampling frame was stratified on the basis of census region and Metropolitan Area size within region.  Within a region, the allocation of sampling points was in proportion to the population of Metropolitan Areas that have one or more permanent mall interviewing facilities. This procedure yielded the following markets:

| | |
|---|---|
| Albany | Los Angeles |
| Austin | Minneapolis |
| Baltimore | New York |
| Chicago | Philadelphia |
| Cincinnati | San Diego |
| Houston | San Francisco |

3.   <u>Shopping Mall Selection</u>

The criteria for selecting a specific shopping mall testing facility within each of the Metropolitan Areas selected included:  1) that an experienced interviewing organization existed within the mall; 2) that this organization had a permanent office within the shopping center created specifically to conduct interviews with consumers; and 3) that their workload was such that they could complete their portion of the assignment within the desired schedule.  Using these criteria, the following malls were selected as interviewing sites:

| Market | Mall |
|---|---|
| Albany | Crossgates Mall |
| Austin | Lakeline Mall |
| Baltimore | White Marsh Mall |
| Chicago | Louis Joliet Mall |
| Cincinnati | Florence Mall |
| Houston | West Oaks Mall |
| Los Angeles | Moreno Valley Mall |
| Minneapolis | Mall of America |
| New York | Sunrise Mall |
| Philadelphia | Neshaminy Mall |
| San Diego | Parkway Plaza |
| San Francisco | West Valley Mall |

4.    <u>Respondent Selection</u>

It is often found by market researchers that people who frequent shopping malls tend to be younger than the population as a whole.

To safeguard against the skewing toward any particular age or gender group, a "quota screening" procedure was employed in which males and females aged 21 years and older were approached in three age groupings proportionate to their presence in the population.  In this manner, these age groups were correctly represented for the purpose of determining eligibility according to census demographics.

Based on available data[7], these screening quotas were established:

| <u>Ages</u> | <u>Male</u> | <u>Female</u> |
|---|---|---|
| 21 - 34 | 13.6% | 13.2% |
| 35 - 49 | 15.7% | 15.9% |
| 50/+ | 19.0% | 22.6% |

While screening was in proportion to population, actual inclusion in the sample was not necessarily, and need not be, proportional to census demographics. Once a respondent met age and gender screening needs, inclusion in the study was based on the fact that he/she met all the stated prerequisites.

Thus, by setting quotas for screening the number of males and females by age group, a representative number of qualifiers within each age and gender group was obtained on an "as they fall" basis, thereby providing a directly proportionate sample of relevant consumers.[8]

---

[7] Source:  <u>Population Projections for 2010 Census</u>, published by the U.S. Census Bureau.
[8] <u>See</u> Appendix D for age, gender, and other data regarding respondents who participated in the study.

## DOUBLE-BLIND INTERVIEWING

It is important to point out that the study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the interviewers were similarly "blind" with respect to the study's purpose and sponsorship.  Without such knowledge, there is little likelihood that some interviewer(s) might ascertain what responses would be desirable from the sponsor's perspective, and thereby be in a position either to exert an influence on the respondents in this regard, or to modify their recording of a respondent's answers so as to be "helpful".

## INTERVIEWING PROCEDURES

Screenings for eligibility were conducted on the mall premises in each designated shopping mall.  Once qualified, respondents were escorted into the interviewing facility that was operated by the interviewing organization.  Throughout the assignment, tight control and supervision was maintained over all aspects of the interviewing.

Guideline prepared customized, detailed interviewer and supervisor instructions for this assignment.  Copies of these instructions are found in Appendix C of this report.

Before beginning work on this study each interviewer was required to:

- Read the interviewer instructions.
- Attend a personal briefing.  At this briefing, interviewing procedures were outlined and discussed in detail, question by question.
- Complete one or more practice interviews.

Additionally, a representative from each interviewing facility was required to contact a Guideline representative with periodic detailed progress reports. This allowed Guideline to closely monitor and supervise the progress of the study.

## RESPONDENT VERIFICATION

In addition to on-spot verification where both respondent and interviewer signed their respective names onto a "certification" page, telephone follow-up validation calls were attempted by an independent company who specializes in this type of work to verify that the interview did in fact take place and that only qualified respondents were interviewed.

A listing of each respondent's name and phone number was sent to Outfielders of Eastchester, NY, an independent telephone interviewing service, for verification.

This independent validating service was given the responsibility of attempting to recontact respondents by phone to confirm that:

- Such a person actually existed.
- He met the universe requirements for this study.
- He was actually interviewed for this study.

A total of 441 interviews were completed of which 438 provided telephone numbers. Outfielders successfully contacted 291, which represents a level of validation (66%) far exceeding the customary industry practice, which is to validate 15-20%.[9]  This validation procedure resulted in no discrepancies in the interviewing procedures.

_____

[9] See Appendix E for Validation Results.

## CHECK-IN PROCEDURES

When completed questionnaires had been numbered in, they were checked to ensure that respondents' answers to screening questions indicated that they met all eligibility requirements and that the interviews themselves were complete.

## INTERVIEWING PERIOD

Interviewing was conducted from June 12, 2009 through June 21, 2009.

---

## *DETAILED FINDINGS*

### TEST CELL RESULTS

### Question 1 – Who makes or puts out the kitchen tools

When asked who makes or puts out the kitchen tools that are included in the set being advertised, 175 respondents out of 227 (77.1%) named Farberware. 131 of these respondents (57.7% of the Test Cell) named only Farberware, and the other 44 respondents named both Farberware and a second company or brand.[10]

37 of the 227 respondents (16.3%) mentioned Prestige in response to Question 1. 21 of these 37 respondents also mentioned Farberware and the other 16 named only Prestige.

| Question 1 – Who makes/puts out the kitchen tools?<br>BASE = 227 | Respondents Who Named Company/Brand<br>#<br>(%) |
|---|---|
| TOTAL FARBERWARE (NET) | 175<br>(77.1%) |
|    Farberware only | 131<br>(57.7%) |
|    Farberware/Affiniti | 9<br>(4.0%) |
|    Farberware/Prestige | 21<br>(9.4%) |
|    Farberware/other company | 14<br>(6.2%) |
| TOTAL PRESTIGE (NET) | 37<br>(16.3%) |
|    Prestige only | 16<br>(7.0%) |
|    Farberware/Prestige | 21<br>(9.4%) |
| DON'T KNOW | 28<br>(12.3%) |
| OTHER COMPANY/BRAND ONLY | 8<br>(3.5%) |

---

[10] Due to time constraints, I did not have respondents' answers that are recorded on the paper questionnaires inputted into a computer. Accordingly, the data does not exist in electronic form and this report does not contain computer-generated tables displaying the results. The results detailed in this report are based on my own review of the completed paper questionnaires. Copies of the paper questionnaires containing all respondent answers will be produced.

<u>See</u> Appendix G for lists of ID numbers of respondents who named Farberware.

The results of this question alone make evident that there is an extremely high rate of confusion.  77.1% of respondents believed Farberware to make or put out the kitchen tools.  Only 7.0% of respondents named Prestige as the source and did not also mention Farberware.

## <u>Question 2</u>

When the 175 respondents who named Farberware as the company that makes or puts out the kitchen tools were asked what makes them think so, 168 referred explicitly to the use of the Farberware name on the website.  121 answered that the website is a Farberware website or that the web pages say Farberware.  47 respondents specified that the "set" or the pots and pans that the tools are included with are Farberware.  The other 7 respondents did not mention the use of the name Farberware on the site.

| <u>Question 2</u> –  **Reasons for thinking Farberware makes/puts out the kitchen tools?      BASE = 227** | #<br>(%) |
|---|---|
| <u>Use of Farberware name</u> | 168<br>(74.0%) |
| Website/ad says Farberware | 121<br>(53.3%) |
| Set/pots and pans are Farberware | 47<br>(20.7%) |
| <u>Other reasons</u> | 7<br>(3.1%) |

Accordingly, 74.0% of the Test Cell answered that Farberware makes or puts out the kitchen tools and pointed to the use of the Farberware mark in connection with the website and/or the advertised set as their reason for thinking so.

Page 18

Permission/Approval

When asked in Question 6 whether they thought the company that makes the kitchen tools received permission or approval from any company, 67 respondents answered "yes."

| Question 6 –  Was permission/approval received? BASE = 227 | # (%) |
|---|---|
| Yes | 67 (29.5%) |
| No | 71 (31.3%) |
| Don't know | 89 (39.2%) |

Of the 67 who answered "yes," 30 named Farberware as the company that gave permission or approval.

| Question 7 – Who gave permission or approval? BASE = 227 | Respondents Who Named Company/Brand # (%) |
|---|---|
| TOTAL FARBERWARE (NET) | 30 (13.2%) |
| Farberware only | 29 (12.8%) |
| Farberware/Affiniti | 1 (0.4%) |
| PRESTIGE | 6 (2.6%) |
| DON'T KNOW | 14 (6.2%) |
| OTHER COMPANY/BRAND ONLY | 19 (8.4%) |

19 of the 30 respondents who named Farberware in response to Question 7 had already name Farberware in response to Question 1.  The other 11 respondents had not previously mentioned Farberware.   Adding these additional 11 respondents to the 175 respondents who were confused into believing Farberware makes or puts out the

kitchen tools brings the total number of confused respondents to 186, or 81.9% of the Test Cell.

| TOTAL CONFUSION BASE = 227 | # (%) |
|---|---|
| **TOTAL FARBERWARE (NET)** | 186 (81.9%) |
| Farberware makes/puts out kitchen tools | 175 (77.1%) |
| Farberware gave permission or approval | 30 (13.2%) |

Accordingly, the Test Cell's gross estimate of the likelihood of confusion is 81.9%.[11]


**Respondents who mentioned Prestige**

A total of 45 respondents (19.8% of the Test Cell) mentioned Prestige in response to any of the survey questions.

| TOTAL PRESTIGE MENTIONS BASE = 227 | # (%) |
|---|---|
| **TOTAL PRESTIGE (NET)** | 45 (19.8%) |
| Prestige makes/puts out kitchen tools | 37 (16.3%) |
| Prestige affiliated with maker of kitchen tools | 5 (2.2%) |
| Prestige gave permission or approval | 6 (2.6%) |

Of the 45 respondents who mentioned Prestige in connection with the kitchen tools, 35 also expressed confusion with Farberware.

---

[11] 12 respondents answered in response to Questions 4 and 5 that the company that makes the kitchen tools has a business affiliation with Farberware.  All but one of these 12 respondents also said that Farberware made or approved the kitchen tools.

| RESPONDENTS WHO MENTIONED PRESTIGE BASE = 45 | # (%) |
|---|---|
| **CONFUSION WITH FARBERWARE (NET)** | 35 (77.1%) |
| Farberware makes/puts out kitchen tools | 25 (55.6%) |
| Farberware affiliated with maker of kitchen tools | 4 (8.9%) |
| Farberware gave permission or approval | 6 (13.3%) |
| **NO CONFUSION WITH FARBERWARE** | 10 (22.9%) |

As the above table indicates, even among the respondents who did mention the Prestige mark, the large majority (77.1%) nevertheless were confused into believing that Farberware was also involved in making or putting out the tools or approved the tools.

The verbatim answers of some of the respondents who mentioned both Farberware and Prestige are instructive.  Consider the following respondents' reasons for also naming Farberware:

| ID # | Reasons for naming Farberware as the maker or sponsor of kitchen tools |
|---|---|
| 1013 | The way the name is on the set; tools say prestige |
| 1024 | The tools are sold with the pan set |
| 1037 | The Prestige brand is sold by Farberware |
| 1058 | The tools are part of the Farberware set |
| 1077 | Farberware makes the Prestige tools |
| 1085 | Tools are part of a Farberware cookset |
| 1096 | Prestige is part of Farberware line |
| 1121 | Farberware name is big at the top and Prestige is in the box by the utensils. Farberware allowed it since they are packaged together. |
| 1124 | Tools sold with a Farberware set; Prestige may be a brand line |
| 1125 | Tools included in a kitchen set Farberware is showing |
| 1155 | It's a Farberware website |

As these and other verbatims make clear, the use of the Prestige mark did not prevent respondents from believing Farberware is the source or sponsor of the kitchen tools.

## CONTROL CELL RESULTS

When asked in Question 1 who makes or puts out the kitchen tools that are included in the set being advertised, 17 respondents out of 214 (7.9%) named Farberware.

36 of the 214 respondents (16.8%) mentioned Prestige in response to Question 1.

83 respondents named Kitchenware (38.8%), the control name substituted for Farberware.

| **Question 1** – Who makes/puts out the kitchen tools? **BASE = 214** | **Respondents Who Named Company/Brand** **#** **(%)** |
|---|---|
| **FARBERWARE** | 17 (7.9%) |
| **PRESTIGE** | 36 (16.8%) |
| **KITCHENWARE** | 83 (38.8%) |
| **DON'T KNOW** | 39 (18.2%) |
| **OTHER COMPANY/BRAND ONLY** | 39 (18.2%) |

<u>See</u> Appendix G for lists of ID numbers of Control respondents who named Farberware.

An additional 6 respondents named Prestige in response to the last two questions regarding approval and affiliation, yielding a total of 42 Control Cell respondents (19.6%) who mentioned Prestige.

An additional 5 respondents named Farberware in response to the last two questions regarding approval and affiliation, yielding a total of 22 Control Cell respondents (10.3%) who mentioned Farberware.

Page 22

When asked their reasons for naming Farberware, the 22 respondents answered that they believed the items shown on the web page looked like Farberware or mentioned that they own Farberware, or that Farberware is a popular brand.[12]

| TOTAL NOISE<br>BASE = 214 | #<br>(%) |
|---|---|
| **TOTAL FARBERWARE (NET)** | 22<br>(10.3%) |
| Farberware makes/puts out kitchen tools | 17<br>(7.9%) |
| Named Farberware in affiliation/approval questions | 5<br>(2.3%) |

Accordingly, the Control Cell showed a tendency of 10.3% of survey respondents to name Farberware in response to the questions asked even in the absence of use of the Farberware mark on the web pages.  Therefore, 10.3% is the noise level inherent to this study.

## *CONCLUSIONS*

Subtracting the 10.3% noise level from the 81.9% gross confusion level found in the Test Cell yields confusion net of noise of 71.6%.  Net confusion of 71.6% is extremely high, far above thresholds used by researchers and courts to determine whether there is an appreciable amount of consumer confusion.

Based on the results of the survey, it is my opinion to a high degree of professional certainty that there is a very large likelihood that consumers will be confused into thinking that non-licensed Meyer products (such as the kitchen tools in the ad shown to respondents) that are included with Farberware-licensed pots and pans in kitchenware sets sold on the Farberware Cookware website are Farberware products or are sponsored by Farberware.

---

[12] See Appendix G for the ID numbers of respondents who named Farberware.

**APPENDIX A**

**CURRICULUM VITAE OF STUDY'S AUTHOR/RULE 26 MATERIAL**

### Hal L. Poret
*(hporet@guideline.com; 212-329-1018)*

## Education

| | |
|---|---|
| 1998 | Harvard Law School, J.D., *cum laude* |

- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

| | |
|---|---|
| 1995 | S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude* |

| | |
|---|---|
| 1993 | Union College, B.S. in Mathematics with honors, *magna cum laude* |

- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

## Employment

**2004 -**   Vice President, Guideline
- Design, supervise, and analyze surveys intended to withstand adversarial and judicial scrutiny, including Trademark, Trade Dress, Advertising Perception, Fraud/Consumer Deception, and Claims Substantiation studies
- Give expert testimony at deposition and trial
- Review and critique third party surveys

**2003 – 2004**   Counsel/Product Development Dir., Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

**1997 – 2003**   Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes; deposed and defended depositions of survey experts.
- Advised clients in the selection, adoption, use, licensing, and protection of trademarks/trade dress; represented clients in trademark/trade dress litigations, administrative proceedings before the Trademark Trial and Appeal Board and United States Patent and Trademark Office, and domain name proceedings under the Uniform Domain-Name Dispute-Resolution Policy.

*Recent Testimony at Trial or by Deposition*

| | | |
|---|---|---|
| 2009 | GAP Inc. v. G.A.P. Adventures | USDC Southern District of NY |
| 2009 | Lumber Liquidators v. Stone Mntn | USDC Eastern District of VA |
| 2009 | CytoSport v. Vital Pharmaceuticals | USDC Eastern District of CA |
| 2009 | REDC v. NHA | USDC Southern District of CA |
| 2008 | 1800Contacts v. Lens.com | USDC District of UT |
| 2008 | Tokidoki v. Fortune Dynamic | USDC Central District of CA |
| 2008 | Brighton Collectibles v. Dynasty | USDC Southern District of CA |
| 2008 | Oneida Ltd Opposition to Oneida | USPTO |
| 2008 | Bridgestone Opposition to Milanza | USPTO |
| 2007 | Johnson & Johnson v. Perrigo | USDC Southern District of NY |
| 2007 | Johnson & Johnson v. Actavis Group | USDC Southern District of NY |
| 2007 | M.D. Skincare v. Bare Escentuals | USDC Southern District of NY |
| 2007 | Doctor's Associates v. QIP Holders | USDC District of CT |
| 2006 | S.C. Johnson v. BuzzOff Insect Shield | USDC Middle District of NC |
| 2006 | Wenger Corp. v. Stadium Chair | USDC Western District of TX |
| 2006 | Wenger Corp. v. Melhart Music | USDC Eastern District of TX |
| 2006 | Electrolux Home Care v. IMIG, Inc. | USDC Eastern District of NY |

*Publications and Presentations*

Comment on Nextel v. Motorola (on TTABLOG.COM, June 19, 2009)

PLI All-Star Briefing Newsletter, "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

The Mark (May 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Understanding Advertising Perception Surveys (presentation at Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (presentation at ACI Claims Substantiation Conference, October 2007)

Trademark and Advertising Survey Report (Summer 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006

*Professional Memberships*

Council of American Survey Research Organizations

International Trademark Association

Promotions Marketing Association

National Advertising Division of Council of Better Business Bureaus

# APPENDIX B

# QUESTIONNAIRES

GUIDELINE
625 Avenue of the Americas
New York, NY 10011

Job #B85-0109

June, 2009

# KITCHENWARE STUDY
## - SCREENER -

5 - 1

| MARKET: (6) | AGE: (7) | SEX: (8) | COLOR: (9) |
|---|---|---|---|
| Albany ........................ 1 | | | |
| Austin ........................... 2 | 21-34 ............... 1 | Male ............. 1 | BLUE............ 1 |
| Baltimore.................... 3 | | | |
| Chicago....................... 4 | 35-49 ................ 2 | Female ......... 2 | PINK............. 2 |
| Cincinnati ................... 5 | | | |
| Houston ...................... 6 | 50 or older........ 3 | | |
| Los Angeles ............... 7 | | | |
| Minneapolis................ 8 | | | |
| New York .................... 9 | | | |
| Philadelphia ............... 0 | | | |
| San Diego ................... X | | | |
| San Francisco ............. Y | | | |

**Sight screen for men and women 21 years or older**

Hello, I'm _____ of Guideline, a nationwide market research organization. We're conducting a study and I'd like to ask you a few questions.  We have nothing to sell, but are only asking for your opinions.

A.    But first, do you or does any member of your immediate household work … **(read list and record "yes" or "no" for each)**?

|  | Yes | No |
|---|---|---|
| In market research.............................................. | 1 | .................. 1 |
| In advertising ..................................................... | 2 | .................. 2 |
| For a company or store that makes or sells kitchenware (that is, pots and pans, cutlery, kitchen utensils, or bakeware).............................. | 3 | .................. 3 |

**Terminate if "yes" to any boxed occupation listed above.  Circle in box below.  Erase and re-use screener.**

**Terminate Q. A:  Related Occupation**

| 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | (10,11) |

**Terminates at Q. A do not count towards screening quota.**

B.     Which of the following groups includes your age?  Are you ... *(Read Choices)*?

(12)

A. 20 years old or younger ............. 1   →   *Terminate.  Circle in box below.  Erase and re-use screener.*

B. 21 - 34 years old........................ 2
C. 35 - 49 years old........................ 3   →   *Check screening quotas.  If needed continue.  If over quota terminate.  Circle in box below.  Erase and re-use screener.*
D. 50 years old and over ............... 4

*(Do Not Read)->*      Refused ...................................... X   →   *Terminate.  Circle in box below.  Erase and re-use screener.*

---

**Terminate Q. B:  Under age/over quota/refused**

| 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | (13,14) |

*Terminates at Q. B do not count towards screening quota.*

---

C.     Have you been interviewed for a survey in a research facility in a mall within the past three months?

Yes ......................... 1   →   *(Terminate, circle in box below.  Erase and re-use screener.)*

No........................... 2   →   *(Ask Q. D)*

---

**Terminate Q. C:  Recently interviewed**

| 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | (15,16) |

*Terminates at Q. C do not count towards screening quota.*

---

D1.    In the past 12 months, have you yourself purchased kitchenware for your household (that is, pots and pans, cutlery, kitchen utensils, or bakeware)?

(17)

Yes ......................... 1

No........................... 2

Don't know.............. 3

D2.    In the next 12 months, are you yourself likely to purchase kitchenware for your household?
       (18)

          Yes ........................ | 1 |

          No............................  2

          Don't know..............  3

---

**Respondent must answer "yes" in EITHER Q. D1 OR Q. D2 to continue.  If "no" or "don't know" to both Q. D1 and Q. D2, terminate and record in appropriate box below.  Erase and re-use screener.**

---

**Terminate Q. D1/D2:   "No"/"Don't Know" to D1 and D2:**

| *MALES* | | | | | | | | | | | *FEMALES* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **21 - 34** | | | | | | | | | | | **21 - 34** | | | | | | | | | | |
| 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (19, | 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (25, |
| 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 20) | 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 26) |
| **35 - 49** | | | | | | | | | | | **35 - 49** | | | | | | | | | | |
| 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (21, | 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (27, |
| 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 22) | 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 28) |
| **50 +** | | | | | | | | | | | **50 +** | | | | | | | | | | |
| 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (23, | 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (29, |
| 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 24) | 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 30) |

***Terminates at Q. D1/D2 do count toward screening quota.***

---

E.    When you buy kitchenware for your home, do you…?  *(Read list)*

                                                          (31)
          Mainly buy individual items............         1      →    *(Terminate, circle in appropriate box*
                                                                      *below, erase and re-use screener)*

          Mainly buy sets of items, or...........    | 2 |
          Sometimes buy individual items                        →    *(Continue)*
          and sometimes buy sets of items ..       | 3 |

---

**Respondent must "mainly buy sets" or "sometimes buy individual items and sometimes buy sets of items" to continue.  If respondent "mainly buys individual items", terminate and record in appropriate box below.  Erase and re-use screener.**

---

**Terminate Q. E:  Mainly buys individual items – does not mainly or sometimes buy sets**

| *MALES* | | | | | | | | | | | *FEMALES* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **21 - 34** | | | | | | | | | | | **21 - 34** | | | | | | | | | | |
| 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (32, | 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (38, |
| 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 33) | 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 39) |
| **35 - 49** | | | | | | | | | | | **35 - 49** | | | | | | | | | | |
| 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (34, | 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (40, |
| 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 35) | 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 41) |
| **50 or older** | | | | | | | | | | | **50 or older** | | | | | | | | | | |
| 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (36, | 01 02 03 04 05 06 07 08 09 10 | | | | | | | | | | (42, |
| 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 37) | 11 12 13 14 15 16 17 18 19 20 | | | | | | | | | | 43) |

***Terminates at Q. E do count toward screening quota.***

F.      Would you consider purchasing kitchenware over the internet?

                                    (44)
            Yes ........................  1   →   *(Continue)*
            No...........................  2   →   *(Terminate, circle in appropriate box below, erase*
                                                *and re-use screener)*

| Terminate Q. F:  Would not consider purchasing over the internet | | |
|---|---|---|
| **_MALES_** | **_FEMALES_** | |
| **21 - 34** | **21 - 34** | |
| 01 02 03 04 05 06 07 08 09 10 <br> 11 12 13 14 15 16 17 18 19 20 | (45, <br> 46) | 01 02 03 04 05 06 07 08 09 10 <br> 11 12 13 14 15 16 17 18 19 20 | (51, <br> 52) |
| **35 - 49** | **35 - 49** | |
| 01 02 03 04 05 06 07 08 09 10 <br> 11 12 13 14 15 16 17 18 19 20 | (47, <br> 48) | 01 02 03 04 05 06 07 08 09 10 <br> 11 12 13 14 15 16 17 18 19 20 | (53, <br> 54) |
| **50 or older** | **50 or older** | |
| 01 02 03 04 05 06 07 08 09 10 <br> 11 12 13 14 15 16 17 18 19 20 | (49, <br> 50) | 01 02 03 04 05 06 07 08 09 10 <br> 11 12 13 14 15 16 17 18 19 20 | (55, <br> 56) |
| *Terminates at Q. F <u>do</u> count toward screening quota.* | | |

G.      Do you usually wear eyeglasses or contact lenses when reading or looking at a computer screen?
                                    (57)
            Yes ........................  1   →   *(Ask Q. H)*
            No...........................  2   →   *(Skip to Q. I)*

H.      Do you have them with you?
                                    (58)
            Yes ........................  1   →   *(Ask Q. I)*
            No...........................  2   →   *(Terminate, circle in appropriate box below.  Erase and*
                                                *re-use screener.)*

| Terminate Q. H:  No Eyeglasses | |
|---|---|
| 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | (59,60) |
| *Terminates at Q. H do <u>not</u> count towards screening quota.* | |

I.      *(Invite qualified respondent to interviewing facility.  If respondent wears glasses or contacts,*
        *make sure they have them on.  Go to main questionnaire same color as this screener.  If*
        *qualified but refused, terminate.  Circle in box below.  Erase and re-use screener.)*
            Willing to participate ................................................. 1
            Not willing to participate........................................... 2

| Terminate Q.I:  Qualified/Refused | |
|---|---|
| 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | (61,62) |
| *Terminates at Q. I do <u>not</u> count towards screening quota.* | |

63 - 80 R

GUIDELINE                                                          Job #B85-0109
625 Avenue of the Americas
New York, NY  10011                                               June, 2009

# K I T C H E N W A R E   S T U D Y
## -  M A I N   Q U E S T I O N N A I R E  –

| BLUE |
|------|
| 5 - 2 |
| 6 - 1 |

***(FOR THIS INTERVIEW YOU SHOULD HAVE A CD MARKED WITH A DOT THE SAME COLOR AS THIS QUESTIONNAIRE - <u>BLUE</u>.  This CD contains a file that will display 2 web pages in the proper order.  Before bringing respondent into the interviewing area, insert the BLUE-dotted CD and click on the "PAGE 1" icon.  The first web page should now be visible on the screen. Maximize the window so that the image covers the entire screen.  Then turn the computer monitor OFF so the web page is not visible.  With the computer monitor off, bring in respondent and seat respondent in front of the computer.  Then say: )***

In a moment, I'm going to show you two pages from a website.  The first page will be the home page and the second page will be another page from the same website.  I'd like you to look at the web pages I show you as you ordinarily would if you came across the website while shopping on the internet.  You may take as much time as you like to review each of the web pages.  After you are finished, I will ask you some questions. If, for any question I ask, you don't know the answer or you have no opinion, please just say so.  Please do not guess.

> ***Turn on the computer monitor.  The first web page should be viewable on the screen.  Say:***

I'm now showing you the home page of a website.  Please take a look at this page and let me know when you are finished.

> ***Allow respondent time to examine the web page.  When respondent is finished, click the button to move forward to the next image.  The second web page should now be viewable on the screen.  Say:***

I'm now showing you another page from the same website.  This page is offering a 15-piece set of kitchenware.  Please look at this page as if you were shopping for kitchenware and were considering purchasing the advertised set.  Please let me know when you are finished and then I will ask you some questions.

> ***Allow respondent time to examine the second web page.  When respondent is finished, leave the monitor on so respondent can still see the second web page and say:***

Now I'd like to ask you some questions about the kitchen tools that are included in the advertised set – the spatula, serving spoon, and slotted spoon that are shown beneath the pots and pans.

1.  Who do you think makes or puts out these kitchen tools, or don't you have an opinion? *(Record verbatim below; if respondent names more than one company or brand, record each company or brand separately below)*

    **a.  FIRST COMPANY/BRAND NAMED:**

    _____ 7-

    _____ 8-

    _____ 9-

    _____ 10-

    **b. SECOND COMPANY/BRAND NAMED:**

    _____ 11-

    _____ 12-

    _____ 13-

    _____ 14-

    **c. THIRD COMPANY/BRAND NAMED:**

    _____ 15-

    _____ 16-

    _____ 17-

    _____ 18-

2.  *(For each company mentioned in Q.1 above, ask following question and record verbatim.)*

    a.  What makes you think *(read and record first company/brand named in Q.1)* _____ makes or puts out these kitchen tools? *(Record verbatim) (Probe once with)*: Anything else? *(Record Verbatim)*

    _____ 19-

    _____ 20-

    _____ 21-

    _____ 22-

    _____ 23-

    _____ 24-

    _____ 25-

    _____ 26-

            27-            29-            31-

            28-            30-            32-

b.      What makes you think *(read and record second company/brand named in Q.1)*
        _____ makes or puts out these kitchen tools?  *(Record verbatim) (Probe once with)*: Anything else?  *(Record Verbatim)*

_____ 33-

_____ 34-

_____ 35-

_____ 36-

_____ 37-

_____ 38-

_____ 39-

_____ 40-

        41-                     43-                     45-
        42-                     44-                     46-


c.      What makes you think *(read and record third company/brand named in Q.1)*
        _____ makes or puts out these kitchen tools?  *(Record verbatim) (Probe once with)*: Anything else?  *(Record Verbatim)*

_____ 47-

_____ 48-

_____ 49-

_____ 50-

_____ 51-

_____ 52-

_____ 53-

_____ 54-

        55-                     57-                     59-
        56-                     58-                     60-


3.      Do you think the company that makes these kitchen tools has a business affiliation with any other company or brand, or don't you think so, or do you have no opinion?

                                                        (61)
        Yes, has business affiliation ................................    1    →   *(Continue to Q. 4)*
        No, does not have business affiliation .................    2    →   *(Skip to Q.6)*
        No opinion/don't know...........................................    3

4.      What other company or brand, if you know?  *(Record verbatim)*

_____  62-

_____  63-

_____  64-

_____  65-

**(IF RESPONDENT ANSWERS "DON'T KNOW" OR NAMES NO COMPANIES/BRANDS, SKIP TO Q.6.  IF RESPONDENT NAMES A COMPANY OR BRAND, ASK Q.5)**

5.      What makes you think the company that makes these kitchen tools has a business affiliation with *(read and record company/brand named in Q.4)*_____? *(Record verbatim)* *(Probe once with)*: Anything else? *(Record Verbatim)*

_____  66-

_____  67-

_____  68-

_____  69-

_____  70-

_____  71-

_____  72-

_____  73-

| 74- | 76- | 78- |
| 75- | 77- | 79- |

| 80 R |
| 5 - 3 |

6.      Do you think these kitchen tools are made or put out with the permission or approval of any company or brand, or don't you think so, or do you have no opinion?

(6)

Yes, made with permission or approval ............... 1 → *(Continue to Q. 7)*

No, not made with permission or approval .......... 2

No opinion/don't know........................................... 3

→ *(Thank respondent and skip directly to certification page.  Do not ask any more questions.)*

7.      What company or brand, if you know?  *(Record verbatim)*

_____    7-

_____    8-

_____    9-

_____    10-

*(IF RESPONDENT ANSWERS "DON'T KNOW" OR NAMES NO COMPANIES/BRANDS, THANK RESPONDENT AND SKIP DIRECTLY TO CERTIFICATION AND ASK NO MORE QUESTIONS. IF RESPONDENT NAMES A COMPANY OR BRAND, ASK Q.8)*

8.      What makes you think these kitchen tools are made or put out with the permission or approval of *(read and record company/brand named in Q.7)*_____? *(Record verbatim)* *(Probe once with)*: Anything else? *(Record Verbatim)*

_____    11-

_____    12-

_____    13-

_____    14-

_____    15-

_____    16-

_____    17-

_____    18-

|  19-  |  21-  |  23- |
|  20-  |  22-  |  24- |

25 - 80 R

**SHUT DOWN THE BROWSER SO THE WEB PAGE IS NO LONGER VISIBLE. THANK RESPONDENT AND CONTINUE TO CERTIFICATION PAGE**

# CERTIFICATION PAGE

[PRINT]
RESPONDENT'S FULL NAME:_____

ADDRESS:  _____

CITY: _____     ZIP: _____

AREA CODE:  _____  TELEPHONE NUMBER:  _____
[PRINT]
INTERVIEWER'S FULL NAME:_____

TIME STARTED:_____     TIME ENDED:_____     DATE:_____

## RESPONDENT

I certify that I was interviewed on the date shown below, and that I was shown a web page with a kitchenware set and was asked some questions about it.

RESPONDENT'S
SIGNATURE:            _____

DATE:                      _____

## INTERVIEWER

I certify that this interview was conducted in accordance with my briefing instructions.

INTERVIEWER'S
SIGNATURE:            _____

## SUPERVISOR:  PLEASE READ AND SIGN

I certify that I observed this interview and that it was conducted in accordance with the briefing instructions.

SUPERVISOR'S SIGNATURE:  _____

DATE: _____

GUIDELINE                                                        Job #B85-0109
625 Avenue of the Americas
New York, NY  10011                                              June, 2009

# K I T C H E N W A R E   S T U D Y
## - M A I N   Q U E S T I O N N A I R E  –

| PINK |
| --- |
| 5 - 2 |
| 6 - 2 |

*(FOR THIS INTERVIEW YOU SHOULD HAVE A CD MARKED WITH A DOT THE SAME COLOR AS THIS QUESTIONNAIRE - PINK.  This CD contains a file that will display 2 web pages in the proper order.  Before bringing respondent into the interviewing area, insert the PINK-dotted CD and click on the "PAGE 1" icon.  The first web page should now be visible on the screen. Maximize the window so that the image covers the entire screen.  Then turn the computer monitor OFF so the web page is not visible.  With the computer monitor off, bring in respondent and seat respondent in front of the computer.  Then say: )*

In a moment, I'm going to show you two pages from a website.  The first page will be the home page and the second page will be another page from the same website.  I'd like you to look at the web pages I show you as you ordinarily would if you came across the website while shopping on the internet.  You may take as much time as you like to review each of the web pages.  After you are finished, I will ask you some questions. If, for any question I ask, you don't know the answer or you have no opinion, please just say so.  Please do not guess.

> *Turn on the computer monitor.  The first web page should be viewable on the screen.  Say:*

I'm now showing you the home page of a website.  Please take a look at this page and let me know when you are finished.

> *Allow respondent time to examine the web page.  When respondent is finished, click the button to move forward to the next image.  The second web page should now be viewable on the screen.  Say:*

I'm now showing you another page from the same website.  This page is offering a 15-piece set of kitchenware.  Please look at this page as if you were shopping for kitchenware and were considering purchasing the advertised set.  Please let me know when you are finished and then I will ask you some questions.

> *Allow respondent time to examine the second web page.  When respondent is finished, leave the monitor on so respondent can still see the second web page and say:*

Now I'd like to ask you some questions about the kitchen tools that are included in the advertised set – the spatula, serving spoon, and slotted spoon that are shown beneath the pots and pans.

1.   Who do you think makes or puts out these kitchen tools, or don't you have an opinion? *(Record verbatim below; if respondent names more than one company or brand, record each company or brand separately below)*

    **a. FIRST COMPANY/BRAND NAMED:**

    _____ 7-

    _____ 8-

    _____ 9-

    _____ 10-

    **b. SECOND COMPANY/BRAND NAMED:**

    _____ 11-

    _____ 12-

    _____ 13-

    _____ 14-

    **c. THIRD COMPANY/BRAND NAMED:**

    _____ 15-

    _____ 16-

    _____ 17-

    _____ 18-

2.   *(For each company mentioned in Q.1 above, ask following question and record verbatim.)*

    a.   What makes you think *(read and record first company/brand named in Q.1)* _____ makes or puts out these kitchen tools? *(Record verbatim) (Probe once with)*: Anything else? *(Record Verbatim)*

    _____ 19-

    _____ 20-

    _____ 21-

    _____ 22-

    _____ 23-

    _____ 24-

    _____ 25-

    _____ 26-

          27-          29-          31-

          28-          30-          32-

b.   What makes you think *(read and record second company/brand named in Q.1)* _____ makes or puts out these kitchen tools?  *(Record verbatim) (Probe once with)*: Anything else?  *(Record Verbatim)*

_____ 33-

_____ 34-

_____ 35-

_____ 36-

_____ 37-

_____ 38-

_____ 39-

_____ 40-

| 41- | 43- | 45- |
| 42- | 44- | 46- |

c.   What makes you think *(read and record third company/brand named in Q.1)* _____ makes or puts out these kitchen tools?  *(Record verbatim) (Probe once with)*: Anything else?  *(Record Verbatim)*

_____ 47-

_____ 48-

_____ 49-

_____ 50-

_____ 51-

_____ 52-

_____ 53-

_____ 54-

| 55- | 57- | 59- |
| 56- | 58- | 60- |

3.   Do you think the company that makes these kitchen tools has a business affiliation with any other company or brand, or don't you think so, or do you have no opinion?

(61)

Yes, has business affiliation ................................. 1   →   *(Continue to Q. 4)*

No, does not have business affiliation ................. 2   →   *(Skip to Q.6)*

No opinion/don't know ........................................... 3

4.      What other company or brand, if you know?  *(Record verbatim)*

_____ 62-

_____ 63-

_____ 64-

_____ 65-

**(IF RESPONDENT ANSWERS "DON'T KNOW" OR NAMES NO COMPANIES/BRANDS, SKIP TO Q.6.  IF RESPONDENT NAMES A COMPANY OR BRAND, ASK Q.5)**

5.      What makes you think the company that makes these kitchen tools has a business affiliation with *(read and record company/brand named in Q.4)*_____? *(Record verbatim)* *(Probe once with)*: Anything else?  *(Record Verbatim)*

_____ 66-

_____ 67-

_____ 68-

_____ 69-

_____ 70-

_____ 71-

_____ 72-

_____ 73-

|        | 74-   |        | 76-   |        | 78-   |
|--------|-------|--------|-------|--------|-------|
|        | 75-   |        | 77-   |        | 79-   |

| 80 R  |
|-------|
| 5 - 3 |

6.      Do you think these kitchen tools are made or put out with the permission or approval of any company or brand, or don't you think so, or do you have no opinion?

|                                              | (6) |               |
|----------------------------------------------|-----|---------------|
| Yes, made with permission or approval ...............  | 1   | → *(Continue to Q. 7)* |
| No, not made with permission or approval ...........   | 2   | *(Thank respondent and skip directly to certification page.  Do not ask any more questions.)* |
| No opinion/don't know...........................       | 3   | → |

7.      What company or brand, if you know?  **(Record verbatim)**

_____   7-

_____   8-

_____   9-

_____   10-

**(IF RESPONDENT ANSWERS "DON'T KNOW" OR NAMES NO COMPANIES/BRANDS, THANK RESPONDENT AND SKIP DIRECTLY TO CERTIFICATION AND ASK NO MORE QUESTIONS. IF RESPONDENT NAMES A COMPANY OR BRAND, ASK Q.8)**

8.      What makes you think these kitchen tools are made or put out with the permission or approval of **(read and record company/brand named in Q.7)**_____? **(Record verbatim) (Probe once with)**: Anything else? **(Record Verbatim)**

_____   11-

_____   12-

_____   13-

_____   14-

_____   15-

_____   16-

_____   17-

_____   18-

          19-                    21-                    23-
          20-                    22-                    24-

25 - 80 R

**SHUT DOWN THE BROWSER SO THE WEB PAGE IS NO LONGER VISIBLE. THANK RESPONDENT AND CONTINUE TO CERTIFICATION PAGE**

# CERTIFICATION PAGE

[PRINT]
RESPONDENT'S FULL NAME:_____

ADDRESS: _____

CITY: _____  ZIP: _____

AREA CODE: _____  TELEPHONE NUMBER: _____
[PRINT]
INTERVIEWER'S FULL NAME:_____

TIME STARTED:_____  TIME ENDED:_____  DATE:_____

## RESPONDENT

I certify that I was interviewed on the date shown below, and that I was shown a web page with a kitchenware set and was asked some questions about it.

RESPONDENT'S
SIGNATURE:  _____

DATE:  _____

## INTERVIEWER

I certify that this interview was conducted in accordance with my briefing instructions.

INTERVIEWER'S
SIGNATURE:  _____

## SUPERVISOR:  PLEASE READ AND SIGN

I certify that I observed this interview and that it was conducted in accordance with the briefing instructions.

SUPERVISOR'S SIGNATURE: _____

DATE: _____