Joseph E. Gulmi (JG–5738)
Victor C. Bushell (VB–3930)
Christopher J. Sovak (CS–3164)
Cem Ozer (CO–1718)
BUSHELL, SOVAK, OZER & GULMI, LLP
60 E. 42nd Street
Suite 2925
New York, New York 10165
(212) 949-4700

*Attorneys for Plaintiff*
*Farberware Licensing Company, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
FARBERWARE LICENSING COMPANY, LLC,          :
                                            :
              Plaintiff,                    :      09-CV-2570 (HB)
                                            :
          – against –                       :      **ECF CASE**
                                            :
MEYER MARKETING CO., LTD., MEYER            :
INTELLECTUAL PROPERTIES, LTD., and          :
MEYER CORPORATION, US,                      :
                                            :
              Defendants.                   :
                                            :
------------------------------------------------------------------- x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR COSTS AND ATTORNEYS' FEES

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT .......................................................................................................... 1

I.     THE JUDGMENT ISSUED BY THE COURT PRECLUDES
       THE INSTANT MOTION ................................................................................1

II.    MEYER CANNOT ESTABLISH THE UNDERLYING SUIT WAS AN
       EXCEPTIONAL CASE JUSTIFYING AN AWARD OF FEES UNDER THE
       LANHAM ACT ...............................................................................................2

     A.    The Exceptional Case Standard under the Lanham Act ...........................2

     B.    FLC had a Reasonable and Good Faith Basis for Pursuing its Lanham Act Claims..4

          1.  FLC's claims regarding the enamel-coated kettles ...............................4

          2.  FLC's claims against Meyer for bundling Farberware cookware with
              Prestige utentils and cutlery were based on both statutory and contract law........5

              a.  Bundling Is Not Allowed ...................................................................5

              b.  Consumer Confusion .........................................................................6

               c.  Dilution ...............................................................................................9

          3.  FLC never approved Meyer's practice of bundling
              Prestige products with Farberware products.....................................10

               a.  FLC never alleged Meyer did not send the Affiniti
                  cookware set bundled with Prestige brand tools to FLC ...................10

               b.  Paragraph 4.3 of the License Agreement requires written approval....14

          4.  FLC did not attempt to conceal that Meyer sent bundled Affiniti Sets to FLC..16

          5.  The Jury's finding for Meyer on the common law unfair competition
              does not establish that FLC pursued its Lanham Act claims in bad faith..........18

     C.    Meyer Chose Not to Proceed with the Alternative Dispute Resolution Process ......19

     D.    Meyer Never Established Any Evidence that FLC's Suit was
          a Ploy for Extra-Contractual Concessions ..............................................20

E.     FLC's Request for Termination of the License Agreement was
Proper under New York Law ................................................................22

F.     Meyer Failed to Provide the Required Documentary Support and,
Therefore, the Instant Motion Should be Denied....................................22

III.     MEYER'S REQUEST FOR COSTS SHOULD BE DENIED OR,
AT A MINIMUM, DRASTICALLY REDUCED ........................................23

A.     Meyer's Request for Costs Should be Denied for
Failure to Comply with Local Civil Rule 54.1 ......................................23

B.     Meyer's Cannot Recover Costs under § 1117 ......................................24

C.     Alternatively, Meyer's Requested Costs Should be Reduced to Only Those
Allowable by § 1920 and Applicable Rules ..........................................24

CONCLUSION......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Audi AG v. Shokan Coachworks, Inc.,* 592 F.Supp.2d 246 (N.D.N.Y. 2008) .............................. 10

*Banff. Ltd. v. Colberts, Inc.,*
810 F.Supp. 79 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 33 (2d Cir. 1993) ......................................... 2, 3

*Bowmar Instrument Corp. v. Continental Microsystems, Inc.,*
497 F.Supp. 947 (S.D.N.Y. 1980) .............................................................................................. 22

*Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.,*
88 F.Supp.2d 914 (C.D. Ill. 2000) ............................................................................................. 22

*Carmody v. City of New York,*
05 Civ. 8084 (HB), 2008 WL 3925196 (S.D.N.Y. Aug. 26, 2008).............................................. 24

*Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187 (2d Cir. 1996).............................................. 2, 3

*Conopco, Inc. v. Cosmair, Inc.,* 49 F.Supp.2d 242 (S.D.N.Y. 1999) ............................................ 8

*Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437 (1987),
*superseded by statute on other grounds*, 42 U.S.C. § 1988(c) ........................................................ 2

*Dawai Special Asset Corp. v. Desnick,*
No. 00 Civ. 3856 (SHS), 2002 WL 31767817 (S.D.N.Y. Dec. 3, 2002)...................................... 23

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.,*
440 F.Supp.2d 249 (S.D.N.Y. 2006)............................................................................................. 8

*Farberware Licensing Co. LLC v. Meyer Marketing Co., Ltd.,*
09 Civ. 2570 (HB), 2009 WL 1357956 (S.D.N.Y. May 14, 2009) ............................................. 19

*Farberware Licensing Co. LLC v. Meyer Marketing Co., Ltd.,*
09 Civ. 2570 (HB), 2009 WL 2710208 (S.D.N.Y. Aug. 25, 2009)....................................... 4, 5, 6

*Hensley v. Eckerhart,* 461 U.S. 424 (1983) ................................................................................. 23

*Heisman Trophy Trust v. Smack Apparel Co.,* 595 F.Supp.2d 320 (S.D.N.Y. 2009).................... 9

*Helen Curtis Indus., Inc. v. Suave Shoe Corp.,*
13 U.S.P.Q.2d 1618 (T.T.A.B. 1989) ........................................................................................... 9

*Hirschfeld v. Board of Ed.,* 984 F.2d 35 (2d Cir. 1992) ................................................................ 2

*Johnson & Johnson v. Actavis Group HF,*
No. 06 Civ. 8209 (DLC), 2008 WL 228061 (S.D.N.Y. Jan 25, 2008) .................................... 8, 9

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
799 F.2d 867 (2d Cir. 1986) ........................................................................................... 8

*Lon Tai Shing Co., Ltd. v. Koch+Lowy,*
No. 90 Civ. 4464 (LJF), 1992 WL 18806 (S.D.N.Y. Jan. 28, 1992) ................................. 7

*Mennen Co. v. Gillette Co.,* 565 F.Supp. 648 (S.D.N.Y. 1983) ....................................... 8

*Multivideo Labs, Inc. v. Intel Corp.,*
No. 99 Civ. 3908 (DLC), 2000 WL 502866 (S.D.N.Y. Apr. 27, 2000) ................................. 2, 3

*New York State Assn' for Retarded Children v. Carey,*
711 F.2d 1136 (2d Cir. 1983) ........................................................................................ 23

*Orient Express Trading Co. v. Federated Dep't Stores, Inc.,*
No. 84 Civ. 5964 (CBM), 1988 WL 3385 (S.D.N.Y. Jan. 8, 1988) ................................. 3

*RJR Foods Inc. v. White Rock Corp.,*
603 F.2d 1058 (2d Cir. 1979) ........................................................................................ 7

*Savin Corp. v. The Savin Group,* 391 F.3d 439 (2d Cir. 2004) ................................. 9, 10

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.,*
589 F.Supp.2d 331 (S.D.N.Y. 2008) ........................................................................... 24

*Silberstein v. Fox Entertainment Group, Inc.,*
536 F.Supp. 2d 440 (S.D.N.Y. 2007) ............................................................................. 3

*Textile Deliveries, Inc. v. Stagno,*
No. 90 Civ. 2020 (CMM), 1994 WL 202620 (S.D.N.Y. May 23, 1994) .............................. 3, 18

*Tri-Star Pictures, Inc. v. Unger,* 42 F.Supp.2d 296 (S.D.N.Y. 1999) ......................... 23

*U.S. Naval Institute v. Charter Communications, Inc.,*
875 F.2d 1044 (2d Cir. 1989) ......................................................................................... 4

*Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70 (2d Cir. 1986) ............ 3

*Yeshiva Univ. v. New England Educ. Inst. Inc.,*
631 F.Supp. 146 (S.D.N.Y. 1986) .................................................................................. 3

**Statutes**

9 U.S.C. § 3 ......................................................................................................... 19
Lanham Act §35, 15 U.S.C. § 1117 ........................................................................ 1
Lanham Act §35(a), 15 U.S.C. § 1117(a) ...................................................... 2, 18, 24
Lanham Act §43(c), 15 U.S.C. § 1125(c) ................................................................ 9
18 U.S.C. § 1828 ................................................................................................... 24
18 U.S.C. § 1920 .......................................................................................... 1, 2, 24
28 U.S.C. § 1923 ................................................................................................... 24
28 U.S.C. § 1404 ................................................................................................... 19
42 U.S.C. § 1988(c) ................................................................................................ 2
Fed. R. Civ. P. 54(d) ........................................................................................ 2, 24
Fed. R. Evid. 702. .................................................................................................. 8
Local Civ. R. 54.1 ........................................................................................... 23, 24
Local Civ. R. 54.1(c)(1) ........................................................................................ 25
Local Civ. R. 54.1(c)(3) ........................................................................................ 25
Local Civ. R. 54.1(c)(6) ........................................................................................ 25
Local Civ. R. 54.1(c)(7) ................................................................................... 24, 25

**Supplemental Authorities**

*McCarthy on Trademarks and Unfair Competition* § 25:30 (4th ed.) ....................................... 4, 6

**PRELIMINARY STATEMENT**

The motion for attorney fees under 15 U.S.C. §1117 and costs under 15 U.S.C. §1117 and 28 U.S.C. §1920 by Meyer Intellectual Properties Ltd. and Meyer Corporation US (collectively "Meyer") should be denied.   In its Counterclaim, Meyer sought both attorney fees and costs.  The Court denied that relief when it entered a Judgment, stating, "to the extent that either party sought other and further relief not granted in this Judgment, such request is denied."

The Court properly denied Meyer's claim for attorney fees under the Lanham Act because the underlying trademark suit does not meet the criteria of the "exceptional case" standard followed in this Circuit.  Meyer also does not meet the requirements for obtaining costs under 15 U.S.C. §1117 and 28 U.S.C. §1920.

**ARGUMENT**

**I.    THE JUDGMENT ISSUED BY THE COURT PRECLUDES THE INSTANT MOTION**

In the Judgment, the Court expressly "ordered, adjudged and decreed that to the extent that either party sought other and further relief that is not granted in this Judgment, such request is denied."  *See* Judgment at 3.[1]  Meyer sought both attorney fees and costs in its Counterclaims. *See* Meyer's Answer, Affirmative Defenses and Counterclaim[2] at 91 (hereinafter "Meyer's Counterclaim") (specifically ¶ 15 – "Awarding Meyer reasonable attorneys' fees as allowed by statute and by law" and ¶ 17 – "Awarding Meyer its costs as permitted by law").  After considering Meyer's request for attorney fees and costs, the Court denied Meyer's request.  Clearly, the Court has authority to deny such relief.  An award of attorney fees under the Lanham Act is at the Court's discretion  and is available only in exceptional cases, a standard certainly

---

[1] A true and accurate copy of the Judgment entered in this case is attached as Ex. A to the accompanying declaration of Joseph E. Gulmi, dated November 10, 2009 (hereinafter "Gulmi Decl.").
[2] A true and accurate copy of Meyer's Answer, Affirmative Defenses and Counterclaim is attached as Ex. B to the accompanying Gulmi Decl.

not met in this case.  *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir. 1996).

Similarly, 28 U.S.C. §1920, relating to costs recoverable, enumerates expenses that a federal

court may tax as a cost under the discretionary authority found in Rule 54(d). *Crawford Fitting*

*Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 441–42 (1987), *superseded by statute on other grounds,*

42 U.S.C. § 1988(c).  However, Rule 54(d) also provides that a prevailing party should receive

costs – "unless a court order provides otherwise."  Here the Court clearly denied costs in the

Judgment it issued.

## II.    MEYER CANNOT ESTABLISH THE UNDERLYING SUIT WAS AN EXCEPTIONAL CASE JUSTIFYING AN AWARD OF FEES UNDER THE LANHAM ACT

### A.    The Exceptional Case Standard under the Lanham Act

Section 35(a) of the Lanham Act states "[t]he court in exceptional cases may award

reasonable attorneys' fees to the prevailing party."  15 U.S.C. § 1117(a).  In the Second Circuit,

prevailing defendants can be awarded attorney fees only if they show the plaintiff's Lanham Act

claim was "baseless, capricious, unreasonable, or otherwise pursued in bad faith."  *Banff Ltd. v.*

*Colberts, Inc.*, 810 F. Supp. 79, 80 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 33 (2d Cir. 1993)

(defendants failed to show case was "exceptional" so as to warrant award of attorneys' fees,

despite plaintiff's reliance on faulty interpretations of law and imprudent trial tactics); *Conopco,*

*Inc.*, 95 F.3d at 194-95 (attorneys' fees only recoverable upon a showing by the prevailing party

of fraud or bad faith).  "A finding of bad faith is warranted 'when the claim is entirely without

color and has been asserted wantonly, for purposes of harassment or delay, or for other improper

reasons.'"  *Multivideo Labs, Inc. v. Intel Corp.,* No. 99 Civ. 3908 (DLC), 2000 WL 502866, at

*1 (S.D.N.Y. Apr. 27, 2000) (quoting *Hirschfeld v. Board of Ed.,* 984 F.2d 35, 40 (2d Cir.

1992)).

The "mere fact" that a plaintiff does not establish sufficient evidence to prove its Lanham Act claim at trial does not establish bad faith. *Textile Deliveries, Inc. v. Stagno,* No. 90 Civ. 2020 (CMM), 1994 WL 202620, at *1 (S.D.N.Y. May 23, 1994) (no attorney fees awarded to prevailing defendant where plaintiff made a sincere but ultimately fruitless effort to present enough evidence to prove its Lanham Act claim); *Conopco Inc.,* 95 F.3d at 194-95 (attorney fees denied to prevailing defendant, notwithstanding defendant successfully disposed of plaintiff's case on a showing of laches). Rather, bad faith is found where, for instance, the plaintiff fraudulently obtained the trademarks to create a basis for its litigation, *see Orient Express Trading Co. v. Federated Dep't Stores, Inc.,* No. 84 Civ. 5964 (CBM), 1988 WL 3385 (S.D.N.Y. Jan. 8, 1988), or otherwise knew it had no trademark on which it brought suit, *see Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 797 F.2d 70, 75 (2d Cir. 1986).[3]

In short, a case becomes "exceptional" for purposes of awarding a defendant fees only where it is pursued without any reasonable basis and for an improper purpose. *See Silberstein v. Fox Entertainment Group, Inc.,* 536 F. Supp. 2d 440, 445 (S.D.N.Y. 2007) (denying attorney fees even though defendant was able to dispose of plaintiff's Lanham Act claims by a summary judgment motion); *Multivideo Labs, Inc.,* 2000 WL 502866, at*2. Given the high standard necessary for a case to be considered "exceptional," "[d]efendants are rarely awarded attorney's fees under Section 35." *Yeshiva Univ. v. New England Educ. Inst. Inc.,* 631 F. Supp. 146, 149 (S.D.N.Y. 1986) (no award of attorneys' fees to prevailing defendants despite the fact defendants were "subjected to considerable expense to resist overblown and fanciful damage claims"); *Banff Ltd.,* 810 F. Supp. at 80.

---

[3] Meyer's reliance on this case is misplaced since there was no question in the instant proceedings that FLC owned the trademarks on which it brought suit and Meyer never introduced any evidence to the contrary.

**B.    FLC had a Reasonable and Good Faith Basis for Pursuing its Lanham Act Claims**

**1.    FLC's claims regarding the enamel-coated kettles**

FLC's trademark claims against Meyer regarding the enamel-coated kettles are based on an ambiguous definition of "Cookware and Bakeware Products" in the License Agreement. In relevant part, the License Agreement permits Meyer to use the Farberware® mark to market "only those [kettles] made of stainless steel, regular aluminum or anodized aluminum." *See* License Agreement, Schedule I.[4] FLC in interpreting the scope of Meyer's license to sell kettles applied the custom and usage in the cookware industry of classifying cookware products by their exterior finish. Therefore, FLC considered a stainless steel kettle one without any exterior coating of enamel or other paint.[5] *See, e.g., U.S. Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044, 1048 (2d Cir. 1989) (trade usage may be considered to aid in the interpretation of the words of a contract). Accordingly, FLC viewed the color-coated kettles Meyer was marketing under the Farberware® brand, notwithstanding their stainless steel substrate, as outside of the scope of the License Agreement and, therefore, in breach of the License Agreement and in violation of the Lanham Act. *See McCarthy on Trademarks and Unfair Competition* § 25:30 (4th ed.) ("… any sale of goods … under the mark which are outside the area of consent granted in the license are regarded as infringements of the mark.").

Notwithstanding Meyer's claim in its moving papers that this provision of the License Agreement was unambiguous (*See* Meyer's Brief at 6), the Court itself held "the phrase 'made of stainless steel' is subject to more than one interpretation, and is therefore ambiguous." *Farberware Licensing Co. LLC v. Meyer Marketing Co., Ltd.,* 09 Civ. 2570 (HB), 2009 WL

---

[4] A true and accurate copy of the License Agreement is attached as Ex. C to the accompanying Gulmi Decl.
[5] FLC also relied on the fact that the kettle definition in the License Agreement distinguishes between "regular aluminum" and "anodized aluminum" which suggests the terms "stainless steel," "regular aluminum" and "anodized aluminum" describe the exterior finish of the kettle (which is consistent with industry custom and usage) since both categories of kettles are "made of" aluminum, but the anodized aluminum kettle is treated with a chemical to change its exterior finish.

4

2710208, at *2 (S.D.N.Y. Aug. 25, 2009) (hereinafter "*Farberware Licensing Co. I*"). In so

holding, the Court denied Meyer's motion in limine to exclude the expert testimony of Jeffrey E.

Cooley, former president of Calphalon, whose unimpeached testimony at trial was that in the

cookware industry products are classified or categorized by their exterior finish and not their

substrate material. Trial Tr. at 347:24–358:3[6]; *see also* Trial Tr. at 4:6–16 (the Court noted that

Mr. Cooley had sufficient experience in the cookware industry to qualify as an expert).

Moreover, other witnesses with decades of experience in the in the cookware industry also

provided the same testimony: Edward Sandberg, Vice President of EVCO International and

Jeffrey Siegel, CEO of Lifetime Brands. *Id.* at 506:8–17; 513:16–515:19; 556:4–15.

Furthermore, despite Meyer's denial that its stainless steel kettles had an enamel finish, FLC

introduced unimpeached evidence that Meyer itself advertised its color-coated stainless steel

kettles as having "porcelain enamel exteriors." *Id.* at 905:14–906:3; MEYER 000876[7] (a Meyer

sell sheet for Farberware kettles which states, "Add color to the kitchen with *porcelain enamel*

*exteriors* that won't crack or chip") (emphasis added).

### 2. FLC's claims against Meyer for bundling Farberware cookware with Prestige utensils and cutlery are based on both statutory and contract law

The basis for FLC's Lanham Act claims against Meyer for marketing Farberware

cookware sets bundled with Prestige utensils and cutlery was that such bundling both violated

the License Agreement and would lead to consumer confusion and trademark dilution.

#### a.    <u>Bundling Is Not Allowed</u>

As this Court held, the provisions of the License Agreement regarding FLC's approval

rights and Meyer's rights to the use of the Farberware® trademark are unambiguous.

---

[6] True and correct excerpts of the Trial Transcript, from August 17 to August 27, cited to in this brief are attached as Ex. D to the accompanying Gulmi Decl.
[7] A true and accurate copy of MEYER 000876 is attached as Ex. E to the accompanying Gulmi Decl.

*Farberware Licensing Co. I*, 2009 WL 2710208, at *1.  Articles II, III, IV and XII of the License

Agreement establish and define the scope of Meyer's license and FLC's approval rights.

Pursuant to Paragraph 12.1, Meyer "agree[d] that it will not use the Licensed Intellectual

Property in any way other than as herein granted."  The only rights Meyer received under the

License Agreement with regard to the use of Farberware mark were limited to "the sourcing,

manufacture and/or distribution of … Cookware and Bakeware Products" as that term is defined

in the License Agreement.

Meyer conceded that the term "Cookware and Bakeware Products" does not include

cutlery or kitchen utensils and admitted that it does not hold the license to use the Farberware

mark with respect to those products.  *See* Meyer's Counterclaim at ¶ 153.  Because nothing in the

License Agreement permits Meyer to bundle non-Farberware products with Farberware®

products, use of the Farberware® mark in connection with non-Farberware products bundled

with Farberware® products is prohibited.  *See McCarthy on Trademarks and Unfair Competition*

§25:30 ("The fact that the license is silent on a particular type of use of the mark does not mean

that such use is permitted.").

Agreeing with FLC, the Court denied Meyer the declaratory judgment it sought declaring

that the License Agreement permitted it to bundle non-Farberware products with Farberware

cookware sets.  *See* Judgment at 2.[8]

**b.    Consumer Confusion**

Apart from having an independent basis for suit for breach of contract, FLC prior to

commencing any action, commissioned several consumer surveys by Thomas Maronick, DBA,

JD.  These surveys were designed to determine whether there was sufficient evidence of

---

[8] Significantly, Meyer Corporation, US's CEO, Stanley Cheng, testified he was unaware of any provision in the License Agreement permitting Meyer to bundle Prestige products with Farberware brand cookware.  Trial Tr. at 648:13–16.

consumer confusion caused by Meyer's bundling Farberware cookware with Prestige utensils and cutlery.

Among other things, Dr. Maronick tested the impact on consumers of Meyer's website advertisement on www.potsandpans.com, of a Farberware cookware set bundled with Prestige utensils and cutlery and the product packaging of a "Triple Bonus Set" containing Farberware cookware and Prestige cutlery, utensils and bakeware.  Trial Tr. at 384:22–405:10.

These surveys showed very high levels of consumer confusion (40% to 88%), clearly establishing that consumers believed the Prestige products were made by or associated with Farberware.  The results of these surveys are well-above the 15-20% threshold needed to show actual confusion in this Circuit.  *See RJR Foods Inc. v. White Rock Corp.,* 603 F.2d 1058, 1061 (2d Cir. 1979); *Lon Tai Shing Co., Ltd. v. Koch+Lowy,* No. 90 Civ. 4464 (LJF), 1992 WL 18806, at *3 (S.D.N.Y. Jan, 28, 1992) (18% consumer confusion on survey sufficient to show actual confusion).[9]

The fact that FLC commissioned Dr. Maronick to conduct these surveys prior to commencing suit is one of several clear indications that FLC made good faith attempts to determine whether it had any basis to sue Meyer.

Subsequently, FLC commissioned an additional survey by Hal Poret of Guideline regarding Meyer's website advertisement on www.farberwarecookware.com, which offered a set of Farberware cookware bundled with Prestige utensils and which was materially similar to the bundled cookware sets in issue at trial.  The Guideline survey also showed a great majority – 71.6% – of consumers surveyed believed Prestige utensils were either Farberware products or sponsored by Farberware. Trial Tr. at 190:6–190:21.

---

[9] FLC objected to the Court not instructing the Jury that a consumer survey can be considered evidence of actual confusion and provided a proposed instruction on this point.  Trial Tr. at 1035:23–1036:22

Even Meyer's expert, Bobby J. Calder, conceded on cross-examination that consumers would think FLC is the source or sponsor of the Prestige tools in the bundled packaging because as he testified, he thought "the consumer sees Farberware as offering them this product bundle and would assume that Farberware has control over it." Trial Tr. at 503:16–21; see De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc., 440 F. Supp. 2d 249, 274 (S.D.N.Y. 2006) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.").

Although Meyer claims these consumer studies had methodological flaws and therefore were useless as support for FLC's claims, see Meyer Brief at 12, Meyer conveniently fails to note that its motions in limine to exclude the testimony of Dr. Maronick and Mr. Poret were denied. Trial Tr. at 3:11–17. Rather, the Court found Dr. Maronick and Mr. Poret's testimony to be sufficiently reliable to pass muster under Fed. R. Evid. 702 and expressly noted that their testimony would be of "some help to the jury." Id.[10] Furthermore, the survey evidence presented by these expert witnesses also refutes Meyer's assertion that FLC failed to produce any evidence of actual confusion. After all, it is well–settled that actual confusion is very difficult to prove, see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986), and for that reason courts allow "scientific surveys which test the statistical likelihood of consumer confusion to be submitted as evidence of actual confusion." Conopco, Inc. v. Cosmair, Inc. 49 F. Supp. 2d 242, 252 (S.D.N.Y. 1999); Johnson & Johnson v. Actavis Group HF, No. 06 Civ. 8209 (DLC), 2008 WL 228061, at *6 (S.D.N.Y. Jan. 25, 2008). In fact, a consumer survey can be used as an alternative to direct consumer testimonials to show actual

---

[10] Accordingly, Meyer's reliance on Mennen Co. v. Gillette Co., 565 F. Supp. 648 (S.D.N.Y. 1983) is also misplaced because there the court expressly found that plaintiff's consumer survey was severely flawed, which was not the case here. See id. at 652-53. That court also held that plaintiff had no credible evidence to show any likelihood of confusion, which is certainly not what the evidence establishes in the instant case. See id. at 653-54.

confusion. *Johnson & Johnson,* 2008 WL 228061, at *6 ("Customary ways of showing actual confusion include direct consumer testimonials or *consumer surveys*".) (emphasis added).

In addition to the foregoing, FLC reasonably believed it had evidence to establish other factors underlying consumer confusion. For instance, there was: 1) "bridging the gap" in that Meyer was marketing utensils and cutlery bundled in Farberware cookware sets when FLC had licensed another entity, Lifetime Brands Corp., to market Farberware branded utensils and cutlery, *see Heisman Trophy Trust v. Smack Apparel Co.,* 595 F. Supp. 2d 320, 327 (S.D.N.Y. 2009) (no need for plaintiff to make a showing of whether it will bridge the gap where it already granted a license to another party regarding the same goods); and 2) "proximity of the products" in that because Meyer was bundling the Farberware cookware with its Prestige utensils and cutlery in packaging that was prominently labeled as "Farberware," the consumer would logically suppose that all of these products had a common origin, *see Helen Curtis Indus., Inc. v. Suave Shoe Corp.,* 13 U.S.P.Q.2d 1618, 1624 (T.T.A.B. 1989).

### c. Dilution

FLC also had a good faith basis to bring a trademark dilution claim against Meyer. To prevail on its dilution claim, FLC had to demonstrate: 1) its mark is famous; 2) Meyer is making use of the mark in commerce; 3) Meyer's use began after the mark become famous; and 4) Meyer's use is likely to cause dilution by blurring[11]. *See* 15 U.S.C. §1125(c). The Court charged the jury that there was no dispute the first three elements had been met. As for the fourth element, there is a presumption that "where a plaintiff who owns a famous senior mark can show the commercial use of an identical junior mark, such a showing constitutes circumstantial evidence of the actual-dilution element of a[] F[ederal] T[rademark] D[ilution] A[ct] claim." *Savin Corp. v. The Savin Group*, 391 F.3d 439, 452 (2d Cir. 2004). In other words, where defendants use an identical mark, *actual dilution is*

---

[11] FLC did not allege dilution by tarnishment.

9

*presumed. Id.; Audi AG v. Shokan Coachworks, Inc.,* 592 F. Supp. 2d 246, 281 (N.D.N.Y. 2008). This is a legal theory which FLC articulated in its memorandum of law in support of its motion for a preliminary injunction.

In this suit, FLC reasonably contended that Meyer was improperly using the actual Farberware mark by: 1) bundling Prestige branded products in packaging of Farberware cookware that is prominently labeled with the Farberware mark in violation of the License Agreement and 2) using the Farberware mark to identify enamel kettles, which as discussed above, FLC believed were outside the scope of the License Agreement. Accordingly, FLC had a reasonable basis to conclude that Meyer's improper use of the Farberware mark was diluting the Farberware mark's ability to identify actual Farberware-licensed utensils and cutlery and properly licensed Farberware enamel kettles.

**3.    FLC never approved Meyer's practice of bundling Prestige products with Farberware products**

**a.    FLC never alleged Meyer did not send the Affiniti cookware set bundled with Prestige brand tools to FLC**

Meyer misrepresents the allegations in FLC's Complaint when it states that FLC "makes the unconditional assertion that because Meyer had never submitted any bundled cookware sets which included Prestige tools for review and approval, Meyer was guilty of trademark infringement and creating consumer confusion." Meyer Brief at 10. Meyer's counsel repeats this accusation throughout the brief in support of this motion when he states "FLC's claims were based largely on its claims that Meyer's Prestige utensil Products were never submitted for approval" and that FLC' should have withdrawn its allegation "once the falsity of the claim was admitted." *See id.* at 11. *FLC, however, never alleged that Meyer did not send the subject Affiniti sets to FLC and no such claim is contained anywhere in FLC's Complaint.*

Meyer cites two paragraphs in FLC's 510–paragraph Complaint in support of its misstatement of FLC's claims: paragraphs 95 and 472.[12]  Paragraph 95 addresses the "Triple Bonus" promotion Meyer ran in the Fall of 2007. In that instance, Meyer included Prestige knives, kitchen utensils and cookie sheets in Farberware Classic and Accent cookware sets and referred to them as "Triple Bonus" sets.  *See* Complaint at ¶¶ 82–96. Paragraph 95 states:

> Meyer never provided FLC with written notice of its intention to market Prestige knives, kitchen utensils or cookie sheets with Farberware Accent or Classic Cookware as required by Article IV of the License Agreement.

Meyer admitted the allegations in Paragraph 95 at trial when David Tavacol, Meyer Corporation US's Director of Retail Marketing and Creative Services, testified on cross-examination that Meyer neither provided written notice to FLC of the "Triple Bonus" set as FLC alleged in Paragraph 95 nor sent a sample of the "Triple Bonus" set to FLC for approval.  Trial Tr. at 794:16–795:1.  The set Meyer sent to FLC sometime in the Fall of 2007 was an "Affiniti" set – not the "Classic" or "Accent" "Triple Bonus" sets described in Paragraph 95.  Furthermore, the Affiniti set was made up of different pieces of cookware and Prestige products than the "Triple Bonus" set.[13]  The allegations in Paragraph 95 do not concern Meyer's sending the Affiniti sets to FLC.

Similarly, Paragraph 472 of FLC's Complaint does not allege that Meyer "never submitted any bundled cookware sets" to FLC for approval as Meyer now claims.  Instead, Paragraph 472 states in relevant part:

> Meyer has willfully and materially breached the terms of Articles 4.2 and/or 4.3 of the License Agreement though its failure to seek either Prior Approval or Post Production Review for, among others, the following Products using the Farberware name and trademark:
>
>                   .        .        .        .        .        .        .

---

[12] A true and accurate copy of FLC's Complaint is attached as Ex. F to the accompanying Gulmi Decl.

[13] The Affiniti sets at issue contain two Prestige tools, a slotted spoon and a turner. The "Triple Bonus" set contains a set of six Prestige tools, a Prestige Santoku knife and a Prestige cookie sheet, as well as different cookware from the Affiniti set.

iii.) **Various** cookware sets bearing the FARBERWARE name and mark which include Prestige or other non-Farberware products such as bakeware, cutlery and/or Kitchen utensils, including, but not limited to those sets addressed herein. (emphasis added).

Paragraph 472 alleges that Meyer breached the terms of the License Agreement through its failure to comply with the terms of Paragraphs 4.2 and 4.3 with regard to *various* cookware sets – not simply the "Affiniti" sets. Furthermore, Paragraph 472 is contained in FLC's cause of action for breach of contract – not trademark infringement and consumer confusion as Meyer now ignores.[14] As set forth below, the evidence presented at trial proves that Meyer failed to comply with the notice and approval provisions of Article 4 of the License Agreement with regard to the subject bundled Affiniti sets, as well as numerous other bundled sets.

Meyer mischaracterizes the trial testimony of Dan Foley, FLC's Vice President, regarding the Affiniti set as an admission that FLC received "timely written notice" from Meyer regarding the bundling of Prestige items with Farberware Cookware sets. However, Meyer acknowledged it sent the bundled Affiniti sets in October of 2007 pursuant Paragraph 4.3 of the License Agreement for "Post Production Review". Trial Tr. at 798:11–15. Paragraph 4.3 of the License Agreement requires that Meyer provide written notice of its intention to introduce new products "prior to or contemporaneously" with the first commercial sale of the product. But Exhibit P–116[15], which states the date of the first commercial sale of the various bundled cookware sets at issue in the litigation, reflects that the first commercial sale of the Affiniti sets at issue began in late August and early September of 2007.[16] Under cross–examination, Mr. Tavacol testified Meyer never submitted *any* written notice to FLC of its intention to bundle Prestige items with Farberware cookware prior to sending FLC the Affiniti package in October

---

[14] As the Court is aware, FLC succeeded on its cause of action for breach of contract which includes this allegation, although the jury did not find the breach material.

[15] A true and accurate copy of FLC's trial exhibit P–116 is attached as Ex. G to the accompanying Gulmi Decl.

[16] Barry Meinhart, Meyer Corp. US's Vice President of Sales Administration and Special Projects, confirmed that Exhibit P–116 reflects the first commercial sale of the 29 cookware sets at issue. Trial Tr. at 889:13–17.

of 2007.  Trial Tr. at 797:9–17 and 804:16–20.  This is a clear and unambiguous admission that Meyer did not provide FLC with the timely written notice required by Paragraph 4.3 of the License Agreement for the Affiniti sets.

In addition to Mr. Tavacol's testimony, the emails between Meyer and FLC that pre-dated Meyer sending the Affiniti sets to FLC (the sole documents which Meyer now tries to characterize as "timely written notice") clearly demonstrate that Meyer did not notify FLC of the inclusion of Prestige brand products with Farberware cookware. *See* Exhibit P–41[17]; Trial Tr. at 269:1–269:9[18]

Exhibit P–116 further establishes that by the time Meyer sent the Affiniti sets to FLC, it was already selling seven (7) other bundled sets. [19]  Although Article IV of the License Agreement requires that Meyer seek approval for each of these sets, Mr. Tavacol admitted on cross examination that Meyer never sought any form of approval from FLC under the License Agreement for any of the seven sets already on sale by the time it sent FLC the Affiniti sets.[20] *See* Trial Tr. at 797:3–17 and Exhibit P–116. This evidence establishes that by the time Meyer allegedly sent the Affiniti Cookware sets in October of 2007, it had wholly abandoned the notice and approval procedures required of it by Article 4 of the License Agreement and was producing and selling these bundled cookware sets all without any notice to or approval from FLC.

Furthermore, Meyer's breach of Article 4 continued in that by October 2008, when FLC first became aware of and objected to the inclusion of Prestige items bundled with Farberware cookware, Meyer was marketing ten (10) different sets of Farberware cookware bundled with

---

[17] A true and accurate copy of FLC's trial exhibit P–41 is attached as Ex. H to the accompanying Gulmi Decl.

[18] Furthermore, email does not qualify as proper notice under the terms of Article 16.3 of the License Agreement which requires notice by personal delivery, courier or registered or certified mail.

[19] Specifically, bundled sets bearing SKU Nos. 14177, 17852, 71783, 14157, 14162, 21009 and 71849 all have first commercial sale dates prior to October 3, 2007 when the Affiniti sets were allegedly sent. Barry Meinhart testified at trial that the November 2006 first commercial sale date for SKU No. 12307 was a typo and it should read March of 2009. Trial Tr. at 890:1–14.

[20] Meyer also never sought any form of approval for the packaging of the aforementioned sets under Paragraph 4.6.1 or 4.6.2 as required by the License Agreement and presented no evidence otherwise.

Prestige items in addition to the two Affiniti sets it sent to FLC. As David Tavacol admitted on

cross examination, Meyer neither submitted prototype samples of any of these ten sets to FLC as

required under Paragraph 4.2 nor provided FLC with written notice of its intention to market sets

including Prestige items "prior to or contemporaneously" with the sets' first commercial sale as

required by Paragraph 4.3.[21] Trial Tr. at 803:18–804:20.  These admissions and other evidence

establish that the allegations in Paragraph 472 of FLC's Complaint are true and correct and

Meyer has no basis to contend that these allegations are inaccurate or that FLC should have

withdrawn them from its complaint.

### b.  Paragraph 4.3 of the License Agreement requires written approval

The fact that Meyer sent two Affiniti sets to FLC pursuant to Paragraph 4.3 did not

require FLC to withdraw its claims for trademark infringement since it is undisputed that FLC

never approved the submitted Affiniti sets in writing or otherwise.  In fact, David Tavacol

admitted that by October of 2008, Meyer sold tens of thousands of various bundled cookware

sets *without ever receiving FLC's approval on a single one*.  Trial Tr. at 800:21–25. This

testimony specifically includes the Affiniti sets at issue as they were among the "tens of

thousands" of bundled sets sold by October of 2008. *See* Exhibit P–116.  Clearly aware of Mr.

Tavacol's testimony, it is not surprising that Meyer does not even attempt to claim the Affiniti

sets were approved by FLC in its brief, merely that they were sent to FLC – a fact FLC never

denied.

Mr. Tavacol testified the Affiniti Cookware sets were submitted to FLC for approval

under Paragraph 4.3 of the License Agreement for "Post Production Review." *Id.* at 798:11–15.

There is no time frame for FLC to respond to a submission made under Paragraph 4.3.

---

[21] Meyer similarly failed to seek approval of the packaging for each of these sets as required by Articles 4.6.1 or 4.6.2. Furthermore, Meyer's claim that it displayed these Prestige sets at the 2008 Housewares Show does not comply with Article 4.

Accordingly, FLC's failure to respond to Meyer about the bundled Affiniti sets, does not result in an approval of those sets under the terms of Paragraph 4.3. Quite the contrary, Paragraph 4.3 provides that, *absent approval in writing*, if FLC determines at some point after submission that the product does not comply with applicable laws, FLC can demand that Meyer withdraw the product from the market immediately.[22] As such, the onus is on Meyer to obtain written approval from FLC for any submission under Paragraph 4.3 or bear the risk that FLC may require the product be withdrawn at some future date. Meyer never received written approval or any form of response from FLC to its submission of the bundled Affiniti set in the Fall of 2007. Trial Tr. at 785:14–786:3. Instead, Mr. Tavacol testified that because Meyer did not hear back from FLC regarding the bundled Affiniti sets, Meyer assumed the sets were approved based only on FLC's silence. Trial Tr. at 802:5–20. Mr. Tavacol admitted Meyer did not follow up and see if the package was received or whether FLC's written approval was forthcoming. Trial Tr. at 799:8–800:7. In light of the unambiguous terms of Paragraph 4.3, Meyer had no basis to assume FLC's silence amounted to an approval and thus, FLC had every right to commence suit.

Finally, even though FLC only became aware that Meyer sent bundled Affiniti sets in the late Fall of 2008, it still had a good faith basis to bring this suit. As set forth above, under Paragraph 4.3 there is no time limit by which FLC must approve or reject the product at issue. Moreover, even if FLC failed to raise a timely objection to the Affiniti sets sent to it in the Fall of 2007, under Paragraph 16.2 of the License Agreement, such a failure does not amount to a waiver of FLC's right to object to any of the other unapproved bundled cookware sets Meyer was selling. Paragraph 16.2 of the License Agreement provides that absent a written waiver, any

---

[22] Paragraph 4.3 specifically provides that "If Licensor thereafter determines in Licensor's reasonable discretion (which shall not be arbitrarily or capriciously exercised) that any Cookware or Bakeware Product not previously approved in writing (except as otherwise provided in the penultimate sentence of 4.2) does not comply with applicable laws and regulations or meet the quality standards required by Section 4.1, Licensor shall have the right (which shall be exercised reasonably and, if challenged by the Licensee, shall be subject to the dispute resolution procedures set forth in Article XV) by written notice to Licensee to order that such product be withdrawn from the market immediately."

failure by the Licensor to comply with any condition or obligation of the License Agreement shall not operate as a waiver of or estoppel with respect to any subsequent or other failure by the Licensee. Therefore, because there is no written waiver, FLC had a sound basis under the express wording of the License Agreement to object to the other bundled cookware sets Meyer was marketing without approval and to commence suit.[23]

### 4.    FLC did not attempt to conceal that Meyer sent bundled Affiniti Sets to FLC

Meyer misrepresents both Mr. Foley's testimony and the events in this litigation, in a rather transparent attempt to claim that FLC somehow "concealed" "until the time of trial" the fact that sometime in the Fall of 2007 Meyer sent it Affiniti cookware sets bundled with Prestige tools.  As addressed in Section II.B.3.a., *supra,* FLC never denied Meyer sent it bundled Affiniti sets in its complaint.  Quite the contrary, Mr. Foley provided candid testimony regarding the bundled Affiniti sets Meyer submitted to FLC at his deposition on July 23, 2009.[24]  Mr. Foley volunteered this information even though it was not responsive to the question asked.  *See* July 23, 2009 Dan Foley 30(b)(6) Depo. Tr. at 382:24–386:17.[25]  Mr. Foley's testimony on this issue plainly demonstrates that Meyer's claim that FLC concealed this information until forced to admit it "at trial" is completely unfounded.

Meyer's misrepresentation to the Court on this issue is clearly intentional as Dean Dickie, Meyer's counsel and signatory on the brief and affidavit in support of the present motion, was the attorney questioning Mr. Foley at his deposition when he provided the testimony regarding the Affiniti set.  Thus, Counsel was well aware of Mr. Foley's actual testimony when he made this motion.

---

[23] After October of 2008 when FLC first objected to the bundled sets, Meyer continued to submit bundled sets for approval. FLC never approved any of these sets as they were outside the scope of the License Agreement. Trial Tr. at 77:1–4 and 81:5–12.

[24] Discovery in this case only started in late May of 2009 and concluded the week before trial in early August of 2009.

[25] True and correct excerpts of the July 23, 2009 30(b)(6) deposition transcript of Dan Foley are attached as Ex. I to the accompanying Gulmi Decl.

Furthermore, although Meyer was aware that it sent Affiniti sets to FLC sometime in the Fall of 2007, Mr. Dickie never asked any of FLC's witnesses that were deposed about these sets during the 6 hours he spent deposing Mr. Foley on June 5, 2009, or during the approximately 11 hours he spent deposing Jan Ratushny, FLC's President, on June 10, 2009 and June 11, 2009, or during the approximately 9 hours he spent deposing Peter Cameron on June 9, 2009.

Meyer also failed to serve any Interrogatories, Requests for Admissions or Document Requests during discovery that addressed Meyer sending the bundled Affiniti sets to FLC in the Fall of 2007. Any delay in obtaining testimony or other information on this issue was due solely to a lack of inquiry by Meyer, not the withholding or concealment of information by FLC.

Meyer also mischaracterizes Dan Foley's trial testimony regarding FLC's receipt of the Affiniti set. Mr. Foley did not "reluctantly admit" [Meyer's words] that Meyer previously sent a bundled set of Affiniti cookware to FLC in 2007 at trial under cross-examination – there was no *Perry Mason* moment. To the contrary, both Mr. Foley and Mr. Ratushny testified on direct examination about the set sent by Meyer and the circumstances leading up to Meyer sending that set. Trial Tr. at 82:2–84:7 and 267:16–268:1. Both witnesses also testified the set was never reviewed because it was misplaced until the late Fall of 2008. *Id*. Mr. Foley also testified during his deposition on July 23, 2009, that during the Fall of 2007 when the sets were allegedly sent to FLC, the office building housing FLC offices was under construction and FLC moved its offices three times within the building during the construction process. *See* Foley Deposition Tr. at 382:24–386:17. Although FLC does not know exactly when the box was received by it (and Meyer could not provide any proof at trial on this point), it appears the box was simply misplaced during the construction process when FLC moved its offices.

Finally, the Court should note that despite alleging that there were "months of official denials by FLC" (Meyer Brief at 10), Meyer does not cite to any evidence in support of this

allegation.  This is because no such "official denials" exist. As shown above, Meyer's allegations
of concealment are fabrications made in a transparent effort to obtain an unwarranted award of
fees and costs.

### 5. The Jury's finding for Meyer on common law unfair competition does not establish that FLC pursued its Lanham Act claims in bad faith

The Jury's finding for Meyer on common law unfair competition does not otherwise
establish that FLC brought the instant suit in bad faith.  Meyer is disingenuously using the
bad faith the Jury found because it was an element of the common law unfair competition
charge, out of context, to argue that FLC lacked any good faith basis for its Lanham Act
claims.  That is improper because the Jury was not asked to consider "bad faith" for
purposes of determining whether FLC had any basis to bring its trademark claims. As the
discussion above shows, FLC had a reasonable basis both in law and fact for bringing its
Lanham Act claims against Meyer.  The fact that FLC did not ultimately prevail at trial on
all of its claims is not sufficient to hold it liable for Meyer's attorneys' fees under Section
35(a)[26].  *See Textile Deliveries, Inc.,* 1994 WL 202620, at *1 (no attorney fees awarded to
prevailing defendant where plaintiff made a sincere but ultimately fruitless effort to present
enough evidence to prove its Lanham Act claim).

Furthermore, the Jury rejected Meyer's affirmative defense of unclean hands, which
specifically asked the Jury to find whether FLC "used the legal process for the improper
purpose of thwarting competition."  *See* Jury Charge at 59[27]; Trial Tr. at 1221:22–1222:8;
Judgment at 2.  The Jury also rejected Meyer's claim that FLC breached the covenant of
good faith and fair dealing by unreasonably withholding approval for packaging and
promotional materials.  *See* Jury Charge at 59; Trial Tr. at 1223:23–1224:5; Judgment at

---

[26] FLC prevailed on its breach of contract claim.
[27] A true and accurate copy of the Jury Charge is attached as Ex. J to the accompanying Gulmi Decl.

2.  The Jury's findings with respect to both these claims are highly relevant to the issue of whether FLC proceeded with its Lanham Act claims in bad faith.

**C.      Meyer Chose Not to Proceed with the Alternative Dispute Resolution Process**

Meyer cannot legitimately argue that it was FLC that abandoned the alternative dispute resolution process and should bear the entire costs of litigation before this Court because Meyer had the opportunity to avail itself of the alternative dispute resolution process and chose not to. When Meyer was served with process in this action, it could have immediately moved to compel arbitration under 9 U.S.C. § 3.  Meyer did not do so because it wanted to litigate.  Even before FLC filed this suit on March 19, 2009, Meyer (in breach of Paragraph 12.2 of the License Agreement) already commenced suit in the Eastern District of California, seeking the same declaratory judgment with respect to the kettles from the California court that it ultimately litigated before this Court.[28] *See* Meyer's Seventh Counterclaim.

Meyer's intention to litigate in court rather than mediate or arbitrate became clear when, instead of filing a motion under 9 U.S.C. § 3 in response to FLC's suit, it filed a motion to transfer the instant case to the Eastern District of California pursuant to 28 U.S.C. § 1404, which this Court denied.  *See Farberware Licensing Co. LLC v. Meyer Marketing Co., Ltd,* 09 Civ. 2570 (HB), 2009 WL 1357956 (S.D.N.Y. May 14, 2009); *see also* Gulmi Decl. at ¶¶ 3–4.

Moreover, at the preliminary conference before this Court on May 6, 2009, Meyer's counsel represented that Meyer would be able to conduct all discovery and be ready for trial in 120 days.  *See* Gulmi Decl. at ¶ 5.  Thus, Meyer was not concerned about avoiding the extra

---

[28] Meyer breached Paragraph 12.2 by not seeking or obtaining the required written approval from FLC before instituting its lawsuit against Alfay and Evco in California.

expense associated with taking depositions or engaging in other forms of discovery not permitted in arbitration proceedings, it just wanted to do so in its home forum.[29]

Furthermore, if Meyer and FLC had proceeded to arbitration, the License Agreement provided that arbitration was to occur in New York City. *See* License Agreement at ¶ 15.3. Therefore, Meyer would have incurred the same travel and lodging costs for counsel and witnesses notwithstanding whether the matter was heard before this Court or an arbitrator.[30]

Finally, and most importantly, the Court should consider that FLC made a good faith effort to proceed with alternative dispute resolution but that Meyer thwarted that procedure. First, on three occasions (November and December 2008, January 2009), FLC requested to initiate the dispute resolution procedure under the License Agreement with respect to Meyer's practice of bundling Prestige products in Farberware cookware packaging. Meyer ignored FLC's requests. Trial Tr. 266:7–267:11; *see also* Exhibits P–98, P–101, P–102[31]. Second, with respect to the infringement action regarding the kettle, FLC sought for months to proceed with mediation, but Meyer engaged in dilatory tactics that made proceeding with mediation impossible. Trial Tr. at 627:2–627:11. Left with no other meaningful choice, FLC commenced this action.

## D.    Meyer Never Established Any Evidence that FLC's Suit was a Ploy for Extra-Contractual Concessions

Meyer makes the spurious claim that the present suit was somehow part of a larger strategy on the part of FLC to attack its 200 year licenses with both Meyer and Lifetime Brands ("LTB") and that these efforts were undertaken in both cases in order to obtain "extra-contractual

---

[29] Moreover, under the American Arbitration Association's Procedures for Large, Complex Commercial Disputes, the arbitrators in this case would have likely ordered that additional methods of discovery could be used, including depositions.

[30] Meyer's costs with regard to travel by its counsel would not have changed if it were successful on its motion to transfer the matter to California. Meyer's legal team was based in Chicago and, therefore, counsel still would have needed to travel to California and pay for accommodations there.

[31] True and accurate copies of FLC's trial exhibits P–99, P–101, and P–102 are attached as Ex. K to the accompanying Gulmi Decl.

concessions" to which FLC was not entitled.  To support this claim, Meyer makes a number of

glaring misrepresentations regarding a litigation that occurred between LTB and FLC before this

Court in 2005.[32] (hereinafter the "LTB litigation")  First, despite Meyer's contention to the

contrary, the license that was the subject of the LTB litigation was not the 200 year license that

LTB holds with FLC.  The LTB litigation addressed a different license between FLC and LTB,

one for the use of the Farberware mark in connection with dinnerware and flatware.  That license

had expired, but LTB continued to use the Farberware name on the licensed products without

paying royalties to FLC, despite FLC's demands that LTB discontinue such use.

After granting FLC's motion for a preliminary injunction to enjoin LTB from continuing

to sell flatware and dinnerware under the Farberware mark, this Court mediated a settlement by

which the parties agreed to renew the license under terms reflected in the Court's order.  *See*

August 5, 2005 Post–Mediation Order of Discontinuance.[33]  Second, contrary to Meyer's

allegations, there was no threat of the "overall forfeiture of the LTB license" made in the LTB

litigation.  *See* LTB litigation Complaint.[34]  The $ 2.4 million LTB paid FLC was to renew and

extend the expired Flatware and Dinnerware License.  As such, the resolution was hardly an

"extra-contractual concession."

Meyer further wildly misrepresents the facts when it claims that FLC's complaint against

Meyer was "largely a copied and pasted product from a virtually identical complaint in the LTB

litigation."  In fact, only twenty nine (29) paragraphs contained in the complaint filed against

LTB are arguably repeated in FLC's 510–paragraph complaint against Meyer in this case.  *In*

*other words, there were 481 paragraphs of allegations in the Complaint against Meyer that did*

*not appear in the complaint against LTB.*  To the extent any paragraphs are repeated in both

---

[32] *Farberware Licensing Co. LLC v. Lifetime Hoan Corp. n/k/a Lifetime Brands Corp.*, Case No. 05 CV 6315 (HB).
[33] A true and accurate copy is attached as Ex. L to the accompanying Gulmi Decl.
[34] A true and accurate copy of the LTB litigation Complaint is attached as Exhibit M to the accompanying Gulmi Decl.

complaints, it was because they either set forth history of FLC and the Farberware mark or addressed the elements of various causes of action in common in both complaints.

Lastly, LTB's CEO, Jeffrey Siegel, testified on behalf of FLC at trial and specifically refuted Meyer's claim that the litigation between LTB and FLC was an attempt to "claw back" any rights under the agreements between the LTB and FLC or that LTB had ever been the subject of any coercive action by FLC.  *See* Trial Tr. at 558:12–559:25.  Here again, Meyer's inaccurate representations to this Court are just further evidence of the meretricious nature of the instant motion.

**E.    FLC's Request for Termination of the License Agreement was
       Proper under New York Law**

Under New York law, a licensee who breaches a license agreement by using the trademark outside the scope of the license agreement commits a material breach sufficient for the licensor to terminate the license agreement, "even if the license is irrevocable."  *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.,* 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) (decided under New York law); *see also Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F. Supp. 947, 958-59 (S.D.N.Y. 1980).  As set forth above, FLC had a reasonable basis to seek termination of the License Agreement given that it believed in good faith Meyer was materially breaching the License Agreement by marketing enamel kettles, bundling non-Farberware products with Farberware cookware sets in contravention of the License Agreement, failing to follow the notice and approval procedures set forth in the Article IV of the License Agreement, and refusing to comply with the dispute resolution procedures set forth in Article XV.

**F.    Meyer Failed to Provide the Required Documentary Support and,
       Therefore, the Instant Motion Should be Denied**

"A party must submit to the court contemporaneous time records as a prerequisite for recovering attorneys' fees, specifying 'for each attorney, the date, the hours expended, and the

nature of the work done.'" *Tri-Star Pictures, Inc. v. Unger,* 42 F. Supp. 2d 296, 302 (S.D.N.Y.

1999) (quoting *New York State Assn' for Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d

Cir. 1983)).  Despite citing this case in its brief, Meyer failed to provide the required

documentation.  This documentation is necessary because it is the fee applicant's burden to

establish that both the amount of time billed and the hourly rate charged are reasonable.  *See*

*Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983).

In the instant application, it is clear that Meyer's counsel believe it is the responsibility of

the Court to do their work for them and sift through presumably hundreds of pages of time

entries to separate out which fees are actually recoverable and which are not.  That is wrong; the

burden is theirs alone.  *See id.*  The case law makes clear what is "'reasonable' for purposes of a

fee award to be paid by the losing party to the prevailing party in a litigation is not the same as

the reasonableness of a bill that law firm might present to its own paying client." *Daiwa Special*

*Asset Corp. v. Desnick,* No. 00 Civ. 3856 (SHS), 2002 WL 31767817, at *2 (S.D.N.Y. Dec. 3,

2002).  Thus, without copies of the time records, there is no way for the Court to determine how

much of the claimed fee is fair and to what extent it should be reduced.  Having failed to meet

this most basic pre-requisite, the Court should deny Meyer's motion for attorneys' fees.

## III.   MEYER'S REQUEST FOR COSTS SHOULD BE DENIED OR, AT A MINIMUM, DRASTICALLY REDUCED

### A.   Meyer's Request for Costs Should be Denied for Failure to Comply with Local Civil Rule 54.1

Local Civil Rule 54.1 states that the party seeking costs "shall file with the clerk a request

to tax costs annexing a bill of costs and indicating the date and time of taxation."  That rule

further requires that "[b]ills for the costs claimed shall be attached as exhibits."  Where an

applicant fails to comport with the requirements of Local Civil Rule 54.1, the party's request for

costs will be denied.  *See Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.,* 589 F. Supp. 2d 331, 340 (S.D.N.Y. 2008) (no costs awarded where no bill of costs was presented).

**B.     Meyer Cannot Recover Costs under § 1117**

Section 1117(a) provides that where there has been a violation of any right of the registrant of a mark registered in the Patent Office or a violation of 43(a) established, a prevailing plaintiff is entitled to the costs of the action.  By its very wording, §1117 does not provide Meyer any authority to seek costs, because it was neither the registrant of the Farberware mark nor did it establish a violation of section 43(a).

**C.     Alternatively, Meyer's Requested Costs Should be Reduced to Only Those Allowable by § 1920 and Applicable Rules**

"The Supreme Court has interpreted the word 'costs' in Rule 54(d)(1) to mean only those categories of costs enumerated in 28 U.S.C. §1920."  *Carmody v. City of New York,* 05 Civ. 8084 (HB), 2008 WL 3925196, at *1 (S.D.N.Y. Aug. 26, 2008).   These categories are: 1) fees of the clerk and marshal; 2) fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; 3) fees and disbursements for printing and witnesses; 4) fees for exemplification and copies of papers necessarily obtained for use in the case; 5) docket fees pursuant to 28 U.S.C. §1923; and 6) compensation of court-appointed experts, interpreters, and salaries, fees, expenses and costs of special interpretation services pursuant to 28 U.S.C. §1828.  *Id;* 28 U.S.C. §1920.   "[F]ederal courts have no authority to award costs in excess of statutory limits."  *Carmody,* 2008 WL 3925196, at *1.  Local Civil Rule 54.1 further limits the costs that may be recovered.

Based on §1920, Rule 54(d) and Local Civil Rule 54.1, even if the Court were to allow recovery of costs, Meyer would *not* be able to recover:

- $78,311.37 for Holland & Knight (local counsel cost) as this is nothing more than a request for attorneys' fees and related costs.  *See Local Civil Rule 54.1(c)(7).*

- $85,537.09 travel and lodging for Meyer's attorneys as this is also nothing more than a request for attorneys' fees and related costs. *See id.*

- $91,176.54 for retained experts. *See Local Civil Rule 54.1(c)(3).*

- $26,439.50 for DecisionQuest (trial consulting firm).

- $27,279 for an IT specialist at trial. *See Local Civil Rule 54.1(c)(6).*

- $3,840 for trial equipment rental. *See id.*

- $13,000 for a court reporter as only costs for transcripts necessarily obtained for use in court are taxable. *See Local Civil Rule 54.1(c)(1).*

While costs for deposition transcripts used at trial, witness fees[35], mileage and subsistence, docket fees, copying of exhibits where the original was not available, and docket fees are taxable, Meyer's failure to produce any bills to support any of these expenses prevents the Court from determining whether the amounts sought are appropriate. Accordingly, if the Court is not inclined to deny Meyer costs, then it should at a minimum require Meyer to produce bills for these expenses so the propriety of such expenses can be determined.

## **CONCLUSION**

For the foregoing reasons, FLC prays that the Court will deny Meyer's motion for attorneys' fees and costs and provide such other and further relief as the Court deems just.

Dated: New York, New York
      November 10, 2009

                                  _____/s/ Joseph E. Gulmi_____
                                    Joseph E. Gulmi (JG–5738)
                                    Victor C. Bushell (VB–3930)
                                    Cem Ozer (CO–1718)
                                    Christopher J. Sovak (CS-3164)
                                        BUSHELL, SOVAK, OZER & GULMI LLP
                                    60 East 42nd Street, Suite 2925
                                    New York, New York 10165
                                    *Attorneys for Plaintiff Farberware Licensing Co. LLC*

---

[35] Although Dean Krause, Esq., Meyer Corp. US's vice president and general counsel, testified at trial, he should be considered a party and, therefore, no witness fee, mileage, and subsistence should be allowed for him. *See Local Civil Rule 54.1(c)(3).*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

FARBERWARE LICENSING COMPANY, LLC,    :
                                      :
                        Plaintiff,    :    09-CV-2570 (HB)
                                      :
               – against –            :    **ECF CASE**
                                      :
MEYER MARKETING CO., LTD., MEYER      :
INTELLECTUAL PROPERTIES, LTD., and    :
MEYER CORPORATION, US,                :
                                      :
                        Defendants.   :
                                      :
------------------------------------------------------------- x

## <u>CERTIFICATE OF SERVICE</u>

I, Cem Ozer, certify that the following documents:

- Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Costs and Attorneys' Fees, and

- Declaration of Joseph E. Gulmi in Opposition to Defendants' Motion for Costs and Attorneys' Fees, with Exhibits,

were served upon Counsel for Defendants Meyer Intellectual Properties, Ltd. and Meyer

Corporation, US via the ECF Filing System for the United States District Court for the

Southern District of New York on November 10, 2009.

Dated: New York, New York
       November 10, 2009

                    _____/s/ Cem Ozer_____
                         Cem Ozer (CO 1718)